## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 25-474

DENVER PUBLIC SCHOOLS

      Plaintiff,

v.

KRISTI NOEM, Secretary of the United States
Department of Homeland Security; and DEPARTMENT
OF HOMELAND SECURITY, in their official
capacities,

      Defendants.

---

### PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

---

Plaintiff Denver Public Schools ("DPS" or "Plaintiff"), by and through their counsel Davis Graham & Stubbs LLP, submits this Emergency Motion for Temporary Restraining Order and Motion for Preliminary Injunction.

### <u>INTRODUCTION</u>

On January 20, 2025, then-Acting Secretary of the Department of Homeland Security ("DHS"), Benjamine Huffman ("Huffman"), purportedly issued a directive rescinding a 2021 memorandum by former Secretary Alejandro Mayorkas ("2021 Memo"), which identified specific areas that are "protected" or "sensitive" areas where, as a general matter, the government could not engage in immigration enforcement activities. Schools were included in the list of protected places. Memorandum from Alejandro N. Mayorkas, Secretary, Department of Homeland Security, *Guidelines for Enforcement Actions in or Near Protected Areas*, at 2 (Oct. 27, 2021) ("2021 Memo"),

attached as Exhibit 1 to Compl.) The 2021 Memo, however, was just the latest articulation of 30 years of DHS policy that barred immigration enforcement activities at or near schools except in very limited circumstances (the "Protected Areas Policy").

DHS has not published this "directive." Instead, the announcement that the Protected Areas Policy was being rescinded came in a short press release containing a statement from a "DHS Spokesperson" explaining that DHS was rescinding the Protected Areas Policy so that "[c]riminals will no longer be able to hide in America's schools and churches to avoid arrest" and going forward, law enforcement will be guided by their own "common sense" ("January 21 Press Release"). (*See* Press Release, Department of Homeland Security, Statement from a DHS Spokesperson on Directive Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole (Jan. 21, 2025), attached as Exhibit 3 to Compl.) [1]

Although not linked, attached, or otherwise provided in the January 21 Press Release, it appears that DHS and its component agency, Immigration and Customs Enforcement ("ICE"), have issued two short memos relating to rescindment of the Protected Areas Policy, neither of which have been published or otherwise released to the public at large.[2] Specifically, on January 20, 2025, Huffman issued a memo entitled Enforcement Actions in or Near Protected Areas ("Huffman Memo"). (*See* Memorandum

---

[1] *See also* https://www.foxnews.com/politics/trump-dhs-repeals-key-mayorkas-memo-limiting-ice-agents-orders-review-parole-use.

[2] DPS obtained copies of the DHS memo and the ICE memo discussed above only by virtue of reviewing the docket in a lawsuit captioned *Philadelphia Yearly Meeting of the Religious Society of Friends et al. v. United States Department of Homeland Security et al.*, No. 8:25-cv-00243, pending in the United States District Court for the District of Maryland ("Maryland Lawsuit"), where the plaintiffs attached the memo from DHS to their amended complaint and the defendants attached the memo from ICE to one of their filings.

from the Acting Secretary of Homeland Security Benjamine Huffman, *Enforcement Actions in or Near Protected Areas* (Jan. 20, 2025), attached as Exhibit 11 to Compl.). ICE issued a January 31, 2025, memo from its Acting Director Caleb Vitello ("Vitello") titled "Common Sense Enforcement Actions in or Near Protected Areas" ("Vitello Memo"). (Memorandum from Caleb Vitello, Acting Director of U.S. Immigration and Customers Enforcement, *Common Sense Enforcement Actions in or Near Protected Areas* (Jan. 31, 2025), attached as Exhibit 12 to Compl.). The Huffman Memo, Vitello Memo, and the January 21 Press Release are collectively referred to herein as the "2025 Policy."

The enactment of the 2025 Policy violates the APA. Not only is the policy not generally publicly available, it is arbitrary and capricious. DHS has not demonstrated that there are good reasons for the new policy. DHS has provided no evidence that it examined relevant data, let alone any data, prior to enacting the 2025 Policy. DHS also has failed to address the legitimate reliance on the Protected Areas Policy. In short, beyond the two-sentence statement from an unnamed spokesperson and a few general statements in non-public memos, DHS has not provided any—let alone a satisfactory—explanation for its actions.

For the DHS to rescind a policy in place for more than three decades—with little more than a three-sentence press release and unpublished memos just as lacking in detail or rationale—flies in the face of the APA's requirement that government act only pursuant to considered reasons, and not arbitrarily and capriciously. And the impacts of this governing by unsupported—or non-public—directive cannot be understated. Plaintiff DPS is the largest school district in the state, serving over 90,000 students in Colorado.

DPS has been committed to its mission of educating and caring for Colorado's children for over one hundred and twenty years. Defendants' arbitrary and capricious decision to rescind prior policy without any articulated basis has undercut that mission dramatically and painfully, creating an environment of anxiety and uncertainty, rather than stability and safety. Not only must schoolteachers and administrators divert precious resources to addressing the new threat to the safety of their students and their families, but even more critically, they can no longer assure their students that, absent some true emergency, immigration officials will not come into their schools and make arrests. Teachers, administrators, staff and, most critically, students, are now forced to come to school every day in fear, or stay home and miss out on their education. This result cannot stand, particularly where the government has failed to justify its agency action. As a result, the Court should enjoin and vacate the 2025 Policy and enjoin DHS and its constituent agencies from implementing, enforcing, or acting pursuant to the 2025 Policy on both a preliminary and permanent basis.

## STATEMENT OF RELEVANT FACTS AND GROUNDS WARRANTING TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF

### A.    The History of the Protected Areas Policy

Prior to 1993, federal immigration enforcement officers used school grounds as a location to conduct immigration enforcement activities. *See Murillo v. Musegades*, 809 F. Supp. 487, 495 (W.D. Tex. 1992) (amended preliminary injunction entered on Dec. 4, 1992). As recounted by a federal district judge for the Western District of Texas, at one school, immigration enforcement officers had a "regular, consistent, and prominent presence" on a particular high school campus. *Id.* The district judge decried the practice, finding that the high school was intended to "provide[] an oasis of safety

and freedom for the students and staff who reside within the School District" but that the "continued harassment" by immigration authorities had "invad[ed] . . . the oasis." *Id.*

On May 17, 1993, James Puleo, the acting associate commissioner of the Immigration and Naturalization Service (the "INS"),[3] signed a Memorandum titled "Enforcement Activities at Schools, Places of Worship, or at Funerals or other Religious Ceremonies." (*See* Memorandum from James A. Puleo (the "1993 Memo"), attached as Exhibit 4 to Compl.)[4] The 1993 Memo established "a policy of the [INS] to attempt to avoid apprehension of persons and to tightly control investigative operations on the premises of schools, places of worship, funerals and other religious ceremonies." (*Id.* at 1.) Under the 1993 Memo, apart from "exigent circumstances," any immigration enforcement operation that was "likely to involve apprehensions on the premises of schools, places of worship, funerals and other religious ceremonies" required "advance written approval" from specified supervisory agents. (*Id.*)

For the next three decades, the policy of curtailing immigration enforcement activities and investigative operations at or near protected areas, and schools specifically, was consistently emphasized, reinforced, and adhered to. (*See, e.g.*, Memorandum from Marcy M. Forman, *Enforcement Actions at Schools* (December 26, 2007) (the "2007 Memo," attached as Exhibit 5 to Compl.);[5] Memorandum from Julie L.

---

[3] The INS was the agency tasked with immigration enforcement activities prior to 2003. The Homeland Security Act of 2002 disbanded the INS on March 1, 2003, s*ee* 6 U.S.C. § 291(a), and the INS's duties were reallocated to Customs and Border Protection, Immigration and Customs Enforcement, and U.S. Citizenship and Immigration Services, all housed within the Department of Homeland Security.
[4] Available at: https://www.aila.org/aila-files/0630B9EA-805A-4353-92DE-4DEBE638D0B8/08050774.pdf (pages 9-11).
[5] Available at: https://www.ice.gov/doclib/foia/policy/10029_EnforcementActionsSchool_12.26.2007.pdf.

Myers, Assistant Secretary, U.S. Immigration and Customs Enforcement, *Field Guidance on Enforcement Actions or Investigative Activities At or Near Sensitive Community Locations* (July 3, 2008) (the "2008 Memo," attached as Exhibit 6 to Compl.);[6] Memorandum from John Morton, Director of U.S. Immigration and Customs Enforcement, *Enforcement Actions at or Focused on Sensitive Locations* (Oct. 24, 1011) (the "2011 Memo," attached as Exhibit 7 to Compl.).[7]

  Each iteration of the Protected Areas Policy recognized that limiting immigration enforcement activities in sensitive areas, such as schools, struck the right balance between the needs of the community and the needs of the enforcement agencies. (*See* 2007 Memo, Ex. 5 to Compl., at 1 (creating policy to ensure "that great care and forethought be applied before undertaking any investigative or enforcement type action at or near schools"); 2008 Memo, Ex. 6 to Compl. (creating policy to "ensure that [immigration enforcement] personnel conduct enforcement operations in a manner that is safe and respectful of all persons" and recognizing the "balance between [immigration] law enforcement responsibilities and the public's confidence in the way ICE executes its mission"); 2011 Memo, Ex. 7 to Compl. (creating policy to "ensure that ICE officers and agents exercise sound judgment when enforcing federal law at or focused on sensitive locations and make substantial efforts to avoid unnecessarily alarming local communities"). Notably, each iteration of the Protected Areas Policy also recognized that the general rule curtailing enforcement actions at sensitive locations was not absolute and included exceptions for various "exigent circumstances." (*See*

---

[6] Available at: https://www.aila.org/aila-files/66F1AEF1-A758-4979-9B52-40FEC0A344B0/10102632.pdf.

[7] Available at: https://www.ice.gov/doclib/ero-outreach/pdf/10029.2-policy.pdf.

1993 Memo, Ex. 4 to Compl.at 2; 2007 Memo, Ex. 5 to Compl. at 1; 2008 Memo, Ex. 6 to Compl. at 2; 2011 Memo, Ex. 7 to Compl. at 2-3.)

The 2021 Memo was the most recent iteration of the Protected Areas Policy and was issued on October 27, 2021. (*See* Ex. 1 to Compl.)[8] Similar to the prior Protected Areas memos, the 2021 Memo set forth the "[f]oundational [p]rinciple" that "[t]o the fullest extent possible, [federal immigration agents] should not take an enforcement action in or near a location that would restrain people's access to essential services or engagement in essential activities." (*Id.*at 2; *see also id.* at 3 ("The foundational principle of this guidance is that, to the fullest extent possible, we should not take an enforcement action in or near a protected area.").) The 2021 Memo included schools and school bus stops as protected areas. (*Id.* at 2-3.) Consistent with prior iterations of the Protected Areas Policy, the 2021 Memo emphasized that the policy was in place to ensure that agents fully "consider[ed] [the] many factors" relevant to an enforcement action before proceeding—including the community impact of such actions. (*Id.* at 2.) And like the prior articulations of the policy, the 2021 Memo also included exceptions for exigent circumstances—including situations involving "a national security threat," "an imminent risk of death, violence, or physical harm to a person," and "the hot pursuit of an individual who poses a public safety threat." (*Id.* at 3-4.)

For the past 30 years, the Protected Areas Policy allowed DPS to further its education mission without interference from federal immigration enforcement agents or officers. Instead of the systemic practice of intimidation towards students recounted by

---

[8] Available at https://www.dhs.gov/sites/default/files/publications/21_1027_opa_guidelines-enforcement-actions-in-near-protected-areas.pdf.

the court in *Murillo v. Musegades*, INS and CBP conducted notably few immigration enforcement activities on school grounds. According to a 2022 report to Congress, under the Protected Areas Policy, as set forth in the 2011 Memo and 2021 Memo, ICE conducted an "extremely limited number of enforcement actions . . . at sensitive locations[.]" (U.S. Immigration and Customs Enforcement, *Immigration Enforcement at Sensitive Locations,* Fiscal Year 2020 Report to Congress (Apr. 18, 2022) at 2, attached as Exhibit 9 to Compl.)[9] Specifically, ICE data reflected that from October 1, 2018, through October 31, 2020, nationwide, ICE conducted only two Enforcement and Removal Operations arrests at a school and only conducted eighteen Enforcement and Removal Operations arrests near a school. (*Id.*) None of these operations near or at a school occurred in Denver or the State of Colorado.

### B.    The Rescission of the Protected Areas Policy

On January 21, 2025, Fox News reported that it had reviewed a draft of a DHS memorandum rescinding the 2021 Memo. (*See* Adam Shaw & Bill Melugin, *Trump DHS repeals key Mayorkas memo limiting ICE agents, order parole review*, Fox News (Jan. 21, 2025), attached as Exhibit 2 to Compl.) Later that same day, a press release appeared on DHS's official website stating that Acting DHS Secretary Benjamine Huffman had, on January 20, 2025, issued a "directive" that "rescinds the Biden Administration's guidelines for [ICE] and [CBP] enforcement actions that thwart law

---

[9] Available at: https://www.dhs.gov/sites/default/files/2022-06/ICE%20-%20Immigration%20Enforcement%20at%20Sensitive%20Locations.pdf.

enforcement in or near so-called 'sensitive' areas." (*See* January 21 Press Release, Ex. 3 to Compl.)[10]

The January 21 Press Release contained the following "statement attributable to a DHS Spokesperson":

> This action empowers the brave men and women in CBP and ICE to enforce our immigration laws and catch criminal aliens—including murders [*sic*] and rapists—who have illegally come into our country. Criminals will no longer be able to hide in America's schools and churches to avoid arrest. The Trump Administration will not tie the hands of our brave law enforcement, and instead trusts them to use common sense.

(*Id.*) The January 21 Press Release contained no further rationale for rescinding the 2021 Memo. There is no factual support for the sensational assertion that "murders [*sic*] and rapists," and other criminals have been hiding in America's schools to avoid arrest. Nor is there any explanation for why this assertion could constitute a reasoned ground for rescinding the 2021 Memo, and the Protected Areas Policy more generally, when every iteration of the Protected Areas Policy has contained grounds for initiating enforcement actions on school grounds under such exigent circumstances as a rapist or murderer hiding on school grounds.

On or around January 21, 2025, Caleb Vitello, the Acting Director of ICE, confirmed the existence of a memo relating to the rescindment of the Protected Areas Policy and the 2021 Memo. (*See* Memorandum from Caleb Vitello, Acting Director of U.S. Immigration and Customers Enforcement, *Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses* (Jan. 21, 2025), attached as Exhibit 10 to

---

[10] Available at: https://www.dhs.gov/news/2025/01/21/statement-dhs-spokesperson-directives-expanding-law-enforcement-and-ending-abuse.

Compl.)[11] Specifically, a memorandum issued by Vitello entitled "Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses" referenced a "Memorandum from the Acting Secretary of Homeland Security Benjamine Huffman, *Enforcement Actions in or Near Protected Areas* (Jan. 20, 2025)" and noted "[t]he Acting Secretary's Memorandum also supersedes and rescinds Alejandro Mayorkas's October 27, 2021 memorandum entitled, Guidelines for Enforcement Action in or Near Protected Areas." (*Id.* at 1 & n.1.)

On February 5, 2025, the plaintiffs in the Maryland Lawsuit (*see supra* p. 2 n.2) attached a copy of the Huffman Memo to their amended complaint. The Huffman Memo articulates little more than the January 21 Press Release. (*See* Huffman Memo, Ex. 11 to Compl.) Instead, the Huffman Memo addresses enforcement actions in or near areas that DHS "previously determined require special protection." (*Id.*) Rescinding the 2021 Memo "effective immediately," the Huffman Memo offers only the following as explanation and reasoning:

> Our brave men and women in uniform put their lives on the line every day to advance the rule of law and keep our people safe. As a part of that work, officers frequently apply enforcement discretion to balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive location.
>
> Going forward, law enforcement officers should continue to use that discretion along with a healthy dose of common sense. It is not necessary, however, for the head of the agency to create bright line rules regarding where our immigration laws are permitted to be enforced. The Director of ICE and the Commissioner of CBP may wish to issue further guidance to assist officers in exercising appropriate enforcement discretion.

(*See* Huffman Memo, Ex. 11 to Compl.)

---

[11] Available at: https://www.ice.gov/doclib/foia/policy/11072.3_CivilImmEnfActions Courthouses_01.21.2025.pdf.

### C.    DPS and the 2025 Policy's Harmful Effects

DPS is Colorado's largest public school district, with over 90,000 students enrolled in its 207 schools (as of October 2024). (Declaration of Dr. Alex Marrero ("Marrero Decl."), attached as Exhibit 15, ¶ 2.) DPS guarantees an education to any student located within its district boundaries and enrollment zones, regardless of that student's immigration status. DPS's mission is to prepare every one of its students for careers, college, and life by creating conditions where students and families belong and thrive. (*Id.*) DPS hosts a diverse student body reflecting a cross-section of the City of Denver's community. As of the 2023-2024 school year, 51.8% of DPS students were Hispanic/Latinx. (*See* Denver Public Schools, *Annual District Report Strategic Roadmap Update 2023-24* (last visited Feb. 11, 2025), attached as Exhibit 13 to Compl., p. 2)[12] The enrollment in certain schools within DPS grew noticeably after an influx of new-to-country students arrived in Denver in 2024. (*See* Marrero Decl., Ex. 15, ¶ 9.)

The rescission of the 2021 Memo and the Protected Areas Policy—and its associated threat of unbridled enforcement actions occurring on DPS school grounds—has instilled a fear within DPS administrators, faculty, and students that their school will be the target of an immigration raid. (*See* Declaration of Janet Estrada ("Estrada Decl."), attached as Exhibit 16, ¶ 5; Marrero Decl., Ex. 15, ¶ 12; Declaration of Christina Sylvester ("Sylvester Decl."), attached as Exhibit 17, ¶¶ 4-5, 7.) Prior to January 21, 2025, DPS administrators and faculty relied on the Protected Areas Policy to facilitate DPS's educational mission without fear of routine immigration enforcement activities

---

[12] Available at: https://issuu.com/dpscommunications/docs/2024_roadmap_report_final_web?fr=sMzQ3YTY0MDIxMjk.

taking place on school grounds. (*See* Declaration of Nadia Madan Morrow ("Morrow Decl."), attached as Exhibit 18, ¶ 2.) They can no longer do so. (*See* Marrero Decl., Ex. 15, ¶ 10; Sylvester Decl., Ex. 17, ¶ 13.) This has come with a host of harms to DPS's operations. Specifically, DPS schools have experienced a dramatic decrease in student attendance since the rescission. (Estrada Decl., Ex. 16, ¶ 6; Morrow Decl., Ex. 18, ¶ 5(b); Declaration of Laney Shaler ("Shaler Decl."), attached as Exhibit 19, ¶ 7; Sylvester Decl., Ex. 17, ¶ 5; *see also* Marrero Decl., Ex. 15, ¶ 9.) This decrease has been especially noticeable at schools with large populations of new-to-country families. (Marrero Decl., Ex. 15, ¶ 6; Shaler Decl, Ex. 19, ¶ 7 *see also* Estrada Decl., Ex. 16, ¶¶ 3, 5-6.) The drop in attendance is particularly disruptive now—when schools are conducting state-mandated ACCESS testing, designed to assess information about the progress that multi-lingual students are making in learning English. (Estrada Decl., Ex. 16, ¶ 7.) This testing provides DPS and its schools with important data for allocating resources and determining funding priorities and amounts. (*Id.*)

In addition, as a result of the rescission of the 2021 Memo and Protected Areas Policy, DPS administrators and staff have had to divert their time and resources away from their general educational duties and towards responding to the rescission and the associated fear in the community. (Estrada Decl., Ex. 16, ¶¶ 14(a)–(f); Marrero Decl., Ex. 15, ¶¶ 4(a)–(h); Morrow Decl., Ex. 18, ¶ 5(a)–(d); Shaler Decl., Ex. 19, ¶¶ 5(a)-(e), 6; Sylvester Decl., Ex. 17, ¶¶ 3, 8.) These diversions have consisted of, among other things, responding to fears of parents and students of immigration raids occurring on schools, investigating reports of suspected immigration enforcement activities at or near schools, and creating and communicating policies for students and staff to follow in

the event of federal immigration enforcement actions occurring on school grounds. (Estrada Decl., Ex. 16, ¶¶ 14(a)–(f); Marrero Decl., Ex. 15, ¶¶ 4(a)–(h); Morrow Decl., Ex. 18, ¶¶ 5(a)–(d); Shaler Decl., Ex. 19, ¶¶ 5(a)-(e), 6; Sylvester Decl., Ex. 17, ¶¶ 4, 7-11.)

   Recent federal immigration enforcement actions in the area have demonstrated how the 2025 Policy and the rescission of the Protected Areas Policy are harming DPS. Early on the morning of February 5, 2025, DPS administrators and faculty began receiving reports of federal immigration enforcement raids that targeted areas within DPS schools' enrollment zones. (Estrada Decl., Ex. 16, ¶ 9; Marrero Decl., Ex. 15, ¶ 7; Morrow Decl., Ex. 18, ¶ 6; Shaler Decl., Ex. 19, ¶ 8.) Specifically, there was a raid at the Cedar Run apartment complex, which is less than a mile from two DPS schools and just over a mile from two more. As a result of the raid, approximately five school busses worth of elementary aged children could not attend school because either their bus could not pick them up due to the ongoing enforcement actions going on or fear. (*See* Jessica Seaman, *Fear that ICE could show up at schools increases as raids hit Denver, Aurora*, DENVER POST (Feb. 6, 2025, 6:00 AM));[13] (*see also* Marrero Decl., Ex. 15, ¶ 13; Sylvester Decl., Ex. 17, ¶ 9.) Four DPS students were detained in the raid. (Marrero Decl., Ex. 15, ¶ 14.) And two other students' parents were detained. (*Id.*, ¶ 9.)

   The impact of the raid on DPS's schools cannot be overstated. Attendance was noticeably down. In one school where classes typically have 38 kids per class, there was a class with 7 students. (*Id.*) DPS administrators had to abandon their plans for the

---

[13] Available at: https://www.denverpost.com/2025/02/06/denver-aurora-ice-raids-schools/ (last visited Feb. 11, 2025).

day to respond to questions and concerns from families and students. (Estrada Decl., Ex. 16, ¶ 15; Marrero Decl., Ex. 15, ¶ 8; Morrow Decl., Ex. 18, ¶ 9; Shaler Decl., Ex. 19, ¶ 9; Sylvester Decl., Ex. 17, ¶¶ 5, 7) And there was an oppressive feeling of fear and dread. It was not possible for teachers or students to focus on education. (Marrero Decl., Ex. 15, ¶¶ 10, 14-15, 17.) Not only were people fearful following the raids, but they also did not have any guarantee that the next raid would not be at the school. (*Id.* ¶ 10; Shaler Decl., Ex. 19, ¶ 10.) People were so afraid that when DPS Superintendent Dr. Alex Marrero arrived on campus wearing a suit, students responded fearfully because they worried he was an immigration official. (Marrero Decl., Ex. 15, ¶ 11.) Parents of students were also fearful of Dr. Marrero. (*Id.*)

In the absence of the 2021 Memo or Protected Areas Policy, and under the new 2025 Policy, DPS cannot reassure its families, students, and faculty that schools remain safe places for children to gather. (Estrada Decl., Ex. 16, ¶ 13; Marrero Decl., Ex. 15, ¶¶ 16–17; Morrow Decl., Ex. 18 ¶¶ 6, 9; Shaler Decl., Ex. 19, ¶ 10; Sylvester Decl., Ex. 17, ¶ 13.) The corresponding fear, and the required responses of DPS administrators and faculty, has created an environment detrimental to education and resources are constantly being diverted away from DPS's core mission of educating all. (Marrero Decl., Ex. 15, at ¶¶ 10, 12; Sylvester Decl., Ex. 17, ¶ 14; Shaler Decl., Ex. 19, ¶ 6.)

## **ARGUMENT**

## II.    **DPS IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION TO PRESERVE THE STATUS QUO.**

The purpose of a temporary restraining order or preliminary injunction is to preserve the status quo between the parties pending a final determination on the merits.

*Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980); *Bray v. QFA Royalties LLC*, 486 F. Supp. 2d 1237, 1241 (D. Colo. 2007). Thus, courts have discretion to grant a temporary restraining order and preliminary injunction under the traditional standard unless granting this relief would alter the status quo prior to a trial on the merits. *O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004). The Tenth Circuit has defined status quo for the purposes of a temporary restraining order and preliminary injunction as "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001) (citing *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1100 n.8 (10th Cir. 1991)); *see also Spiehs v. Larsen*, No. 5:23-CV-4107-JAR-BGS, 2024 U.S. Dist. LEXIS 63780, at *10-11 (D. Kan. Apr. 8, 2024) ("Where an injunction challenges a policy or action that has taken place, it is not necessarily disfavored based on the status quo factor, because the status quo is the position of the parties *before* the challenged action or policy occurred." (emphasis in original) (citing *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 798 n.3 (10th Cir. 2019)).

Here, the status quo is the point prior to the DHS's rescindment of the Protected Areas Policy. At that point in time, DPS schools were functioning without risk that students would be subject to immigration enforcement activities on school grounds and without having to undertake significant efforts and divert important resources to plan for and react to immigration enforcement actions that occur at or near DPS schools.

III.    **DPS SATISFIES EACH ELEMENT NECESSARY TO OBTAIN A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION.**

The decision to grant a temporary restraining order or other injunctive relief lies within the Court's discretion. *Dominion*, 269 F.3d at 1153. Equitable relief is warranted where the moving party demonstrates: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury to the movant outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction will not adversely affect the public interest. *Dominion*, 269 F.3d at 1154. DPS satisfies each of these elements.

A.    **DPS Will Succeed on Its Claims Against Defendants.**

DPS asserts claims regarding Defendants' violations of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A) and Freedom of Information Act, 5 U.S.C. § 552(a)(2)(B). DPS has a substantial likelihood of success on both claims.

1.    Claim One – Violation of 5 U.S.C. § 706(2)(A)

The APA provides that federal courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The 2025 Policy is an agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

*The 2025 Policy is an agency action.* Section 1103 authorizes the Secretary of Homeland Security to "establish such regulations' and "issue such instructions" to enforce "laws relating to . . . immigration." 8 U.S.C. § 1103. The 2025 Policy constitutes a final agency action because it is "the consummation of the agency's decisionmaking process" and it determines "rights [and] obligations" and creates "legal consequences."

*United States Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016). On January 21, 2025, DHS announced that according to the 2025 Policy, ICE and DHS agents can enter schools and undertake deportation and other immigration-related activities. (Compl. ¶¶ 32-40.) The 2025 Policy articulates the agency's decision to rescind the Protected Areas Policy and has legal consequences. Thus, it is an agency action and is reviewable.

*The 2025 Policy is arbitrary and capricious.* While "[a]gencies are free to change their existing policies," to do so, they must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). This requirement demands that where an agency changes an existing policy, it must "display awareness that it is changing position," and demonstrate that "there are good reasons for the new policy." *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009). Agencies must "examine the relevant data and articulate a satisfactory explanation for [their] actions." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). When an agency "rescinds a prior policy, its reasoned analysis must consider the alternatives that are within the ambit of the existing policy." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,* 591 U.S. 1, 30 (2020) (internal quotations omitted).

For over 30 years, DHS has consistently protected school areas from immigration enforcement activities, except in limited circumstances. (Compl. ¶¶ 28-31.) The 2025 Policy rescinded the Protected Areas Policy. However, DHS has failed to provide a reasoned explanation for the change. Indeed, in undoing decades of prior agency policy, DHS publicly released only the following statement from an unnamed spokesperson:

> This action empowers the brave men and women in CBP and ICE to enforce our immigration laws and catch criminal aliens—including murders [*sic*] and rapists—who have illegally come into our country. Criminals will no longer be able to hide in America's schools and churches to avoid arrest. The Trump Administration will not tie the hands of our brave law enforcement, and instead trusts them to use common sense.

(*See* January 21 Press Release, Ex. 3 to Compl.) The unpublished Huffman and Vitello Memos similarly lack any reasoned explanation for rescinding the Protected Areas Policy, other than law enforcement officers' "frequently" use discretion. (*See* Huffman Memo, Ex. 11 to Compl.; *see also* Vitello Memo, Ex. 12 to Compl.)

The 2025 Policy, and the rescindment of the Protected Areas Policy, is arbitrary and capricious. Defendants did not demonstrate that there are good reasons for the new policy, as is required by the APA. (Compl. ¶¶ 41-51, 77-78.) Defendants have provided no evidence that it examined relevant data, or any data. (*Id.*, citing *Motor Vehicle Mfrs.*, 463 U.S. at 43.) For example, Defendants have not cited any evidence to support its statement that criminals were hiding in schools. Nor have Defendants provided any—let alone a satisfactory—explanation for the 2025 Policy. (Compl. ¶¶ 41-51, 77-78 (citing *Motor Vehicle Mfrs.*, 463 U.S. at 43).)

Defendants also failed to consider policy alternatives, such as keeping the 2021 Policy in place or modifying it to better address what the Defendants apparently considered to be their policy objective—arresting and removing more criminal aliens. (Compl. ¶ 77.) Although Defendants were not required to consider all policy alternatives when deciding to rescind existing policy, the APA requires that an agency's "reasoned analysis must consider the alternatives that are within the ambit of the existing policy" and "be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Regents,* 591 U.S. at 30 (internal citations

omitted). Avoiding enforcement actions in designated protected areas subject to reasonable exceptions "was the centerpiece" of the Protected Area Policy and therefore was "within the ambit of the existing policy." *See id.* (*See also* Compl. ¶¶ 5, 28-31.) However, there is no indication that Defendants considered alternatives within the existing policy's ambit. In fact, Defendants have not provided any explanation for how the 2021 Policy prohibited agents from apprehending "murders [*sic*] and rapists" at schools. This is likely because the 2021 Policy did not stop such activity. (*See* 2021 Memo, Ex. 1 to Compl., articulating the circumstances by which agents would be allowed to enter schools, including enforcement actions that involved: a national security threat; and imminent risk of death, violence, or physical harm to a person; the hot pursuit of an individual who poses a public safety threat; the hot pursuit of a personally observed border-crosser; an imminent risk that evidence material to a criminal case will be destroyed, and circumstances where a safe alternative location does not exist). As such, the "reasoning" of the 2025 Policy is wholly inadequate.

In addition, Defendants failed to address the legitimate reliance interest that existed due to the Protected Areas Policy existing for the last 30 years. *See Smiley v. Citibank (s.D.), N.A*, 517 U.S. 735, 742 (1996). Prior to the rescindment, DPS has been able to tell its students and staff that routine immigration raids cannot occur on school grounds absent exigent circumstances, and DPS has made policy choices based on that expectation. While not required to ultimately accommodate such reliance interests, Defendants are obligated to consider their "existence and strength . . . and weigh them against competing policy concerns." *Regents*, 591 U.S. at 5. There is no evidence that Defendants did so here.

Because Defendants failed to examine the relevant data and articulate a satisfactory explanation, including any consideration of Plaintiff's reliance interests—the 2025 Policy is arbitrary and capricious, and Defendants must be enjoined from implementing it.

        2.    <u>Claim Two – Violation of the Freedom of Information Act, 5 U.S.C. § 552(a)(2)(B)</u>

The Freedom of Information Act ("FOIA") provides that statements of policy and interpretations adopted by the agency and not published in the Federal Register must be made available for public inspection in electronic format. 5 U.S.C. § 552(a)(2)(B). As established above, the 2025 Policy is governed by the APA and constitutes a final agency action. Pursuant to 5 U.S.C § 552, agencies "shall make available for public inspection in an electronic format . . . those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register[.]" 5 U.S.C. § 522(a)(2)(B). Moreover, unlike required disclosures under 552(a)(3)(A), *i.e.*, in response to a FOIA request, information subject to 552(a)(2)(B) must be disclosed unprompted. *Animal Legal Def. Fund v. United States Dep't of Agric.*, 935 F.3d 858, 867 (9th Cir. 2019) ("FOIA's reading-room provision, [ 552(a)(2)] requires agencies to post certain categories of documents *without a request.*") (emphasis in original); *Citizens for Responsibility & Ethics v. United States DOJ*, 164 F. Supp. 3d 145, 147 (D.D.C. 2016) ("Section 552(a)(2) of the Freedom of Information Act ('FOIA') is known as FOIA's 'reading room' requirement. Unlike its better-known counterpart, Section 552(a)(3) . . . Section 552(a)(2) obligates agencies to make certain types of materials available 'for public inspection and copying,' without the predicate requirement of a request."). *See also Tereshchuk v. Bureau of Prisons*, 67 F. Supp. 3d 441, 456

(D.D.C. 2014) (noting that Section 552(a)(2) "represents a strong congressional

aversion to secret law . . . .") (internal quotations omitted).

Defendants had an affirmative duty to make the 2025 Policy available for public

inspection in electronic format. They have not complied with this requirement.

Defendants' failure to make the Huffman Memo and Vitello Memo publicly available is a

violation of 5 U.S.C. § 552(a)(2)(B) and, therefore, the Court must order Defendants to

publish the 2025 Policy. *See* 5 U.S.C. § 552(a)(4)(B).

**B.    DPS Will Suffer Irreparable Harm Absent a Temporary Restraining Order and Injunctive Relief.**

DPS will suffer irreparable harm absent injunctive relief. Numerous federal courts

have found in other contexts that a disruption to school or education can cause

irreparable harm. *See N.D. v. Reykdal*, 102 F.4th 982, 994 (9th Cir. 2024) (finding that a

disruption to special education due to ending of special needs programs establishes

irreparable harm); *Douglas Cty. Sch. Dist. Re-1 v. Douglas Cty. Health Dep't*, 568 F.

Supp. 3d 1158, 1166 (D. Colo. 2021) (granting temporary restraining order in favor of

plaintiffs where they established irreparable harm if a public health order that allowed

students to be exempt from wearing masks to school during the COVID-19 pandemic

was not enjoined); *G.S. v. Lee*, 560 F. Supp. 3d 1113, 1131 (W.D. Tenn. 2021)

(granting preliminary injunction enjoining a governor's executive order that disallowed

any mask mandates in schools during COVID-19 pandemic in part because the order

forced students to decide between their health and education). In addition,

"[o]rganizations may establish irreparable harm by showing 'ongoing harms to their

organizational missions.'" *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 854 (9th

Cir. 2020) (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)).

DPS has suffered and will continue to suffer irreparable harm if the rescindment of the Protected Areas Policy and adoption of the 2025 Policy is not enjoined. First, the rescindment is inhibiting DPS's ability to fulfill its mission to educate its students by causing extreme disruptions to the school day and by forcing DPS to spend resources and time responding to students' and families' fears about immigration enforcement activities on school grounds. (Estrada Decl., Ex. 16, ¶¶ 14(a)-(f); Marrero Decl., Ex. 15, ¶¶ 4(a)-(h); Morrow Decl., Ex. 18, ¶ 5(a)-(d) Shaler Decl., Ex. 19, ¶¶ 5(a)-(e); Sylvester Decl, Ex. 17, ¶¶ 3-4, 7-12.) While prior to the rescindment, DPS could reassure families that their students would be safe from DHS and ICE enforcement activities while at school, DPS can no longer provide these assurances. (Estrada Decl., Ex. 16, ¶ 13; Marrero Decl., Ex. 15, ¶¶ 10, 16; Morrow Decl., Ex. 18, ¶ 5(a); Sylvester Decl., Ex. 17, ¶ 13; Shaler Decl., Ex. 19, ¶ 10.) Accordingly, DPS must devote substantial time and resources to responding to the fear that students and families are experiencing. (*E.g.*, Estrada Decl., Ex. 16, ¶¶ 14(a)-(f); Marrero Decl., Ex. 15, ¶¶ 4(a)-(h); Morrow Decl., Ex. 18, ¶ 5(a)-(d); Shaler Decl., Ex. 19, ¶¶ 5(a)-(e); Sylvester Decl., Ex. 17, ¶¶ 3-4, 7-12.) This includes providing mental health support to students, diverting administrator attention from academics to immigration issues, and assisting students who miss school to catch up. (Estrada Decl., Ex. 16, ¶¶ 12, 14(a)-(f); Marrero Decl., Ex. 15, ¶¶ 4(a)-(h), 8; Morrow Decl., Ex. 18, ¶¶ 5(a)-(d), 9; Sylvester Decl., Ex. 17, ¶¶ 7-12.) As a result of having to devote resources to responding to the rescindment of the Protected Areas Policy, DPS no longer has these resources available to further DPS's mission of educating its students. (Estrada Decl., Ex. 16, ¶¶ 15, 18; Marrero Decl., Ex. 15, ¶¶ 5, 20; Morrow Decl., Ex. 18, ¶¶ 9-10; Sylvester Decl., Ex. 17, ¶¶ 15-16.)

Indeed, events from just days ago demonstrate the disruption, impact, and harm suffered by DPS because of the rescindment. Specifically, on February 5, 2025, a large immigration raid was conducted at the Cedar Run apartment complex, which is less than a mile from two DPS schools and houses DPS families. (Jessica Seaman, *Colorado's public school enrollment to fall, but immigrant students are helping fill classrooms*, THE DENVER POST (Jan. 16, 2025, 12:41 PM), attached as Exhibit 14 to Compl.)[14] In response to the raid, DPS fielded numerous phone calls from scared families asking about the safety of the students attending DPS's schools. (Estrada Decl., Ex. 16, ¶¶ 14(a); Marrero Decl., Ex. 15, ¶ 4(a); Morrow Decl., Ex. 18, ¶ 5(a); Sylvester Decl, Ex. 17, ¶ 10.) However, because of the rescindment of the Protected Areas Policy, DPS could not reassure families that their students would be safe at schools. (Estrada Decl., Ex. 16, ¶ 13; Marrero Decl., Ex. 15, ¶¶ 10, 16; Morrow Decl., Ex. 18, ¶ 5(a); Sylvester Decl., Ex. 17, ¶ 13; Shaler Decl., Ex. 19, ¶ 10.) As a further result, attendance plummeted the day of the raids and on the days following, at least two sisters from one of the nearby schools were rendered effectively orphans when both of their parents were detained, and at least four other DPS students were themselves detained. (Estrada Decl., Ex. 16, ¶ 6; Marrero Decl., Ex. 15, ¶¶ 9, 12, 14; Morrow Decl., Ex. 18, ¶ 5(b).) In addition, DPS had to expend significant time and divert various resources in response to the raids. (Estrada Decl., Ex. 16, ¶ 15; Marrero Decl., Ex. 15, ¶ 8; Morrow Decl., Ex. 18, ¶ 9; Shaler Decl., Ex. 19, ¶ 9; Sylvester Decl., Ex. 17, ¶ 10.) These efforts included dispatching its safety officers and mental health services

---

[14] Available at: https://www.denverpost.com/2025/02/06/denver-aurora-ice-raids-schools/ (last visited Feb. 11, 2025).

personnel to the affected schools and neighborhoods. (Estrada Decl., Ex. 16, ¶ 11; Marrero Decl., Ex. 15, ¶ 8; Sylvester Decl., Ex.17, ¶¶ 7, 11-12.) Currently, DPS can offer no assurances or guidance to families and will continue to have to divert substantial resources in response to every raid. (Estrada Decl., Ex. 16, ¶¶ 13, 18; Marrero Decl., Ex. 15, ¶¶ 10, 16, 20; Morrow Decl., Ex. 18, ¶¶ 5(a), 10; Sylvester Decl., Ex. 17, ¶¶ 13-16.) The harm caused by this disruption and fear is real and irreparable.

In addition to the diversion of resources harm suffered due to the rescindment, DPS will also suffer irreparable harm from the likelihood that DPS will lose funding for its schools because students are too fearful to attend school. *See e.g. Moore v. Tangipahoa Parish Sch. Bd.*, 507 F. App'x 389, 399 (5th Cir. 2013) (loss of funding would result in irreparable harm where it would result in "the failure to make timely scholarship payments [which] would result in [fifty] children having to relocate during the school year"). DPS is seeing declines in attendance following the change in policy. (Shaler Decl., Ex. 19, ¶ 7; Sylvester Decl., Ex. 17, ¶ 5; Morrow Decl., Ex. 18, ¶ 5(b).) DPS's funding is directly tied to the number of students in its classes. If students are afraid to come to school, DPS will lose funding and in turn will have to cut teachers and programs necessary to further its education mission. Irregular attendance also makes it difficult to DPS to plan. Because DPS has established it will suffer irreparable harm absent a temporary restraining order and injunctive relief, the Court should grant this temporary restraining order and preliminary injunction.

### C. The Balance of Hardships Tips in DPS's Favor and the Temporary Restraining Order and Preliminary Injunction Would Not Adversely Affect the Public Interest.

The third and fourth factors to consider—the balance of the equities and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*,

556 U.S. 418, 435 (2009); *see also Denver Bible Church v. Azar,* 494 F. Supp. 3d 816, 843 (D. Colo. 2020) (explaining the "court must balance the harm to Plaintiffs of not granting the injunction against the State's harm if the injunction is granted"). These factors, too, weigh in favor of granting DPS's requested relief.

Absent a temporary restraining order and preliminary injunction, DPS will have to continue to divert resources from educating students and towards preparing for potential raids and addressing the disruption, trauma, and chaos that raids—or the threat of routine raids—cause. The possibility of a raid at a school puts everyone on high alert. (Marrero Decl., Ex. 15, ¶¶ 9-15, 17; Morrow Decl., Ex. 18, ¶ 5(a), 5(c); Sylvester Decl., Ex. 17, ¶¶ 4, 7, 10, 15.) School officials must field continuous reports of potential raids. (Estrada Decl., Ex. 16, ¶ 14(b); Morrow Decl., Ex. 18, ¶ 5(a), 5(c); Shaler Decl., Ex. 19, ¶ 5(b); Sylvester Decl., Ex. 17, ¶ 8.) A man in a suit or a truck with flashing lights showing up at a school causes panic because they are potential immigration officials. (*See e.g.* Marrero Decl., Ex. 15, ¶¶ 11, 14.) The Defendants, on the other hand, will not be unduly harmed if the 2025 Policy is temporarily enjoined. Defendants have failed to show how the prior Protected Area Policy does not allow them to fulfill their purpose of catching "murders and rapists . . . hid[ing] in America's schools" or exercising their discretion. (*See* January 21 Press Release, Ex. 3 to Compl.) To the contrary, the prior Protected Area Policy did not provide full immunity for schools from DHS agents. Rather, the Protected Area Policy contemplated "limited circumstances under which an enforcement actions needs to be taken in or near a protected area," such as when it "involves a national security threat," "imminent risk of death, violence, or physical harm to a person." (*See* 2021 Memo, Ex. 1 to Compl.)

Moreover, the public interest favors a restraining order and an injunction in this case. It is in the public interest for schools not to become hunting grounds for suspected undocumented immigrants. Having agents enter schools, carrying weapons, and generally disrupting the learning does not serve the public. Indeed, Federal Courts consistently recognize a strong public interest in allowing public schools to operate without disruption from outside forces. *See, e.g.*, *Norris v. Cape Elizabeth Sch. Dist.,* 969 F.3d 12, 29 (1st Cir. 2020) ("The Supreme Court has repeatedly emphasized the necessary discretion school officials must exercise and the attendant deference owed to many of their decisions."); *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968) ("By and large, public education in our Nation is committed to the control of state and local authorities."); *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954) ("Today, education is perhaps the most important function of state and local governments."). As such, the public interest in schools being safe environments that can devote their resources to education (instead of to reacting to law enforcement actions) clearly outweighs any interest Defendants may have in rescinding the Protected Areas Policy.

IV.    **THE COURT HAS AUTHORITY TO GRANT THE REQUESTED RELIEF.**

  A.    **Plaintiff has Standing to Seek Relief**

An organization has standing to sue for injunctive relief on its own behalf where it has sustained injuries. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393 (2024) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, n. 19 (1982)). Here, Defendants' conduct has resulted in "a diversion of its resources and frustration of its mission" and is likely to cause "a substantial loss in organizational funding." *E. Bay Sanctuary Covenant*, 994 F.3d at 974 (first quoting *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002), then citing *E. Bay Sanctuary Covenant v. Trump*, 932

- 26 -

F.3d 742, 766-67 (9th Cir. 2018)). DPS has had to divert resources from its educational mission to ensure that students, educators, faculty, and employees are not disturbed by immigration raids at schools and preparing for potential raids. (*See, e.g.*, Estrada Decl., Ex. 16, ¶¶ 14(a)–(f), 15, 18; Marrero Decl., Ex. 15, ¶¶ 4(a)–(h); Morrow Decl., Ex. 18, ¶¶ 5(a)–(d); Shaler Decl., Ex. 19, ¶¶ 5(a)-(e), 6, 13; Sylvester Decl., Ex. 17, ¶¶ 3, 8, 13, 15.) DPS's mission of providing quality education to all children of the Denver community is also frustrated if children are staying home from school for fear of immigration enforcement actions, or if parents are refusing to drop their kids off at school for fear of being detained at the bus stop or in the drop-off or pick-up line. Further, DPS funding is tied to its pupil count. More children staying home from school (or being forcibly removed from school) means less funding for DPS and thwarted ability to plan. All of these actions impede DPS's ability to engage in its educational mission, draining resources that would otherwise go to affirmative educational goals. *Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 576 (6th Cir. 2013) (organization alleged that it had to "divert its resources, its staff time and energy" to addressing defendant's conduct thus establishing injury); *E. Bay Sanctuary Covenant*, 994 F.3d at 974.

Moreover, the interest sought to be protected falls within the zone of interests to be protected or regulated by the Immigration and Nationality Act (the "INA"). "[A] person suing under the APA must satisfy not only Article III's standing requirements, but an additional test: The interest he asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (quoting

*Ass'n of Data Processing Serv. Organizations, Inc. v. Camp*, 397 U.S. 150, 153 (1970)).

"[W]hen analyzing whether a plaintiff falls within the zone of interests of a particular

statute, courts should be particularly lenient if a violation of that statute is being asserted

through an APA claim." *Sierra Club v. Trump*, 929 F.3d 670, 703, n.26 (9th Cir. 2019).

"The test is not meant to be especially demanding; in particular, there need be no

indication of congressional purpose to benefit the would-be plaintiff." *Clarke v. Sec.*

*Indus. Ass'n*, 479 U.S. 388, 399-400 (1987). "The zone-of-interests analysis forecloses

suit 'only when a plaintiff's interests are so marginally related to or inconsistent with the

purposes implicit in the statute that it cannot reasonably be assumed that Congress

authorized that plaintiff to sue.'" *E. Bay Sanctuary Covenant*, 950 F.3d at 1270 (9th Cir.

2020) (quoting *Lexmark Int'l, Inc., v. Static Control Components, Inc.*, 572 U.S. 118, 130

(2014)).

"[F]or APA challenges, a plaintiff can satisfy the test in either one of two ways:

(1) 'if it is among those [who] Congress expressly or directly indicated were the intended

beneficiaries of a statute,' or (2) 'if it is a suitable challenger to enforce the statute—that

is, if its interests are sufficiently congruent with those of the intended beneficiaries that

the litigants are not more likely to frustrate than to further . . . statutory objectives.'"

*California v. Trump*, 963 F.3d 926, 941-2 (9th Cir. 2020 (second and third alterations in

original) (quoting *Scheduled Airlines Traffic Offices, Inc. v. Dep't of Def.*, 87 F.3d 1356,

1359 (D.C. Cir. 1996)).

The INA is not intended to restrict access to primary or secondary education. For

example, although the INA makes clear that generally an alien is not eligible for means-

tested federal benefits, 8 U.S.C. § 1613(a), that prohibition does not apply to numerous

primary and secondary school related benefits. 8 U.S.C. §§ 1613(c)(2)(C), (D), (H), (I), (J); *see also* 8 U.S.C. § 1615(a) (providing that no individual who is eligible for benefits under the school lunch program of the Richard B. Russell National School Lunch Act or the school breakfast program of section 4 of the Child Nutrition Act of 1966 shall be made ineligible "on the basis of citizenship, alienage, or immigration status").

The 2025 Policy, to the contrary, has the effect of limiting access to education, and, as a result, DPS's challenge is within the zone of interest. To start, DPS's mission is to provide primary and secondary education to all. The 2025 Policy, however, impairs DPS's ability to meet its mission by (1) creating fear amongst individuals and discouraging them from attending school, and (2) requiring DPS to divert resources away from its mission. As a result, the 2025 Policy implicates access to primary and secondary education. Furthermore, DPS's interests are "sufficiently congruent with those of the intended beneficiaries" to bring it within the zone of interest. *See California*, 963 F.3d at 941-42. Therefore, DPS has standing to seek a preliminary injunction and its request should be granted.

## B.    A Nationwide Injunction Is Appropriate.

A district court has "broad discretion to craft remedies based on the circumstances of a case. . . ." *HIAS, Inc. v. Trump*, 985 F.3d 309, 326-27 (4th Cir. 2021) "A district court may issue a nationwide injunction so long as the court 'mold[s] its decree to meet the exigencies of the particular case.'" *Id.* (quoting *Roe v. Dep't of Defense*, 947 F.3d 207, 232 (4th Cir. 2020) (alteration in original). A nationwide injunction is particularly appropriate where only granting injunctive relief to the plaintiff in a case "would cause inequitable treatment" of other similarly situated entities. *See id.* Pursuant to the 2025 Policy, DHS can enter schools around the country. Nationwide

relief is appropriate because it would make no sense to bar routine enforcement activities at DPS but not at other schools. All school districts, regardless of location, should be free from the fear and distraction of being subject routine immigration enforcement activities.

## V.    THIS COURT SHOULD NOT IMPOSE A BOND, OR ONLY REQUIRE A NOMINAL BOND.

Finally, if the Court enters a temporary restraining order and preliminary injunction, Plaintiff respectfully requests that this Court waive the bond requirement or impose a nominal bond under Fed. R. Civ. P. 65(c). As a public school district, DPS is a governmental organization who will not be able to proceed with this case if a substantial bond is required and therefore DPS asks that the Court use its discretion to "dispense with the security requirement" because "requiring security would effectively deny access to judicial review." *Colo. Wild, Inc. v. United States Forest Serv.*, 523 F. Supp. 2d 1213, 1230 (D. Colo. 2007) (granting preliminary injunction in favor of non-profit organization against the United States Forest Service without requiring a bond because to require a bond would preclude plaintiffs' request for review of the Forest Service's access decision that plaintiffs were disputing in the lawsuit).

Dated:  February 12, 2025

s/ Emily L. Wasserman
Tess Hand-Bender, Esq.
Emily L. Wasserman, Esq.
Claire E. Mueller, Esq.
DAVIS GRAHAM & STUBBS LLP
3400 Walnut Street, Suite 700
Denver, CO  80205
Telephone: 303.892.9400
Facsimile:  303.893.1379
tess.hand-bender@davisgraham.com
emily.wasserman@davisgraham.com
claire.mueller@davisgraham.com

Attorneys for Plaintiff Denver Public Schools