IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-00474-DDD-KAS

DENVER PUBLIC SCHOOLS,

     Plaintiff,

v.

KRISTI NOEM, in her official capacity as Secretary of the United States Department of
Homeland Security, and
DEPARTMENT OF HOMELAND SECURITY,

     Defendants.

---

**DEFENDANTS' RESPONSE TO EMERGENCY MOTION FOR TEMPORARY
RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION
(Doc. 2)**

---

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 4

BACKGROUND ................................................................................................. 5

    A.    Relevant statutory background ........................................................ 5

    B.    DHS's updated internal guidance to immigration officers
        for enforcement action ..................................................................... 7

    C.    The effects DPS claims it has suffered since the adoption of
        the 2025 Guidance ...........................................................................10

        1.   When DPS officials learned of the 2025 Guidance. ...............10

        2.   DPS officials' understanding of the changes made by
            the 2025 Guidance ................................................................10

        3.   Recent effects on DPS attendance and resources.....................12

        4.   DPS's description of the relief needed to avoid harm..............14

LEGAL STANDARD .........................................................................................15

ARGUMENT ......................................................................................................16

    I.    DPS has not made a clear and unequivocal showing that it is
       likely to succeed on its claims. ...........................................................16

    A.    DPS has not made a clear showing of standing. ...............................16

        1.   DPS has not shown that it has suffered a cognizable injury
            for its APA claim ..................................................................16

            a.   Any injury to DPS from the change in internal immigration
               enforcement guidance is not legally cognizable. ...........................17

            b.   DPS's injury is not otherwise cognizable. .....................................19

               i.   DPS has not shown that the 2025 Guidance
                 shows that DHS has directly interfered with
                 DPS itself. ...........................................................................19

ii.   DPS has not shown a concrete, particularized,
and certainly impending injury to itself based on
its students' concerns about potential enforcement............21

2.   DPS has not clearly shown an injury caused by and
traceable to the 2025 Guidance.................................................24

3.   DPS has not shown its injury is redressable. ...........................26

a.   Congress has barred the relief DPS seeks......................................26

b.   DPS has not shown that the relief it seeks would redress
its alleged injury...............................................................29

B.   DPS has not shown it has standing to bring its FOIA claim............................31

C.   DPS has not shown it is likely to succeed on its APA claim............................31

1.   DPS is not within the zone of interest protected by the INA..................32

2.   Enforcement is committed to agency discretion by law. ........................33

3.   The challenged action is not final agency action subject
to APA review.......................................................................37

D.   DPS has not shown it is likely to succeed on its FOIA claim..........................41

II.   DPS has not shown that it will suffer irreparable harm if the relief
it seeks is not granted. ...........................................................42

III.   DPS has not shown that the public interest and balance of equities
support granting the relief. ........................................................44

CONCLUSION.................................................................................44

Defendants Kristi Noem, in her official capacity as the Secretary of Homeland Security, and the Department of Homeland Security ("DHS") respond to the Emergency Motion for Temporary Restraining Order and Motion for Preliminary Injunction ("Motion") filed by Plaintiff Denver Public Schools ("DPS"). The Court should deny the Motion.

**INTRODUCTION**

This case involves a challenge to a change in internal guidance provided by DHS to its immigration officers. For decades, DHS has issued internal guidance to its immigration officers governing the factors they should take into account, and the approvals they should obtain, before conducting immigration enforcement actions in certain areas. That guidance has often changed. In 2021, DHS issued guidance that identified certain areas—including, as relevant here, schools—as protected areas, generally explained when immigration officers could pursue enforcement in those protected areas, and provided that higher-level approval was required unless exigent circumstances were present. In January 2025, DHS issued new internal guidance that replaced the 2021 guidance. The 2025 guidance provided fewer specific guidelines, but authorized DHS's enforcement components to issue further guidance. U.S. Immigration and Customs Enforcement ("ICE") issued its own guidance that again defined protected areas to include schools and required supervisory approval before enforcement actions could be taken in those protected areas.

In its Complaint, DPS seeks to challenge this latest change in internal DHS guidance, arguing that it has led to concerns about potential increases in immigration enforcement at or near DPS schools, which in turn have led to reduced student attendance and diverted school resources. DPS asserts two claims. First, it claims that the Administrative Procedure Act

("APA") required DHS to engage in a fulsome analysis of its change in internal enforcement guidance and any alternatives before adopting the 2025 guidance.  As relief, DPS asks the Court to enjoin DHS from relying on the 2025 guidance.  Second, DPS claims that the Freedom of Information Act ("FOIA") required DHS to make the memoranda reflecting the 2025 guidance available to the public, and it asks the Court to order DHS to do so.

In its Motion, DPS seeks to enjoin the 2025 guidance immediately.  But DPS has not met its heavy burden to obtain the disfavored preliminary injunction it seeks.  It has not shown that either claim is likely to succeed.

DPS has not demonstrated that it has standing to bring its APA claim—that it has suffered a cognizable and concrete injury of its own that is traceable to the 2025 guidance and that could be redressed by an order from this Court.  DPS also has not shown that it falls within the zone of interests protected by the relevant provisions of the immigration statute, or that the internal guidance is reviewable rather than committed to agency discretion, or that the guidance is a final agency action subject to challenge.

Nor has DPS shown it is likely to succeed on its FOIA claim.  Among other defects, DPS has not shown that it has standing to bring this claim or that—given that it has the memoranda—it would suffer irreparable harm if its Motion is denied.

Finally, DPS has not shown that it meets the other prerequisites for emergency preliminary relief.

## BACKGROUND

### A.    Relevant statutory background

"The Government of the United States has broad, undoubted power over the subject of

immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012).

Through the Immigration and Nationality Act ("INA") and related statutes, Congress has

established an "extensive and complex" framework for the "governance of immigration and

alien status." *Id.* at 395. "A principal feature of th[is]" congressionally established "removal

system is the broad discretion exercised by immigration officials." *Id.* at 396.

Congress has charged the Secretary of Homeland Security with "administration and

enforcement" of immigration laws. *See* 8 U.S.C. § 1103(a)(1). As relevant here, Congress

has granted immigration officers broad authority to arrest, detain, and remove aliens who are

unlawfully present or otherwise removable. *See id.* § 1226(a) (permitting arrest and detention

upon a warrant issued by the Secretary of Homeland Security); *id.* § 1226(c)(1) (Secretary

"shall take into custody any alien" who has committed certain crimes); *id.* § 1231(a)(1)(A), (2)

(authorizing detention of aliens with final removal orders); *see also id.* § 1357(a) (listing

powers that immigration officers may exercise, including interrogation without a warrant of

"any alien or person believed to be an alien as to his right to be or to remain in the United

States").

Congress has made this authority subject to only a few location-based rules. It has

limited certain investigative activities at farms. *See id.* § 1357(e) (prohibiting officers from

entering a farm or other outdoor agricultural operation for investigative purposes "without the

consent of the owner (or agent thereof) or a properly executed warrant"). And it has granted

immigration officers expanded authority for investigations near the border. *See id.*

§ 1357(a)(3) (providing that within 25 miles of an international border, immigration officers

may have access, without a warrant, to any "private lands, but not dwellings"). But Congress

has not otherwise imposed any location-based restrictions—such as restrictions relating to

schools—on the general arrest and detention authority of immigration officers.

Congress has also restricted the authority of lower courts to enjoin or restrain operations

by immigration officers to arrest and detain aliens. Specifically, except in a case brought by

"an individual alien" in removal proceedings, and "[r]egardless of the nature of the action or

claim or of the identity of the party or parties bringing the action, no court (other than the

Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the

provisions of part IV of this subchapter," which includes Sections 1221-1231. *Id.* § 1252(f)(1).

## B.    DHS's updated internal guidance to immigration officers for enforcement actions.

In 2021, the then-Secretary of Homeland Security issued general guidance to government

officials about enforcement actions "in or near areas that require special protection," including

schools and bus stops ("2021 Guidance"). Doc. 1-1 at 2-4. The 2021 Guidance stated that "[t]o

the fullest extent possible, we should not take an enforcement action" in a protected area. *Id.* at

3. But the 2021 Guidance did *not* prohibit enforcement action in or near schools, and it provided

no guarantee to school administrators that enforcement actions would not occur in or near

schools. *See id.* at 4-5. Rather, it recognized that there were circumstances "under which an

enforcement action needs to be taken in or near a protected area." *Id.* at 4. First, "exigent

circumstances" could justify enforcement action in or near a protected area. *Id.* at 4-5. Second,

even "[a]bsent exigent circumstances," officers could "seek prior approval from their Agency's

headquarters, or as you [component directors, commissioners, or other officers] otherwise

delegate, before taking an enforcement action in or near a protected area." *Id.* at 5. The 2021

Guidance offered a non-exhaustive list of circumstances that would justify enforcement action in

protected areas but emphasized that the list included "only examples" and was "not complete" and that "the exercise of judgment is required" to determine appropriate circumstances for protected-area enforcement.  *Id.*

In other words, even when no exigent circumstances were present, the 2021 Guidance allowed immigration officers, such as ICE officers, to conduct protected-area enforcement actions if they obtained approval from designated officials.  *See id.*  The 2021 Guidance clarified that "[t]his guidance does not limit an agency's or employee's statutory authority . . . ."  *Id.*

The 2021 Guidance also clarified that the guidance did not create any right enforceable against the United States:  "This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter."  *Id.* at 6.

On January 20, 2025, the then-Acting Secretary of Homeland Security Benjamine Huffman issued new guidance on protected-area enforcement actions, superseding the 2021 Guidance.  *See* Doc. 1-11 at 2 ("Huffman Memo").  The Huffman Memo eschewed default or bright-line rules in favor of officers' discretion.  *Id.*  It stated that "[g]oing forward, law enforcement officers should continue to use that discretion along with a healthy dose of common sense" when contemplating enforcement actions in or near protected areas.  *Id.*  The Huffman Memo stated that "[i]t is not necessary" for DHS "to create bright line rules regarding where our immigration laws are permitted to be enforced," but that DHS component heads "may wish to issue further guidance to assist officers in exercising appropriate enforcement discretion."  *Id.*  As the 2021 Guidance had done, the Huffman Memo disclaimed that it was creating any enforceable right or benefit: "This memorandum is not intended to, does not, and may not be

relied upon to create any right or benefit, substantive or procedural, enforceable at law by any

party in any administrative, civil, or criminal matter." *Id.* DHS issued a press release describing

the Huffman Memo, *see* Doc. 1-3 at 2, and ICE posted a description of the Huffman Memo on its

website, noting that the 2021 Guidance had been "rescind[ed]" and quoting the key language

advising officers to use "discretion along with a healthy dose of common sense."[1]

The then-acting ICE Director Caleb Vitello then issued guidance regarding protected-area

enforcement actions. *See* Doc. 1-12 at 2 ("Vitello Memo"). The Vitello Memo continued to

define "protected areas" to include schools, although it did not mention "bus stops" in its

definition. *Id.* at 2 n.1. The Vitello Memo similarly declined to create bright-line rules in favor

of allowing the use of "law enforcement discretion to balance of variety of interests," but it did

"charge Assistant Field Office Directors (AFODs) and Assistant Special Agents in Charge

(ASACs) with responsibility for making case-by-case determinations regarding whether, where,

and when to conduct an immigration enforcement action in or near a protected area." *Id.* at 3.

As the prior guidance had done, the Vitello Memo disclaimed that it was creating or modifying

any enforceable rights or benefits. *Id.* at 3. ICE has posted the Vitello Memo in its "FOIA ICE

Library" for public inspection.[2]

In sum, the Huffman Memo and Vitello Memo (the "2025 Guidance") indicated that

officers should use discretion and common sense in deciding where to conduct enforcement

actions (including schools) and charged supervisors (AFODs and ASACs) with the

---

[1] *See* Protected Areas and Courthouse Arrests, *available at* https://www.ice.gov/about-ice/ero/
protected-areas (last visited Feb. 21, 2025).
[2] *See* Vitello Memo, https://www.ice.gov/doclib/foia/policy/CommonSenseEnforcementActIn
NearProtectedAreas.pdf (last visited Feb. 21, 2025).

responsibility to make case-by-case determinations about ICE enforcement actions. Doc. 1-11 at 2; Doc. 1-12 at 2-3.

**C.    The effects DPS claims it has suffered since the adoption of the 2025 Guidance.**

DPS claims in its Complaint that it has suffered two main types of adverse effects from the adoption of the 2025 Guidance: a decline in student attendance, and a diversion of its resources. It alleges that it has been "hindered" in educating "students who are refraining from attending" schools for fear of immigration enforcement. Doc. 1 ¶ 64; Doc. 2-2 (Estrada Decl.) ¶ 7. And it alleges that it has diverted its resources in various ways, responding to concerns about the potential for immigration arrests on DPS grounds. Doc. 1 ¶ 65; Doc. 2-1 (Marrero Decl.) ¶ 4. The evidence it submits clarifies the nature and extent of these two claimed harms.

**1.    When DPS officials learned of the 2025 Guidance.**

Some DPS officials report that they learned of the 2025 Guidance on or around January 21, 2025. *See, e.g.*, Doc. 2-1 (Marrero Decl.) ¶ 3; Doc. 2-3 (Sylvester Decl.) ¶ 2. DPS explains that it obtained the 2025 Guidance documents—the Huffman and Vitello Memos—later, only after it reviewed the docket of a lawsuit filed in the District of Maryland. Doc. 2 at 2 n.2. DPS does not state when it obtained those Memos (which were docketed on February 5, 2025, (Huffman Memo) and February 7, 2025 (Vitello Memo)).

**2.    DPS officials' understanding of the changes made by the 2025 Guidance.**

The declarations DPS submits from school officials reflect some imprecision about the 2021 Guidance and the 2025 Guidance.

As explained above, the 2021 Guidance did not bar immigration enforcement actions at schools, but permitted such actions either with prior higher-level approval or under exigent

circumstances. But the declarations from school officials appear to reflect an understanding—
an incorrect one—that the 2021 Guidance had categorically *prohibited* immigration
enforcement at schools, and the 2025 Guidance thus now permits enforcement that was
previously prohibited. *See* Doc. 2-1 (Marrero Decl.) ¶ 3 ("I learned that . . . agents would now
be allowed to conduct immigration enforcement activities near, around, or on school premises,
or in other areas where our students gather to access school"); Doc. 2-2 (Estrada Decl.) ¶ 13
("because of the rescission of the Protected Areas Policy, there is no federal policy in place to
prevent . . . agents from initiating similar raids on or near School grounds"); Doc. 2-3
(Sylvester Decl.) ¶ 2 ("I was made aware that [DHS] had rescinded the Protected Areas Policy
and that . . . agents would now be allowed to conduct immigration enforcement activities near,
around, or on school premises, or in other areas where our students gather"); Doc. 2-4 (Madan
Morrow Decl.) ¶ 3 ("ICE can now conduct immigration enforcement activities near, around, or
on school premises"); Doc. 2-5 (Shaler Decl.) ¶ 4 ("agents would now be allowed to conduct
immigration enforcement activities near, around, or on school premises, or in other areas where
our students gather").

Those officials also report that the 2025 Guidance has deprived them of the ability to
guarantee students and parents that immigration enforcement would not occur at schools—a
guarantee they believed was reflected in the prior guidance. *See* Doc. 2-3 (Sylvester Decl.)
¶ 13 ("I can no longer reassure the principals . . . that enforcement will not occur on school
grounds"); Doc. 2-1 (Marrero Decl.) ¶¶ 4(h) & 10 (after the 2025 Guidance, communications
"could not include language reassuring all that schools were areas protected from immigration
enforcement activities" and people "did not have any guarantee that the next raid would not be

at the school"); *see also* Doc. 2-2 (Estrada Decl.) ¶ 13; Doc. 2-4 (Madan Morrow Decl.) ¶ 5(a);

Doc. 2-5 (Shaler Decl.) ¶ 10.  But as explained above, the 2021 Guidance contained no such

prohibition or guarantee.

The officials' declarations also indicate an incorrect understanding that under the 2025

Guidance, schools are no longer listed as "protected areas" and that immigration enforcement

at schools has no oversight.  For example, the DPS Superintendent states that DPS has now

communicated to students and staff "that schools are no longer protected areas."  Doc. 2-1

(Marrero Decl.) ¶ 16; *see* Doc. 2-2 (Estrada Decl.) ¶ 4 ("I am aware that [DHS] has rescinded a

policy that designated schools . . . as 'protected areas,' and that . . . federal agents are now

subject to no meaningful oversight when conducting immigration enforcement activities near,

around, or on school premises").  But as explained above, the 2025 Guidance included schools

in its list of "protected areas," and the Vitello Memo charges certain supervisors with

approving ICE enforcement in such areas.

### 3.    Recent effects on DPS attendance and resources.

While DPS points to a decline in attendance since the 2025 Guidance, the evidence it

submits does not clearly show the extent of this decline or whether it was in response to the

2025 Guidance.  The DPS Superintendent states that since the adoption of the 2025 Guidance,

there has been a "noticeable" decrease in school attendance across all schools, particularly at

those schools in an area where there is a large population of new-to-country families and where

ICE enforcement actions have already been occurring.  Doc. 2-1 (Marrero Decl.) ¶ 6.  Another

official reports that she began receiving reports on January 23, 2025, that attendance was down

at some of her schools.  Doc. 2-3 (Sylvester Decl.) ¶ 5. DPS does not provide evidence

quantifying how much lower the attendance was after the 2025 Guidance was adopted.  One

news outlet reported that overall attendance at DPS has been "slightly lower" since

Inauguration Day," with 84.5% attendance on January 30, 2025, a "day it was rumored raids

would start," compared to 88% average attendance for the last school year.[3]

      To illustrate the decline, DPS officials highlight the effect on DPS of an ICE

enforcement action that took place on February 5, 2025, although that action did not take place

at either a school or at a bus stop.  Doc. 2-1 (Marrero Decl.) ¶ 7.  This action took place at an

apartment complex that was "less than a mile from two DPS schools," Doc. 2 at 13, and which

the DPS Superintendent describes as "even closer to a DPS bus stop."  Doc. 2-1 (Marrero

Decl.) ¶ 7.  He states that he heard from DPS bus drivers that "this ICE raid . . . blocked their

ability to pick up students in the area . . . ." *Id*.  He states that he later visited a few nearby

schools and saw the impact of the ICE enforcement action on attendance and on students,

teachers, and administrators.  *Id*. ¶ 9.  A school principal reports that she saw declines in

attendance "after immigration enforcement actions happened near the School" that was due to

"fear" that the school itself "may be a target of an immigration enforcement action."  Doc. 2-2

(Estrada Decl.) ¶¶ 5-6.

      DPS does not present any evidence of any immigration enforcement action since

January 21, 2025, at any DPS school or bus stop.  The Superintendent does not allege any entry

by immigration enforcement officers onto the grounds of any DPS school, or indeed at any

school in the state or country, and he does not identify any impending enforcement actions.

---

[3]  *See* https://www.chalkbeat.org/colorado/2025/02/13/denver-district-sues-ice-to-stop-
immigration-enforcement-at-schools (last visited Feb. 21, 2025).

Doc. 2-1 (Marrero Decl.) ¶ 4(h) (explaining that DPS can "only tell our communities that no enforcement actions have happened yet on school grounds").  But the DPS officials acknowledge that DPS has received "numerous new false reports of suspected DHS and ICE raids near schools," and DPS has had to respond to such false reports of such ICE raids. Doc. 2-4 (Madan Morrow Decl.) ¶ 5(c); *see also* Doc. 2-3 (Sylvester Decl.) ¶ 8 (acknowledging false reports).

DPS states that its funding "is tied to its pupil count," Doc. 2 at 27, but the evidence it provides indicates that its funding may be tied to student enrollment, rather than variations in attendance during the year.  Doc. 1-14 at 3 (discussing the effect of student "enrollment" on funding).

### 4.     DPS's description of the relief needed to avoid harm.

DPS officials state that to address its injuries, DPS would need a prohibition on immigration enforcement at or near school grounds or bus stops.  As the DPS Superintendent explains, if "immigration enforcement activities . . . were allowed to occur on or near school grounds, or at [bus stops], the result would be catastrophic for students and destructive of DPS's educational missions."  Doc. 2-1 (Marrero Decl.) ¶ 18.

Such a bar on immigration enforcement at or near schools or bus stops could significantly limit immigration enforcement in Denver.  DPS is a large school district with 207 schools as of 2024.  *Id.* ¶ 2.  Much of Denver is close to a school, as shown on a map of schools posted by DPS, which shows how DPS schools are scattered across the district.[4]  Bus stops for

---

[4]  DPS District Map at 2, https://drive.google.com/file/d/1SJu_KmK7ELjcXiyXGDhy2Autn YA9SIOb/view (last visited Feb. 21, 2025).

DPS buses are similarly scattered across the district.[5]

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy, the exception rather the rule."
*Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019).  A court
may enter injunctive relief only if the moving party proves "(1) that she's 'substantially likely to
succeed on the merits,' (2) that she'll 'suffer irreparable injury' if the court denies the injunction,
(3) that her 'threatened injury' (without the injunction) outweighs the opposing party's under the
injunction, and (4) that the injunction isn't 'adverse to the public interest.'"  *Id.* at 797.

Because a preliminary injunction is an extraordinary remedy, a movant's right to a
preliminary injunction must be "clear and unequivocal."  *McDonnell v. City & Cnty. of Denver*,
878 F.3d 1247, 1257 (10th Cir. 2018) (quotation marks omitted).  Moreover, a preliminary
injunction is disfavored when "(1) it mandates action (rather than prohibiting it), (2) it changes
the status quo, or (3) it grants all the relief that the moving party could expect from a trial win."
*Fort Collins*, 916 F.3d at 797.  "To get a disfavored injunction, the moving party faces a heavier
burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors" and must
make a "strong showing" that those factors weigh in its favor.  *Id.* (quoting *Fish v. Kobach*, 840
F.3d 710, 724 (10th Cir. 2016)).  Here, DPS faces this heavier burden because it seeks a
disfavored injunction:  it seeks all the relief it could obtain at trial, *i.e.*, preventing DHS from
implementing its 2025 Guidance.  *Cf. Denver Bible Church v. Azar*, 494 F. Supp. 3d 816, 826

---

[5]  *See* DPS Central Shuttle, https://transportation.dpsk12.org/o/transportation/page/central-shuttle
(last visited Feb. 20, 2025); DPS Far Northeast Shuttle, https://transportation.dpsk12.org/o/
transportation/page/far-northeast-shuttle (last visited Feb. 21, 2025).

(D. Colo. 2020) (Domenico, J.), *aff'd in part, dismissed in part*, No. 20-1391, 2022 WL 200661

(10th Cir. Jan. 24, 2022).

## ARGUMENT

**I.    DPS has not made a clear and unequivocal showing that it is likely to succeed on its claims.**

DPS has not met its heavy burden to show a likelihood of success on either of its claims.

### A.    DPS has not made a clear showing of standing.

"To seek injunctive relief, a plaintiff must show" (1) that it is "under threat of suffering

'injury in fact' that is concrete and particularized"; (2) "the threat must be actual and imminent,

not conjectural or hypothetical"; (3) the injury "must be fairly traceable to the challenged action

of the defendant"; and (4) "it must be likely that a favorable judicial decision will prevent or

redress the injury."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).  "At the

preliminary injunction stage, . . . the plaintiff must make a 'clear showing' that she is 'likely' to

establish each element of standing."  *Murthy v. Missouri*, 603 U.S. 43, 58 (2024).  DPS has not

made that clear showing as to any element of standing.

### 1.    DPS has not shown that it has suffered a cognizable injury for its APA claim.

DPS's APA claim is that the 2025 Guidance is an arbitrary and capricious agency action

because the DHS did not provide a "satisfactory explanation" for the new guidance and for the

change, did not account for the "wide variety of costs and harms" that could result from the

change, did not sufficiently consider retaining the 2021 Guidance, and did not consider the

strength of reliance interests on the 2021 Guidance.  Doc. 1 ¶¶ 75-77.  But DPS fails to show that

it has standing to assert this claim, both under the law that applies specifically to challenges to federal immigration enforcement guidance, as well as under general standing principles.

> a.     **Any injury to DPS from the change in internal immigration enforcement guidance is not legally cognizable.**

DPS alleges that it has been injured by DHS's change in its immigration enforcement guidance.  But DPS lacks a legally cognizable injury that allows it to challenge such guidance.

In *United States v. Texas*, 599 U.S. 670 (2023), the Supreme Court considered claims brought by states seeking "to order the Executive Branch to alter its arrest policy so as to make more arrests." *Id*. at 674.  The Court observed that it had "long held 'that a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution.'"  *Id*. at 674 (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)).  It held that this principle extends more broadly to bar "challenges to the Executive Branch's exercise of enforcement discretion over whether to arrest or prosecute." *Id*. at 677.  It concluded that this principle bars states from establishing standing to challenge federal immigration enforcement policies on the ground that they were adversely affected by those policies.  *Id*. at 674.

In reaching this conclusion, the Court explained that only certain injuries have been traditionally recognized as "judicially cognizable" in that they were "traditionally thought to be capable of resolution through the judicial process." *Id.* at 676 (internal quotation marks omitted). It then reasoned that the states could not assert a cognizable injury from federal immigration enforcement policies.

First, the Court explained that the Executive Branch has long had discretion as to how to enforce the laws, particularly in the area of immigration.  It stated:  "Under Article II, the

Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law." *Id*. at 678 (quotation marks omitted). "That principle of enforcement discretion over arrests and prosecutions extends to the immigration context, where the Court has stressed that the Executive's enforcement discretion implicates not only normal domestic law enforcement priorities but also foreign-policy objectives." *Id*. at 679 (quotation marks omitted).

Second, the Court explained that this enforcement discretion left courts with no meaningful standards on which they could evaluate adjustments in enforcement priorities. Because the Executive Branch "invariably lacks the resources to arrest and prosecute every violator of every law," it "must balance many factors when devising arrest and prosecution policies." *Id*. at 680; *see also id*. (recognizing the longstanding history of federal government "prioritization in making immigration arrests"). The Court explained that this "balancing process in turn leaves courts without meaningful standards for assessing those policies." *Id.*

The Court concluded that "federal courts lack Article III jurisdiction over this suit," but that "other forums remain open for examining the Executive Branch's arrest policies," including oversight by Congress and elections. *Id*. at 685. It clarified that irrespective of whether the states' claims had merit, the states lacked standing to bring claims challenging federal immigration enforcement policies. *Id*. ("We take no position on whether the Executive Branch here is complying with its legal obligations under" the relevant statutes). Thus, even if the states had asserted meritorious claims, they lacked a cognizable injury. After all, a cognizable injury requires more than "an asserted right to have the Government act in accordance with law." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (quotation marks omitted).

The Court's decision in *Texas* shows that DPS lacks standing to challenge DHS's 2025 Guidance. The Court's logic in *Texas* extended to challenges to federal policies that involve the use of discretion in prioritizing immigration enforcement. Here, too, the 2025 Guidance that DPS seeks to challenge advises how the Executive Branch should exercise its authority and discretion in immigration enforcement. DPS's APA claim would have this Court examine the Executive Branch's basis for altering those immigration enforcement priorities. But DPS, like the states in the *Texas* case, lacks standing to challenge that guidance or changes to the guidance.

### b.    DPS's injury is not otherwise cognizable.

Even if the APA claim were not barred by the *Texas* decision, DPS has failed to show a cognizable injury to itself under traditional injury standards. DPS argues that an "organization has standing to sue for injunctive relief on its own behalf where it has sustained injuries." Doc. 2 at 26. It asserts two theories of injury to itself as an organization. First, it alleges that it "has had to divert resources from its educational mission" so that schools are not disturbed by "potential raids." *Id.* at 27. Second, it alleges that its educational mission has been and will be frustrated by reduced attendance, based on the fears of immigration enforcement by children and their parents. *Id.* at 27. Neither theory shows sufficient injury to DPS as an organization.[6]

### i.    DPS has not shown that the 2025 Guidance shows that DHS has directly interfered with DPS itself.

DPS's organizational-injury theory must satisfy the standards for such injuries set forth in *Hippocratic Medicine*, 602 U.S. at 393-96. In that case, the Supreme Court clarified that it is

---

[6] DPS does not contend that it is seeking to assert the interests of others. Doc. 2 at 26. But even if it did, such a theory would fail under the "prudential standing doctrine" that "a party may not rest it claims on the rights of third parties where it cannot assert a valid right to relief of its own." *Hill v. Warsewa*, 947 F.3d 1305, 1309-10 (10th Cir. 2020) (quotation marks omitted).

"incorrect" that standing exists when "an organization diverts its resources in response to a defendant's actions." *Id*. at 395. After all, numerous federal decisions or policies affect school district resources. *Cf. Texas*, 599 U.S. at 680 n.3 (observing that while "federal policies frequently generate indirect effects on state revenues or state spending," such an "attenuated" effect is not enough to show standing); *see also Ariz. All. for Retired Ams. v. Mayes*, 117 F.4th 1165, 1177 (9th Cir. 2024) (explaining that after *Hippocratic Medicine*, an organization cannot rely on "the diversion of resources *in response* to a policy to confer standing"). In *Arizona Alliance*, the Ninth Circuit explained that the analysis it had previously followed had been "more forgiving" but is now "mistaken[]" after *Hippocratic Medicine*. *Id.* at 1176 (discussing *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2020)). But that now-rejected standard, about diverted resources, is one DPS urges here. Doc. 2 at 26-27 (citing *E. Bay* and arguing that it has suffered an injury because it has diverted resources in response to the 2025 Guidance). DPS thus cannot show standing on this theory.

Rather, an organization may show standing when the defendant's wrongful conduct has "directly affected and interfered" with the organization's core functions. *Hippocratic Medicine*, 602 U.S. at 395 (discussing *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)). In *Havens*, the Court had concluded that the plaintiff organization, a housing counseling service, had shown that it was directly injured by the wrongful actions of the defendant, an apartment complex owner. 455 U.S. at 379. The defendant had "provided [the plaintiff's] black employees false information about apartment availability," and those "actions directly affected and interfered with [the plaintiff's] core business activities." *Hippocratic Medicine*, 602 U.S. at 395. The Court in *Hippocratic Medicine* thus approved this theory—that an organization can show

standing based on the defendant's *direct* interference with the plaintiff.  But the Court also cautioned that it has "been careful not to extend the *Havens* ruling beyond its context."  *Id.* at 396.

Under this standard, DPS has not shown that DHS, through its 2025 Guidance, has directly interfered with DPS and caused it a cognizable injury.  DPS has shown no actual direct interference by DHS with its activities.  For example, it has not pointed to any immigration activities at DPS schools, on school grounds, or at bus stops.  Rather, DPS relies on a theory of *indirect* interference by DHS, pointing to the impact on DPS of concerns of students and others about potential DHS immigration enforcement at DPS.  It argues it has suffered a cognizable harm from the chilling effect that immigration enforcement may have had on attendance by its students.  Doc. 2 at 27.  But such an indirect effect does not show the kind of *direct* interference and effect that the Court endorsed in *Hippocratic Medicine*.

> ### ii.    DPS has not shown a concrete, particularized, and certainly impending injury to itself based on its students' concerns about potential enforcement.

Even if DPS could rely on this theory that DHS's 2025 Guidance has harmed DPS through its impact on students, DPS still cannot meet burden to show a concrete injury to itself.  "When a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed to establish standing."  *Texas*, 599 U.S. at 678 (quotation marks omitted).

Moreover, alleged harms from the mere *threat* of enforcement are often not enough to show a cognizable injury.  What is required is a showing of a "concrete, particularized, and actual or imminent" harm, *Murthy*, 603 U.S. at 57, not a mere "realistic threat" of one.  *Summers*,

555 U.S. at 499-500 (cleaned up).  The plaintiff must show a "future harm" that is "certainly

impending."  *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 416 (2013); *id.* at 409 ("threatened

injury must be *certainly impending* to constitute injury in fact").

The Supreme Court has explained that various types of evidence are insufficient to show

a "certainly impending" injury.  First, that standard cannot be met by pointing to the mere fact

that government enforcement has been authorized.  In *Clapper*, the plaintiffs claimed that the

government's foreign surveillance activities injured them by interfering with their foreign

contacts.  But the Court concluded that their concerns about enforcement were "necessarily

conjectural" and insufficient, as their speculation of harm relied on a provision that

"*authorizes*—but does not *mandate* or *direct*—the surveillance that respondents fear."  *Id.* at 412.

Second, the "certainly impending" standard cannot be satisfied by evidence that the threat

of potential enforcement has caused apprehensiveness or a chill.  A "chill" based on

"apprehensiveness" that the government may in the future act wrongfully "in some way that

would cause direct harm" to the plaintiff is not enough to show a "threat of specific future harm."

*Laird v. Tatum*, 408 U.S. 1, 13-14 (1972).  In *Laird*, the plaintiffs sought to challenge, on First

Amendment grounds, Army surveillance of civilian political activity.  *Id.* at 3.  But the Court

concluded that the plaintiffs had not shown a cognizable injury because they had not shown they

had sustained, or were "immediately in danger of sustaining, a direct injury as the result of that

action."  *Id.* at 13; *see also Clapper*, 568 U.S. at 418 (observing that the Court in *Laird* declined

to find a cognizable injury based on the "chilling effect aris[ing] merely from the individual's

knowledge that a governmental agency was engaged in certain activities or" and "might in the

future take some *other* and additional action detrimental to that individual"). "[S]uch a fear is insufficient to create standing." *Id*. at 417.

Third, a party generally cannot show standing from the threat of enforcement of a government policy that is directed at others. *See id.* at 419 (recognizing that past cases do not "suggest[] that plaintiffs can establish standing" based on the alleged chilling effect of a policy that "does not regulate, constrain, or compel any action on [the plaintiffs'] part").

Fourth, a party generally cannot show that a future injury is "certainly impending" by pointing to "costly and burdensome measures" it has already taken to prepare for a risk, even if those measures were reasonable. *See id.* at 415-16 (finding "unavailing" the contention that the plaintiffs took measures and incurred costs "as a reasonable reaction to a risk of harm"); *id*. at 422 (concluding that the plaintiffs could not show standing by "incurring costs in anticipation of non-imminent harm").

Under these standards, DPS has not shown that concerns about a threat of potential immigration enforcement by DHS at a DPS school under the 2025 Guidance show an injury to DPS that is "concrete, particularized, and actual or imminent." *Murthy*, 603 U.S. at 57. It cannot show an injury that is certainly impending by pointing to the mere guidance about immigration enforcement; or by pointing to the subjective apprehension of students related to the potential for immigration enforcement at a school; or by pointing to measures DPS has taken to prepare for potential immigration enforcement, however reasonable those may be. Accordingly, despite the generalized concerns DPS and its students may have about immigration enforcement, DPS, as an organization, has not shown a sufficiently direct and cognizable injury to itself from the 2025 Guidance.

      2.      **DPS has not clearly shown an injury caused by and traceable to the 2025 Guidance.**

Even if DPS could show a cognizable injury for its APA claim, it has not met the second element of standing, as it has not shown that its injury is caused by and traceable to the 2025 Guidance.

To establish standing, a plaintiff must show that it "has suffered an injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct . . . ." *Haaland v. Brackeen*, 599 U.S. 255, 291-92 (2023) (quotation marks omitted). To meet this standard, the plaintiff must show that its injury is actually caused by the specific wrongful conduct that it challenges. *Dep't of Com. v. New York*, 588 U.S. 752 (2019) (requiring an evidentiary showing of "*de facto* causality").

Here, DPS's claimed injuries arise from the apprehension experienced by parents and students confronted with the potential for immigration enforcement. "[W]here a causal relation between injury and challenged action depends upon the decision of an independent third party, . . . standing is not precluded, but it is ordinarily substantially more difficult to establish." *California v. Texas*, 593 U.S. 659, 675 (2021) (quotation marks omitted). And where, as here, the causal link depends specifically on the subjective fears of third parties, the link may not be sufficient. For example, in *Clapper*, the plaintiffs claimed that their foreign contacts "might be disinclined to speak with them due to a fear of surveillance," but the Court held that this was not an injury "fairly traceable" to the government because it "was based on third parties' subjective fear of surveillance." 568 U.S. at 417 n.7.

Even when a plaintiff can show that the injury is based on the predictable actions of third parties, the plaintiff cannot rely on risks that are too attenuated. "The causation requirement also

rules out attenuated links," including "distant (even if predictable) ripple effects." *Hippocratic Medicine*, 602 U.S. at 367.  In *Hippocratic Medicine*, the Court declined to recognize standing for the plaintiff-doctors to challenge drug approvals merely because "use of the drugs by others may cause more visits to doctors."  602 U.S. at 393.  The Court observed that it would similarly reject the standing of teachers to "sue to challenge allegedly lax immigration policies that lead to overcrowded classrooms."  *Id*. at 392.

Under these standards, DPS has not shown that its injury is caused by and traceable to DHS's mere adoption of internal guidance for immigration enforcement.  First, the evidence does not show that DHS actually caused the drop in attendance.  Rather, the evidence shows that any drop is the result of fears among students and parents, not any actual enforcement actions by DHS at schools, and may relate to false reports of immigration enforcement at schools or enforcement actions that did not take place on school grounds or at bus stops.  In addition, DPS's own evidence shows that its officials' concerns reflected inaccurate understandings—that immigration enforcement at schools had been prohibited under the 2021 Guidance, and that the 2025 Guidance removes schools from the list of protected areas and provides no supervisory oversight for enforcement in those areas.

Second, the causal link is too attenuated to satisfy this element.  Large public institutions like DPS can be affected by all manner of federal decisions or policies, including immigration.  But in *Hippocratic Medicine*, the Supreme Court signaled that it would decline to rule that effects of federal immigration policy on public school attendance gives standing to challenge immigration policy.  602 U.S. at 392.  Because that same logic applies here, this Court should rule that DPS's causal theory does not support standing.

**3.    DPS has not shown its injury is redressable.**

To satisfy the third prong of standing, a plaintiff must show that its "injury likely would be redressed by the requested judicial relief." *Hippocratic Medicine*, 602 U.S. at 380.  DPS has not satisfied this prong.  First, Congress has barred lower courts from granting the relief DPS has requested.  Second, even if that relief were not barred, DPS has not shown that the relief it seeks—barring enforcement under the 2025 Guidance—would remedy its injury.

**a.    Congress has barred the relief DPS seeks.**

In the Complaint's Prayer for Relief, DPS requests that the Court, in relevant part, "[e]njoin and vacate the 2025 Policy" and "[e]njoin DHS . . . from implementing, enforcing, or acting pursuant to the 2025 Policy . . . ."  Doc. 1 at 24.  But a statutory provision in the INA, 8 U.S.C. § 1252(f)(1), bars this Court from granting DPS that relief.  And as the Supreme Court has explained, the remedies Congress has authorized (or not) affect the Article III redressability analysis.  *See Summers*, 555 U.S. at 497 (observing that the creation of a statutory remedy can affect "the strictures of the redressability prong of our standing inquiry").  Because Section 1252(f)(1) bars the relief DPS seeks, DPS claimed injury is not redressable by "the requested judicial relief."  *Hippocratic Medicine*, 602 U.S. at 380.

Section 1252(f)(1) provides that, except in a case brought by "an individual alien" in removal proceedings, and "[r]egardless of the nature of the action or claim of the identity of the party or parties bringing this action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter."  Part IV of the subchapter includes 8 U.S.C. §§ 1221-1231, which the Supreme Court has described as provisions that "charge the Federal Government with the implementation

and enforcement of the immigration laws governing the inspection, apprehension, examination, and removal of aliens." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549-50 (2022).

In *Aleman Gonzalez*, the Supreme Court interpreted Section 1252(f)(1) as applying broadly to immigration enforcement operations. The Court observed that Section 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Id.* at 550. It explained that the prohibition on enjoining "the 'operation of' the relevant statutes is best understood to refer to the Government's efforts to enforce or implement them," and thus includes "the way that it is being carried out." *Id.* (cleaned up). The Court concluded that because the orders issued in that case would "require officials to take actions that (in the Government's view) are not required by [the INA provision] and to refrain from actions" that are permitted by that provision, the orders would "thus *interfere* with the Government's efforts to operate" the statute and are "barred" by Section 1252(f)(1). *Id.* at 551 (emphasis added).[7]

Section 1252(f)(1) thus bars this Court from enjoining or restraining DHS from engaging in apprehension of aliens as authorized by 8 U.S.C. § 1226 and § 1231. Section 1252(f)(1) bars the relief DPS expressly requests—an order enjoining or restraining the 2025 Guidance or DHS's implementation of it.[8]

---

[7] The Supreme Court has interpreted Section 1252(f)(1) as not expressly "depriv[ing] lower courts of all subject matter jurisdiction over claims brought under Sections 1221 through 1232 of the INA," but just as depriving them of authority to issue the described injunctive relief. *United States v. Biden*, 597 U.S. 785, 798 (2022).

[8] The relief DPS seeks here—enjoining the 2025 Guidance—would run afoul of Section 1252(f)(1), which applies to the arrest and detention operations authorized by 8 U.S.C. §§ 1221-1231. Section 1252(f)(1) would not extend to immigration enforcement actions conducted not

Nor is DPS's claim saved by the fact that it seeks in its Complaint not only to "enjoin" but also to "vacate" the 2025 Guidance. Doc. 1 at 24. Section 706(2)(A) does not expressly grant courts authority to "vacate" an agency action. It authorizes courts to "set aside" an action, but that authority to "set aside" is best understood as directing courts to "disregard" unlawful actions, not vacate them. *See Texas*, 599 U.S. at 695 (Gorsuch, J., concurring in judgment).

Even assuming vacatur is authorized by 5 U.S.C. § 706(2)(A), to "vacate" the 2025 Guidance would be to enter a form of injunctive relief. *See WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1239 (10th Cir. 2017) (discussing relief available under 5 U.S.C. § 706(2)(A) and observing that "[v]acatur of agency action is a common, and often appropriate form of injunctive relief"). Vacatur thus is injunctive relief barred by Section 1252(f)(1). Issuing a vacatur that enjoined immigration officials from exercising their statutory arrest authority in any way would run afoul of Section 1252(f)(1)'s prohibition on lower courts "order[ing] federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Aleman Gonzalez*, 596 U.S. at 550. It would also violate that provision by improperly "restraining" DHS from relying on the 2025 Guidance when determining immigration arrest actions. *Cf. Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 13 (2015) (to "restrain" typically includes actions that "restrict[s] or stop[s] official action").

In sum, Section 1252(f)(1) prohibits this Court from granting any injunctive relief —including an order vacating the 2025 Guidance—that would "interfere with the Government's

---

under those provisions but solely under 8 U.S.C. § 1357, but DPS has not requested such relief; nor, as explained below, has it shown that a partial limit on certain operations that immigration enforcement officers could carry out at schools would redress its claimed injury.

efforts to operate" the covered provisions in a particular way. *Aleman Gonzalez*, 596 U.S. at

551. Because that provision bars the relief DPS seeks, DPS cannot show that a court order

would redress its injury.[9]

> **b.    DPS has not shown that the relief it seeks would redress its alleged injury.**

Even if the Court could grant some injunctive relief without running afoul of the

prohibition in Section 1252(f)(1), DPS has not shown that its "injury likely would be redressed

by the requested judicial relief." *Hippocratic Medicine*, 602 U.S. at 380. DPS claims that the

2025 Guidance has caused it injury because student attendance has declined, and it has had to

divert resources to address the potential for immigration enforcement. But DPS has not shown

that an order from this Court enjoining and vacating the 2025 Guidance—and thus returning

DHS to the 2021 Guidance—would remedy DPS's attendance concerns and avoid the diversion

of DPS resources.

First, DHS's 2021 Guidance did not prohibit immigration enforcement actions in schools

or at bus stops or even restrict such actions to exigent circumstances. Such actions were still

permitted so long as higher-level approval was granted. Thus, even if DPS obtained the relief it

seeks and DHS followed the 2021 Guidance, that order would not mean that no immigration

enforcement actions on school grounds could be authorized.

Second, DPS has not shown that the order it seeks would in fact remedy its attendance

and diverted-resource concerns. In particular, this Court's order would not control the actions

---

[9] Even if DPS's Request for Relief had sought declaratory relief, a mere request for the court to declare what the law is would not establish jurisdiction. *See California*, 593 U.S. at 673 ("a declaratory judgment . . . cannot alone supply jurisdiction otherwise absent").

of—let alone the subjective concerns of—third parties such as DPS students and their parents.
When a plaintiff suffers harm because of the impact of a defendant's allegedly wrongful conduct
on third parties, it is harder for the plaintiff to show that a court order will redress the conduct.
"[R]edressability requires that the court be able to afford relief *through the exercise of its power*,
not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of
its power." *Haaland*, 599 U.S. at 294 (quotation marks omitted). When the injury involves the
actions of third parties, an injunction may "not give [the plaintiff] legally enforceable protection"
from the harm. *Id.* at 293. If redress of the injury would involve "unfettered choices made by
independent actors not before the courts and whose exercise of broad and legitimate discretion
the courts cannot presume either to control or to predict," the plaintiff must show that those
choices by third parties "will be made in such a manner as to . . . permit redressability of injury."
*Lujan*, 504 U.S. at 562. Under those circumstances, standing "is ordinarily substantially more
difficult to establish." *Id.* (quotation marks omitted).

DPS does not meet this heavier burden. It is speculative to assume that the subjective
concerns of students about future immigration enforcement would be assuaged by a court order
enjoining actions under the 2025 Guidance and requiring DHS to operate under the 2021
Guidance, which would still permit DHS enforcement action at schools. Given these
uncertainties, DPS has not shown that it is likely that the order it seeks would in fact redress the
injuries that it claims support standing.

***

In sum, DPS has not satisfied any of the three prongs of standing for its APA claim.

**B.      DPS has not shown it has standing to bring its FOIA claim.**

DPS has not made a clear showing of a cognizable injury to itself sufficient to support its

FOIA claim.  DPS argues that Defendants have an affirmative duty under 5 U.S.C.

§ 552(a)(2)(B) to make the Huffman and Vitello Memos "available for public inspection in

electronic format," Doc. 1 ¶ 82, and seeks injunctive relief to require Defendants to make the

memoranda publicly available.  *Id.* ¶ 86(d).

DPS acknowledges, however, that before it filed its Complaint, it obtained both Memos.

Doc. 2 at 2 & n.2; Doc. 1-11 at 2; Doc. 1-12 at 2.  DPS thus does not show how it is being

harmed by the alleged statutory violation.  Standing requires more than an allegation of a

statutory violation.  *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 429-30 & n.3 (2021)

("Congress may not authorize plaintiffs who have not suffered concrete harms to sue in federal

court simply to enforce general compliance with regulatory law."); *Prisology, Inc. v. Fed. Bureau

of Prisons*, 852 F.3d 1114, 1117-18 (D.C. Cir. 2017) (holding that the plaintiff in a

Section 552(a)(2) case "must still at least allege a particularized injury," and rejecting the

argument that "any violation of a statutory right to information is an injury in fact").  Here, given

that DPS had the documents, DPS has not clearly shown that it is suffering or will suffer a

concrete, particularized harm from the alleged violation.

**C.      DPS has not shown it is likely to succeed on its APA claim.**

Even if DPS had standing, it has not shown a clear right to relief on its APA claim, which

asserts that DHS acted arbitrarily when it adopted its 2025 Guidance and thus changed its

internal guidance to immigration officers regarding enforcing immigration laws in or near

protected areas.  Doc. 2 at 1-3, 16-19.  This APA claim fails for at least three reasons: (1) DPS is

not within the "zone of interest" that the INA was designed to protect; (2) DHS's internal

guidance to its officers regarding its enforcement approach is committed to agency discretion by

law; and (3) the decision is not a "final agency action" with legal consequences that is subject to

APA review.

### 1.    DPS is not within the zone of interest protected by the INA.

DPS acknowledges that, to bring its APA claim, it must show that DPS is within the zone

of interests protected or regulated by the INA.  Doc. 2 at 27.  But DPS has not shown that it is.

A "statutory cause of action extends only to plaintiffs whose interests fall within the zone

of interests protected by the law invoked."  *Lexmark Int'l, Inc. v. Static Control Components,*

*Inc.*, 572 U.S. 118, 129 (2014) (quotation marks omitted).  The zone-of-interests test asks

whether this plaintiff "falls within the class of plaintiffs whom Congress has authorized to sue

under" the relevant statute.  *Id*. at 128.  This test forecloses suit when a plaintiff's interests are

"so marginally related to or inconsistent with the purposes implicit in the statute that it cannot

reasonably be assumed that Congress authorized that plaintiff to sue."  *Id*. at 130 (quotation

marks omitted).

For an APA claim, the relevant zone of interests is defined by "the statutory provision

whose violation forms the legal basis for his complaint," not the APA itself.  *Bennett v. Spear*,

520 U.S. 154, 176 (1997) (cleaned up).  The zone of interest does not extend to "anyone who is

marginally injured by [a statutory] violation," but is "limited to those whose interests Congress

intended *to protect*."  *In re Peeples*, 880 F.3d 1207, 1216 (10th Cir. 2018) (emphasis added).

And the plaintiff itself must be within that protected zone of interests.  *See Moya v. U.S. Dep't of*

*Homeland Sec.*, 975 F.3d 120, 131 (2d Cir. 2020) (a plaintiff "must have more than a derivative

interest in someone else's rights to satisfy the zone-of-interests test" under the INA).

Under this test, the APA claim fails. DPS has not identified any provision in the INA indicating that Congress intended to protect the areas in or near schools from immigration enforcement. As explained above, the INA provides special protections for farms, 8 U.S.C. § 1357(e), but does not provide location-based protection for schools. *Cf. Fed'n for Am. Immigr. Reform, Inc. v. Reno*, 93 F.3d 897, 899 (D.C. Cir. 1996) (affirming the dismissal, under the zone-of-interests test, of an APA claim challenging a plan for paroling Cuban nationals where the plaintiff argued that the plan affected it through the "crowding [of] public schools").

Rather than claim that the INA protects areas around schools from immigration enforcement, DPS asserts that its interest in "provid[ing] primary and secondary education to all" shows that it is within the zone of interests because the INA was "not intended to restrict access to primary or secondary education." Doc. 2 at 28-29. It points to a few statutory provisions where Congress chose not to exclude aliens from certain educational benefits such as school lunches and educational programming. *See* 8 U.S.C. §§ 1613(c)(2)(C), (H), (I), 1615. But DPS's APA claim here does not relate to *those* benefits, but to where DHS may carry out its enforcement operations. Because any interest DPS has in the provision of those benefits to its students is only "marginally related to" the INA's provisions on immigration enforcement, "it cannot reasonably be assumed that" in those provisions "Congress authorized" an APA claim challenging DHS's immigration enforcement guidance under the INA. *Lexmark*, 572 U.S. at 130.

### 2. Enforcement is committed to agency discretion by law.

Separately, DPS's APA claim fails because it challenges a matter that is committed to

agency discretion by law.

The APA bars judicial review of agency action to the extent that it "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Agency action may be deemed committed to agency discretion "even where Congress has not affirmatively precluded review." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Where "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion"—where, effectively, "there is no law to apply"—the APA does not permit judicial review. *Id.*

To determine if a matter is committed to agency discretion, courts review the statutory scheme to determine if it provides an adequate standard of review. *Id.* at 831. "Congress may limit an agency's exercise of enforcement power if it wishes," but only when Congress "has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion, there is 'law to apply' under § 701(a)(2)." *Id.* at 833-34. Courts also may consider whether, as a matter of tradition, action is committed to agency discretion. *See id.* at 832 ("For good reasons, such a decision has traditionally been 'committed to agency discretion,' and we believe that the Congress enacting the APA did not intend to alter that tradition.").

Decisions are "general[ly] unsuitabl[e]" for judicial review when they require "a complicated balancing of a number of factors which are peculiarly within its expertise" or involve where best to spend "agency resources," including whether the agency "is likely to succeed if it acts" and "whether the particular enforcement action requested best fits the agency's overall policies." *Id.* at 831. Decisions committed to agency discretion include, for example, an agency's decision not to institute enforcement proceedings, *id.* at 831-35; the allocation of lump-

sum appropriations, *see Lincoln v. Vigil*, 508 U.S. 182, 192-95 (1993); and the refusal of an

agency to grant reconsideration, *I.C.C. v. Bhd. of Locomotive Eng'rs,* 482 U.S. 270, 282-83

(1987).

Enforcement decisions traditionally involve considerable agency discretion. *See, e.g.*,

*supra* Part I.A.1.a (discussing *Texas*); *JGE ex rel. Tasso v. United States*, 772 F. App'x 608, 612

(10th Cir. 2019) ("law enforcement decisions surrounding the investigation and prosecution of

crimes . . . involve the exercise of discretion"); *Go Leasing, Inc. v. Nat'l Transp. Safety Bd.*, 800

F.2d 1514, 1523 (9th Cir. 1986) ("the Administrator need not promulgate rules constraining his

discretion as to when to employ a particular statutory enforcement action"). Law enforcement

guidance is generally committed to agency discretion because, like other decisions whether to

enforce, enforcement inherently requires a complicated balancing of factors to assess how the

agency can best carry out its responsibility to enforce the law. *Cf. Heckler*, 470 U.S. at 831;

*Texas*, 599 U.S. at 680 ("the Executive Branch must balance many factors when devising arrest

and prosecution policies").

Finally, where "the type of agency decision in question has traditionally been committed

to agency discretion," the action does not "become[] reviewable" just because "the agency gives

a reviewable reason" for it (or fails to do so). *Locomotive Eng'rs*, 482 U.S. at 282-83 (quotation

marks omitted).

Under these standards, DHS's adoption of the 2025 Guidance, which provides internal

guidance to immigration enforcement officers, is committed to agency discretion. The analysis

begins with the statute. Congress through the INA and other statutes has granted immigration

officers broad discretion in carrying out the immigration laws. *See Arizona*, 567 U.S. at 396 ("A

principal feature of the" congressionally established "removal system is the broad discretion exercised by immigration officials.").

DPS does not show that immigration statutes limit its discretion in carrying out its enforcement responsibilities.  In its Motion, DPS cites only 8 U.S.C. § 1103, which describes the powers and duties of the Secretary of Homeland Security.  Doc. 2 at 16.  Section 1103 provides, among other things, that the Secretary "shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens," except where the statute relates to the powers of "the President, Attorney General, Secretary of State," or other "officers."  8 U.S.C. § 1103(a)(1).  The Secretary has "control, direction, and supervision of all employees," and "shall establish such regulations" and "issue such instructions[,] and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter."  *Id.* § 1103(a)(2)-(3).  DPS does not claim that the Secretary violated these permissive provisions.  Section 1103 does not provide any meaningful standard by which to judge the agency's discretion as to enforcement actions in or near schools.

Elsewhere, as noted, the INA imposes few location-based restrictions on DHS's broad authority to investigate and make arrests, evincing only limited intent to dictate agency discretion with respect to the mechanics of enforcement operations.  *See, e.g.*, 8 U.S.C. §§ 1226(a), 1231(a)(1)(A), (2), 1357(a).  For example, Congress limits when immigration officers may enter a farm for investigative purposes.  *Id.* § 1357(e).  But aside from the requirement to obtain warrants in certain circumstances, *see, e.g.*, *id.* § 1226(a), Congress has not placed other restrictions on DHS's enforcement discretion, such as whether, when, or under what circumstances immigration officers may enter or approach other protected locations, including

schools.  Because Congress has circumscribed the Executive Branch's discretion in limited ways
as to where it can conduct enforcement actions or under what circumstances, Congress's failure
to do so with respect to schools means that DHS's enforcement guidance—bright-line rules,
supervisory approvals, and categories of eligible cases—is committed to agency discretion by
law.[10]

Because enforcement guidance is committed to agency discretion, DPS cannot challenge
the procedural aspects of the 2025 Guidance rather than the decision itself.  When Section
701(a)(2) precludes review of "agency action," it precludes review of an agency's "reasons" for
the guidance or the perceived lack thereof.  *See Locomotive Eng'rs*, 482 U.S. at 282-83.

### 3. The challenged action is not final agency action subject to APA review.

The APA claim fails for another reason:  DPS has not shown that the 2025 Guidance was
a reviewable final agency action that has led to legal consequences.

The APA limits review to final agency action.  5 U.S.C. § 704.  The APA defines "agency
action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent
or denial thereof, or failure to act."  *Id.* § 551(13).  If the challenged agency action is not a final

---

[10]  In *DHS v. Regents of the University of California*, 591 U.S. 1 (2020), the Supreme Court ruled
that it could review an APA claim challenging the rescission of the program known as Deferred
Action for Childhood Arrivals, because DACA had "created a program for conferring
affirmative immigration relief."  *Id.* at 18.  Because the Court concluded DACA had bestowed
benefits, including the eligibility to request work authorization and Social Security and
Medicare, DACA was "more than a non-enforcement policy," and its rescission was not a matter
committed to agency discretion.  *Id.* at 18-19; *see also Texas*, 599 U.S. at 683 (explaining that
immigration policies that provide "legal benefits or legal status . . . might implicate more than
simply the Executive's traditional enforcement discretion" and citing *Regents*).  Here, in
contrast, the 2021 and 2025 Guidance are merely internal enforcement guidance to law
enforcement officers.

agency action, the Court lacks jurisdiction under the APA to review the action. *See Sinclair Wyo. Refin. Co., LLC v. U.S. E.P.A.*, 72 F. 4th 1137, 1139 (10th Cir. 2023) ("Because the email was not a final agency action, we dismiss the petition for lack of jurisdiction.").

To be a final agency action, the action must satisfy two conditions. *See Bennett*, 520 U.S. at 177-78. First, "the action must mark the consummation of the agency's decisionmaking process," and, second, "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (quotation marks omitted); *see also U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016) (same).

Under this standard, it is not enough to show that "there may be practical consequences" flowing from agency action to establish that "legal consequences flow from the agency's conduct." *Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 732 (D.C. Cir. 2003). Rather, to be reviewable, the agency action "must itself be the source of the parties' obligations, modifying the applicable legal landscape by interpreting the scope of their statutory rights or duties." *Sinclair*, 72 F. 4th at 1143 (cleaned up).

In litigation over guidance documents, "the finality inquiry is often framed as the question of whether the challenged agency action is best understood as a non-binding action, like a policy statement or interpretive rule, or a binding legislative rule." *LYSTN, LLC v. FDA*, No. 19-cv-01943-PAB-KLM, 2020 WL 5513409, at *4 (D. Colo. Sept. 14, 2020) (quoting *Ass'n of Flight Attendants-CWA v. Huerta*, 785 F.3d 710, 716 (D.C. Cir. 2015)). A policy statement "explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion...under some extant statute or rule," and an interpretive rule is "issued by an agency to advise the public of the agency's construction of the statutes and

rules which it administers." *Id.* By contrast, a legislative rule "modifies or adds to a legal norm based on the agency's own authority flowing from a congressional delegation to engage in supplementary lawmaking." *Id.* (quotation marks omitted). "The most important factor in differentiating between binding and nonbinding actions is 'the actual legal effect (or lack thereof) of the agency action in question,'" *id.*—that is, whether the guidance carries "the force and effect of law." *Ass'n of Flight Attendants-CWA*, 785 F.3d at 713 (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015)).

DPS has not shown that the enforcement guidance it challenges is final agency action. It acknowledges the standard for final agency action, then asserts, without elaboration, that the enforcement guidance "has legal consequences." Doc. 2 at 16-17. It relies on its own allegations describing the guidance itself and another lawsuit challenging the guidance. *See id.* at 17 (citing Doc. 1 ¶¶ 32-40). And in its Complaint, DPS describes events and effects post-dating the 2025 Guidance, but no legal consequences. *See* Doc. 1 at ¶¶ 63-69.

The 2025 Guidance carries no binding, legal consequences for DPS. Rather, it is merely an internal advisement to DHS officers about the use of discretion and the requirements for supervisory approval for ICE enforcement actions in protected areas. *See* Doc. 1-11 at 2; Doc. 1-12 at 2-3. Even the prior 2021 Guidance—the internal guidance that DPS asks this Court to reinstate—did not create any rights that conferred an enforceable benefit on any person. *See* Doc. 1-1 at 6 ("This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.").

The 2025 Guidance does not have the force and effect of law. DHS's actual enforcement

authority is derived from statute. *See, e.g.*, 8 U.S.C. § 1226(a) ("On a warrant issued by the

Attorney General, an alien may be arrested and detained . . . ."). The 2025 Guidance does not

modify the applicable legal regime by interpreting the scope of the parties' statutory rights or

duties; it offers no interpretations of statutes or regulations. *See* Doc. 1-11 at 2; Doc. 1-12 at 3.

It does not require or prohibit enforcement actions in protected areas or otherwise determine the

legal rights of, impose regulatory burdens on, or create affirmative legal benefits for DPS. And

both Memos comprising the 2025 Guidance expressly disclaimed that they created or revoked

any binding or enforceable legal rights. *See* Doc. 1-11 at 2; Doc. 1-12 at 3.

The 2025 Guidance thus does not share the characteristics of agency actions that the

Supreme Court has found to be final agency actions subject to APA review. The Court has found

the "final agency action" requirement satisfied where an agency order exposed a party to double

penalties in a future enforcement proceeding and limited its ability to obtain a government

permit, *see Sackett v. EPA*, 566 U.S. 120, 126 (2012); where an agency terminated a national

program requiring certain non-Mexican nationals to be returned to Mexico to await the results of

their removal proceedings and forbidding government staff from continuing the program, *see*

*Biden*, 597 U.S. at 791, 793, 795, 807-09; where an agency made a definitive determination

whether property contained "waters of the United States," which affected the property owner's

liability for the disposal of pollutants and was binding for five years, *Hawkes*, 578 U.S. at 593,

598-600; and where an agency adopted regulatory requirements for actions that will affect

endangered species, thus altering the "legal regime," *Bennett*, 520 U.S. at 158, 177-78. The 2025

Guidance has no similar legal consequences for any external parties. *Cf. Ass'n of Flight*

*Attendants-CWA*, 785 F.3d at 712-13 ("internal guidance document issued to FAA aviation safety

inspectors" "does not carry the 'force and effect of law'" and therefore "does not reflect final agency action"). DPS alleges only practical, not legal, consequences flowing from the 2025 Guidance, see Doc. 2 at 11-14; Doc. 1 ¶¶ 63-69. But practical consequences are insufficient to show a final agency action. *See Reliable Automatic Sprinkler Co.*, 324 F.3d at 732.

Finally, the mere potential for later agency action does not show final agency action. *See Potash Ass'n of N.M. v. U.S. Dep't of Interior*, 367 F. App'x 960, 966 (10th Cir. 2010) (finding no final agency action where the action affected the plaintiff's legal rights only "on the contingency of future administrative action").

Because DPS cannot show that legal consequences directly flow from the 2025 Guidance, it cannot establish that 2025 Guidance is a final agency action, and this Court lacks jurisdiction over the APA claim. *See Sinclair*, 72 F. 4th at 1139.

> **D.    DPS has not shown it is likely to succeed on its FOIA claim.**

DPS also has not shown a likelihood of success on its FOIA claim. In that claim, DPS— while acknowledging that that it obtained the Huffman and Vitello Memos after they were filed in a separate lawsuit and before DPS filed its Complaint—claims that DHS has violated FOIA by not making those Memos available. DPS claims that the Memos "likely constitute a 'statement of general policy'" that must affirmatively be made available to the public in electronic format pursuant to 5 U.S.C. § 552(a)(2)(B). Doc. 1 ¶¶ 81-82.

FOIA provides that "[e]ach agency, in accordance with published rules, shall make available for public inspection in an electronic format . . . those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register." 5 U.S.C. § 552(a)(2)(B). DHS regulations, in turn, provide that each DHS component

is "responsible for determining which of its records are required to be made publicly available"
and for posting required records "on an ongoing basis," and that each DHS component has a
"FOIA Public Liaison who can assist in locating records particular to a component."  6 C.F.R.
§ 5.2.  For relief, FOIA authorizes courts to "enjoin the agency from withholding agency
records" and order the production of "improperly withheld" documents.  5 U.S.C.
§ 552(a)(4)(B).

DPS has not shown that it is likely to succeed on this claim.  Before filing its Complaint,
DPS obtained electronic copies of both Memos.  The Vitello Memo is now available for public
inspection in an electronic format on ICE's website.[11]  The Vitello Memo describes the salient
guidance from the Huffman Memo, and DHS has separately described that guidance in a press
release, Doc. 1-3 at 2, and on the ICE website.[12]  Under these circumstances, DPS lacks
standing, *see supra* at Part I.B; at a minimum, this claim is moot as to DPS.  *See Brown v.
Buhman*, 882 F.3d 1151, 1166 (10th Cir. 2016) ("a case becomes moot when a plaintiff no longer
suffers an actual injury that can be redressed by a favorable judicial decision").

## II.     DPS has not shown that it will suffer irreparable harm if the relief it seeks is not granted.

DPS has also not shown irreparable harm.  "A plaintiff seeking a preliminary injunction
must establish that . . . [it] is likely to suffer irreparable harm in the absence of preliminary
relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  A mere "possibility of
irreparable harm" is insufficient.  *Id*. at 22.  "That harm must be both certain and great, not
merely serious or substantial.  And a speculative or theoretical injury will not suffice."

---

[11] *See supra* at 9 n.2.
[12] *See supra* at 9 n.1.

*Colorado v. U.S. E.P.A.*, 989 F.3d 874, 884 (10th Cir. 2021) (quotation marks and citation

omitted). The harm also must have an "irreparable effect in the sense of making it difficult or

impossible [for the plaintiff] to resume their activities or restore the status quo ante in the event

they prevail." *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003). "The

purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from

irreparable injury that will surely result without their issuance." *Schrier v. Univ. of Colo.*, 427

F.3d 1253, 1267 (10th Cir. 2005).

    DPS has not shown that it will suffer irreparable harm if the Court does not grant the

preliminary relief it seeks. DPS argues that it faces harm from the 2025 Guidance because

DPS is unable to address the fears of students and families by providing "assurances" that

"students would be safe from DHS and ICE enforcement activities while at school . . . ." Doc.

2 at 22; *id*. at 23 ("because of the rescindment of the Protected Areas Policy, DPS could not

reassure families that their students would be safe at schools"). But the relief DPS seeks—

enjoining the 2025 Guidance and thus returning to the 2021 Guidance—would not enable DPS

to provide those assurances, because the 2021 Guidance did not categorically prohibit

enforcement actions at schools. Also, DPS has not shown that the 2021 Guidance would have

prohibited the DHS enforcement action taken on February 5, 2025, which was not at a school

or bus stop. DPS's argument that it will face harm from immigration enforcement only if DHS

operates under the 2025 Guidance is thus too speculative to show irreparable harm.

    As to its FOIA claim, DPS does not seek preliminary relief, *see* Doc. 2-6 at 1-2, or

argue that it will suffer irreparable harm absent preliminary relief, *see* Doc. 2 at 22-24.

Regardless, now that it has the Memos at issue, it cannot show such harm. *Cf. Ctr. for Nat'l*

*Sec. Studies v. CIA*, 711 F.2d 409, 414 (D.C. Cir. 1983) (rejecting the argument that "any delay

in resolving a FOIA dispute would constitute serious, perhaps irreparable, harm").

**III.    DPS has not shown that the public interest and balance of equities support granting the relief.**

The final two preliminary injunction factors, the public interest and the balance of the

equities, "merge" when the Executive Branch is a party. *Nken v. Holder*, 556 U.S. 418, 435

(2009).  DPS has not shown that these factors strongly weigh in its favor.  While DPS has

identified its students' concerns and its own, "courts of equity should pay particular regard for

the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S.

at 24.  Courts may not "blithe[ly]" dismiss the public interest in the prompt removal of aliens

who are subject to lawful removal. *Nken*, 556 U.S. at 436.  Moreover, 8 U.S.C. § 1252(f))(1)

reflects Congress's determination that the public interest supports avoiding judicial interference

with enforcement by immigration officers carrying out their arrest and removal functions.  The

order DPS seeks would interfere with those enforcement functions.

In addition, an injunction "must be tailored to redress the plaintiff's particular injury."

*Gill v. Whitford*, 585 U.S. 48, 73 (2018).  Here, DPS is pursuing its own rights as an organization

and has not pursued any mechanism to represent the interests of non-parties:  it has not sought

class certification or asserted associational standing to represent others.  The Court thus should

deny DPS's request for a nationwide injunction, Doc. 2 at 29-30, as DPS has not shown that one

is needed to protect DPS.

**CONCLUSION**

Because DPS has not met its heavy burden, the Court should deny the Motion.

Respectfully submitted on February 21, 2025.

J. BISHOP GREWELL
Acting United States Attorney

s/ Kevin Traskos
**Kevin Traskos**
Nicholas A. Deuschle
Thomas A. Isler
Katherine A. Ross
Assistant United States Attorneys
United States Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
Telephone: (303) 454-0100
E-mail: kevin.traskos@usdoj.gov
E-mail: nicholas.deuschle@usdoj.gov
E-mail: thomas.isler@usdoj.gov
E-mail: katherine.ross@usdoj.gov
*Counsel for Defendants*

I hereby certify that the foregoing pleading complies with the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(2), as amended by the Court's Order, Doc. 21.

s/ Kevin Traskos
**Kevin Traskos**

**CERTIFICATE OF SERVICE**

I certify that on February 21, 2025, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system, which will serve all counsel of record, including:

Claire Eleanor Mueller, Esq.
Tess Hand-Bender, Esq.
Emily Lauren Wasserman, Esq.
*Counsel for Plaintiff*

s/ Kevin Traskos
**Kevin Traskos**
Assistant United States Attorney
