**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 25-cv-00474-DDD-KAS

DENVER PUBLIC SCHOOLS

  Plaintiff,

v.

KRISTI NOEM, in her official capacity as Secretary of the United States
Department of Homeland Security; and
DEPARTMENT OF HOMELAND SECURITY,

  Defendants.

---

**PLAINTIFF'S REPLY IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY
RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION**

---

   Instead of defending the 2025 Policy as well reasoned and not "arbitrary and

capricious"—an argument Defendants do not address—Defendants seek refuge in various

procedural and jurisdictional escape hatches. Those efforts fail. Because DPS has standing and is

likely to prevail on the merits of its claim,[1] the Court should follow the Court in *Yearly Meeting*[2]

and grant the Motion.

---

[1] In addition to its APA claim, DPS asserted a FOIA claim under 5 U.S.C. § 552, based on
Defendants' failure to publish the 2025 Policy. After DPS filed its Complaint, Defendants
published one, but not both, of the underlying memos. (*See* ECF-24, "Resp." at 9.) While
Defendants are still in violation of FOIA (and DPS is maintaining the underlying claim), DPS
withdraws its FOIA claim insofar as it was offered as a basis for injunctive relief.
[2] *Philadelphia Yearly Meeting of the Religious Society of Friends et al. v. United States
Department of Homeland Security et al.,* No. 8:25-cv-00243 (D. Md. Feb. 24, 2025), Ex. 20.

## ARGUMENT

## I.    DPS HAS STANDING

Standing has three elements: (1) an injury in fact; (2) causation; and (3) redressability.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). DPS satisfies each element.

### A.    Injury In Fact.

Defendants argue that DPS has not asserted a cognizable injury because (1) the rescission

has not "directly affected and interfered" with DPS's core function, and (2) DPS has not shown a

concrete injury. Resp. at 19-23. Both arguments fail.

### i.    Interference with DPS's core functions.

Defendants rely on *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367 (2024) and

*Arizona Alliance for Retired Americans. v. Mayes*, 117 F.4th 1165 (9th Cir. 2024) to argue that it

is insufficient to merely demonstrate that DPS has diverted resources in response to the

challenged policy. (Resp. at 19-21.) However, DPS has alleged and put forth evidence that the

harm goes well beyond a diversion of resources or an ideological objection to Defendants'

actions. As set forth in the Complaint, Motion, and declarations, Defendants' wrongful conduct

directly interferes with DPS's core function—educating its students. Since the 2025 Policy was

announced, fewer DPS students come to school. (Shaler Decl., Ex. 21.) Relative to last February,

attendance is down 3% across the district, and the number is higher at schools with large new-to-

country populations. (*Id.* ¶¶11-13.) DPS teachers Matt Meyer and Rachel Rosenberg each

explain how decreased attendance and increased stress amongst their students, due at least in part

to the 2025 Policy, hamper their ability to teach their students, *i.e.*, fulfill their mission. (Meyer

Decl., Ex. 22; Rosenberg Decl., Ex. 23.) Mr. Meyer explains: "decreased or inconsistent

attendance directly hampers my ability to effectively educate all of the students in my classroom and has long lasting negative impacts on all students, regardless of their immigration status." (Meyer Decl. ¶46.) In addition, teachers are spending *time* (a precious resource) responding to fears about the 2025 Policy instead of educating students. (*Id.* ¶50; Rosenberg Decl. ¶¶31-32.) DPS's alleged and established harms are more than sufficient to establish standing.

Neither *Hippocratic Medicine* nor *Arizona Alliance* supports a contrary holding. As the Supreme Court explained, the purpose of Article III standing is to answer the question: "What's it to you?" *Hippocratic Med.*, 602 U.S. at 379. In *Hippocratic Medicine*, for plaintiffs, that answer was "nothing," because the policy did not require plaintiffs to do, or refrain from doing, anything. *Id.* The Court explained that organizational standing requires a plaintiff to show more than that they disagree with government action and are spending resources to change it. *Id.* at 394 (citing to *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). But DPS is not an advocacy organization that merely opposes the 2025 Policy; rather, the policy interferes with its ability to fulfill its mission of educating students. Like the plaintiffs in *Havens*,[3] DPS is spending resources (*i.e.*, time and money) to ameliorate the 2025 Policy's negative effects on its classrooms. *Havens*, 455 U.S. at 379; *see also Ariz. All.*, 117 F.4th at 1175 (*Havens* plaintiffs had standing because they "spent resources offsetting policies that harmed its then-existing activities").

---

[3] Defendants argue, based on *Arizona Alliance*, that *Hippocratic Medicine* did away with a plaintiff's ability to argue organizational standing based on diversion of resources. (Resp. at 20.) That was not *Hippocratic Medicine*'s holding. While *Hippocratic Medicine* distinguishes the plaintiff's claims from those in *Havens*, it does not purport to overrule or alter *Haven*'s holding regarding organization standing. *Hippocratic Med.*, 602 U.S. at 395.

*Moya v. DHS*, 975 F.3d 120 (2d Cir. 2020) is more factually analogous than the cases that Defendants cite and supports standing under *Havens*. In *Moya*, the plaintiff (an immigration advocacy group) established standing by showing that a DHS policy caused it to spend twice as much time on certain tasks, leaving less time for other clients and frustrating its mission. *Moya*, 975 F.3d at 129. Relying on *Havens*, *Moya* explained "[t]hese alleged obstacles 'constitute far more than simply a setback to [plaintiff's] abstract social interests'—they represent a real 'drain on the organization's resources.'" *Id.* (citing *Havens*, 455 U.S. at 379). Here, the 2025 Policy forces DPS to divert time from its educational efforts to respond to student absences and increased fear. (Meyer and Rosenberg Decls.; ECF-2 at 11-14.) That constitutes a "real drain" on DPS's resources, which otherwise would be dedicated to education.

### ii.     DPS has suffered concrete injuries.

Defendants rely on *Clapper v. Amnesty Int'l, USA,* 568 U.S. 398 (2013) and *Laird v. Tatum,* 408 U.S. 1 (1972) to argue that DPS cannot rely on students' fears about the threat of enforcement to establish standing. (Resp. at 21-23.) *Yearly Meeting* rejected these same arguments. Ex. 20 at 20-21. Like in *Yearly Meeting*, DPS is not basing its claims on harm to others. Rather, DPS is itself injured because decreased attendance and increased stress in the community hinders its ability to educate its students. These injuries are not impending, they have already occurred.

### iii.     *United States v. Texas* does not bar DPS's claims.

Defendants also argue that DPS lacks standing to bring its APA claims because *United States v. Texas,* 599 U.S. 670 (2023) bars a plaintiff "from establishing standing to challenge federal immigration enforcement policies on the grounds that they were adversely affected by

those policies." (Resp. at 17.) Not so. In *Texas,* several states brought suit arguing that DHS's

guidelines were unlawful because they should mandate *more* noncitizen arrests. *See id.* at 676.

The Court held that the states did not have standing because they had no legally cognizable

interest in compelling more arrests— "when the Executive Branch elects *not* to arrest or

prosecute, it does not exercise coercive power over an individual's liberty or property, and thus

does not infringe upon interests that courts often are called upon to protect." *Id.* at 678.

DPS does not argue that DHS should make *more* arrests. Nor is it challenging

Defendants' enforcement priorities. Rather, DPS argues that Defendants' decision to rescind the

Protected Areas Policy, which dealt with *where* certain law enforcement activities can occur, was

arbitrary and capricious, and as a result, caused DPS *actual* harm. DPS's challenge is therefore

outside of *Texas*'s holding. Ex. 20 at 21-22 (addressing *Texas*).

**B.      DPS's Injuries Are Caused By and Traceable to the 2025 Policy.**

Defendants argue that DPS's injuries caused by decreased attendance and increased stress

on students are not traceable to the 2025 Policy. This argument is absurd given Defendants' own

statements. On January 21, 2025, in their press release announcing the rescission of the Protected

Areas Policy, Defendants called out schools, stating that the rescission was necessary to stop

"murders [*sic*] and rapists" from hiding in "America's schools." (ECF-1-3.). Since then,

Defendants have announced a "multimillion-dollar ad campaign warning illegal aliens to leave

our country now or face deportation."[4] In the ads, Secretary Noem states: "Leave now. If you

don't, we will find you and we will deport you." *Id*. Defendants cannot make statements

---

[4] Press Release, Feb. 17, 2025, Ex. 24, https://www.dhs.gov/news/2025/02/17/dhs-announces-ad-
campaign-warning-illegal-aliens-self-deport-and-stay-out.

threatening increased enforcement, including *at schools*, and disclaim the harm that naturally

flows from them. In addition, DPS has cited specific evidence establishing that the 2025 Policy

is causing, at least in part, the decreased attendance relative to 2024 and increased stress amongst

students. (Shaler Decl. ¶11-13; ECF-2 at 12.) Days ago, ICE *did* detain an individual at a school

in Chicago—a father in the midst of dropping off his two youngest children at their elementary

school.[5] Thus, DPS's injuries are a predictable result of and fairly traceable to the 2025 Policy.[6]

Ex. 20 at 22-27 (finding that plaintiffs' injuries were traceable to and caused by the 2025 Policy;

*see also Department of Commerce v. New York*, 588 U.S. 752, 768 (2019) (traceability satisfied

by showing "predictable effect of Government action on" third parties).

### C.    DPS's Injury Is Redressable.

Defendants argue that DPS's injury is not redressable because §1252 bars DPS's

requested relief and DPS has not shown the relief will remedy the claimed injury. As *Yearly

Meeting* just held, these arguments must be rejected. Ex. 20 at 29-31.

### i.    §1252(f)(1) does not bar DPS's requested relief.

8 U.S.C. §1252(f)(1) does not apply here. Ex. 20 at 29-31. By its own terms, §1252(f)(1)

is limited to claims brought under §§1221–1232. *See Biden v. Texas*, 597 U.S. 785, 798 (2022).

§1252 "does not bar injunctions affecting DHS's authority pursuant to provisions of the INA

outside of §§1221-1232 'simply because of collateral effects on a covered provision'." Ex. 20 at

---

[5] Article, Feb. 27, 2025, Ex. 25.
[6] Defendants' reliance on the hypothetical in *Hippocratic Medicine* is misplaced as it relates to a claim that the government should arrest *more* people. *See* 602 U.S. at 392. That is not the issue here.

29-30 (quoting *Al Otro Lado v. Exec. Office for Immigr. Review*, 120 F.4th 606, 627 (9th Cir. 2024)).

Like in *Yearly Meeting*, the core conduct at issue in this case is not governed by the provisions identified in § 1252. Rather, the challenged conduct is governed by 8 U.S.C. §1357, allowing warrantless enforcement, as DHS has admitted. Rather, the challenged conduct is governed by 8 U.S.C. §1357, allowing warrantless enforcement, as DHS admitted. (*Yearly Meeting* Transcript, Ex. 26, at 82:12-84:19; Ex. 20 at 30-31.) DHS has also conceded here that injunctions are available to stop enforcement under §1357. (Resp. at 27-28 n.8.)[7]

Second, contrary to Defendants' argument, §1252(f)(1) does not bar claims brought under §706, and *Garland* does not hold otherwise. *Garland v. Gonzalez*, 596 U.S. 543, 571 (2022) (Sotomayor, J., concurring in part and dissenting in part) (confirming the Court did not hold that "§1252(f)(1) affects courts' ability to 'hold unlawful and set aside agency action, findings, and conclusions'" under the APA); *see also Texas*, 597 U.S. at 801 n.4 (expressing no view on whether §1252(f)(1) precluded APA relief); *see also E. Bay Sanctuary Covenant v. Biden,* 683 F. Supp. 3d 1025, 1039 (N.D. Cal. 2023).

Finally, Defendants' argument about §706 not permitting a court to "vacate" the 2025 Policy should be rejected. The Tenth Circuit has explained that under §706(2), vacatur is an appropriate remedy. *See High Country Conservation Advocates v. United States Forest Serv.,* 951 F.3d 1217, 1228-29 (10th Cir. 2020).

---

[7] DPS does not seek to enjoin enforcement actions conducted pursuant to §1226(a).

   ii.  **An injunction would redress DPS's injuries.**

  The last element of standing requires that the alleged injury is "likely to be redressed by a favorable decision." *Lujan*, 504 U.S. at 590. "The second and third standing requirements—causation and redressability—are often flip sides of the same coin. If a defendant's action causes an injury, enjoining the action … will typically redress that injury." *Hippocratic Med.*, 602 U.S. at 380-81.

  Defendants argue that returning to the 2021 Policy would not remedy DPS's attendance issues because the   Policy did not "prohibit immigration enforcement actions in schools." (Resp. at 29.) But longstanding policy protected schools from such enforcement in all but limited, delineated circumstances. (ECF-1-1.) The absence of these protections is harming DPS. Therefore, it is reasonable to conclude that returning to the 2021 Policy would redress DPS's injuries. (Ex. 20 at 27-29.)

## II. DPS IS LIKELY TO PREVAIL ON THE MERITS

  As for the merits, Defendants critically do not argue that adopting the 2025 Policy was <u>not</u> arbitrary and capricious. Instead, they seek to avoid judicial review of their unsupported policy altogether for three reasons, each of which should be rejected.

  A. **Defendants' Arguments Concerning Zone of Interest Fail.**

  Defendants' argument that DPS's claim is outside the INA's zone of interest because the INA does not provide explicit "location-based protection for schools" is an overly narrow distortion of the test. (Resp. at 33.) Instead, as Defendants' authorities provide, a plaintiff's interests must merely be "related to or []consistent with the purposes implicit in the statute." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014). "[I]t is

sufficient that [DPS's] asserted interests are consistent with and more than marginally related to the purposes of the INA." *See E. Bay*, 932 F.3d at 768. The test is particularly lenient in the APA context, requiring only that an APA plaintiff be "arguably" within the zone of interests to be protected or regulated by the relevant statute. *Lexmark*, 572 U.S. at 130; *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians* v. *Patchak*, 567 U.S. 209, 225 (2012) (noting Congress's "'evident intent' when enacting the APA 'to make agency action presumptively reviewable.'"). "[T]he benefit of any doubt goes to the plaintiff." *Lexmark*, 572 U.S. at 130.

*Patchak* is illustrative. There, the Supreme Court allowed Patchak's APA challenge to the government's acquisition of land via the Indian Reconstruction Act for use as a casino by a local tribe, even though Patchak was not a member of the tribe and was only a nearby landowner concerned about alleged "economic, environmental, and aesthetic harms" from that use of the land. 576 U.S. at 224. Because the underlying statute and its implementation by the agency "encompasse[d]" land use issues, his interest came within the regulatory ambit of the statute. *Id.* at 226-28.

DPS satisfies this lenient inquiry. DPS's asserted interest in this litigation is in protecting its ability to provide education and related services to all students, regardless of immigration status. (*See* ECF-1 at ¶¶14, 64–68, ECF-2 at 28-29). Defendants do not refute DPS's statement that the INA was not intended to restrict access to education and related benefits. (Resp. at 32-33.) Instead, they argue that DPS's claim is outside of the zone of interest because it does not relate to those interests, but instead, relates only to *where* Defendants can carry out enforcement activities. (*Id.*) Defendants' argument is based on an overly narrow view of the zone of interest test already rejected by *Patchak*. Although the 2025 Policy relates to *where* enforcement

activities can occur, because it permits broad enforcement in schools, it affects DPS's ability to

provide an education and related services to its students—interests the INA (and its prior

implementation) protect. The INA's implicit purpose of not hindering educational opportunity

for immigrant students is further evidenced by the Protected Areas Policy itself—*i.e.*, the

agency's longstanding implementation of the statute. (ECF-1 ¶¶22–31.) Accordingly, because

the 2025 Policy affects DPS's ability to provide education and other related benefits, DPS's

interest is consistent with INA's purposes and implementation, and at least "arguably" within the

zone protected or regulated by the statute. *See E. Bay*, 932 F.3d at 768.

**B.    The "Agency Discretion" Exception Does Not Bar Review.**

Defendants next invoke 5 U.S.C §701(a)(2), which exempts from judicial review actions

that are "committed to agency discretion by law" ("Exemption"), to argue that the 2025 Policy is

not reviewable. But the Exemption, which must be read keeping in mind the strong presumption

that administrative actions are reviewable, *see Abbott Labs. v. Gardner*, 387 U.S. 136, 140-41

(1967), is not as broad as Defendants assert and does not apply.

The Supreme Court has applied the Exemption "quite narrowly," limiting it to "rare

circumstances" when a court has "no meaningful standard against which to judge the agency's

exercise of discretion" and has refused attempts to expand these categories. *DOC v. New York*,

588 U.S. 752, 772-73 (2019) (holding action is reviewable because there is "law to apply" in

evaluating the decision); *see also DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 17–18 (2020);

*Weyerhaeuser Co. v. USFWS*, 586 U.S. 9, 23-26 (2018). Indeed, the Court has recognized

limited categories of unreviewable actions. *See DOC*, 588 U.S. at 772; *Weyerhaeuser*, 586 U.S.

at 23. Defendants do not assert that any of these categories apply, but urge an unsupported expansion of the holding in *Heckler v. Chaney*, 470 U.S. 821 (1985).

*Heckler* involved a challenge to the FDA's refusal to initiate certain enforcement actions concerning lethal injection drugs. 470 U.S. at 823. *Heckler* held that refusals to enforce were not entitled to the APA's presumption of reviewability but instead "should be presumed immune from judicial review;" construing the Exemption to apply when decision making is committed "to the agency's judgment absolutely." *Id.* at 830-32. *Heckler* reasoned that refusals are distinctive because "when an agency refuses to act it generally does not exercise its *coercive* power…and thus does not infringe upon areas that courts often are called upon to protect." *Id.* at 832. In contrast, when an agency "*does* act to enforce," it exercises its power, and that action is "a focus for judicial review." *Id.* at 832. *Heckler's* holding only addresses the reviewability of specific non-enforcement decisions, it says nothing about the reviewability of an agency's unreasoned recission of a long-standing policy of general applicability. *See Regents*, 591 U.S. at 18 (rejecting *Heckler* argument and holding that the creation of DACA and its recission was subject to judicial review.).[8]

Recognizing *Heckler's* limitations, Defendants also argue that the Exemption should apply because of the "broad discretion" granted immigration officials, including under 8 U.S.C. §1103, and the "traditional[]" discretion afforded to law enforcement. (Resp. at 35-36.) This

_____

[8] Addressing *Regents*, Defendants point to its reasoning that DACA conferred "affirmative immigration relief." (Resp., 37 n.10.) But DPS does not contend that the 2025 Policy is reviewable based on that reasoning; instead, *Regents* stands for the proposition that the Exemption, as applied in *Heckler*, will not apply where the challenged action is *not* a nonenforcement decision. *See* 591 U.S. at 18. The 2025 Policy is not a nonenforcement decision and thus falls outside of *Heckler* and the Exemption.

argument is a request for this Court to create a new, poorly defined category of unreviewable

actions under the Exemption: specifically, decisions that "involve considerable agency

discretion." (*Id.*) But application of the "narrow" Exemption in such broad and undefined

circumstances is unsupported.

     To begin, the Supreme Court has rejected application of the Exemption because an

agency is conferred "broad discretion." In *DOC*, the Court ruled the agency's decision to

reinstate census questions was reviewable under the APA, even where the agency was afforded

"broad discretion" to perform the census in "such form and content as he may determine" and

"obtain such other census information as necessary." 588 U.S. at 771.[9] Under *DOC*, that

Defendants are afforded discretion to "perform such other acts as [the Secretary] deems

necessary," 8 U.S.C. §1103(a)(3), does not mean Defendants' actions are unreviewable. *DOC*,

588 U.S. at 771.

     The existence of discretion does not warrant application of the Exemption. To hold

otherwise could render all discretionary actions unreviewable (an unfounded expansion of

§701(a)(2)) and would frustrate the APA's directive to "hold unlawful and set aside agency

action … found to be … an abuse of discretion." 5 U.S.C. §706(2)(A); *Weyerhaeuser*, 586 U.S.

at 23 ("A court could never determine that an agency abused its discretion if all matters

committed to agency discretion were unreviewable."); *see also Texas*, 597 U.S. at 815

(Kavanaugh, J., concurring) ("Because the immigration statutes afford substantial discretion …

---

[9] In so holding, the Court noted examples where, despite the "broad discretion," the underlying statute "contrain[ed]" the agency's authority. *See* 588 U.S. at 771. Here, not only is the grant of "broad discretion" similar, Defendants admit that Congress has "dictate[d]" and "circumscribed" its discretion in certain ways. (Resp. at 36-37.)

different Presidents may exercise that discretion differently. That is Administrative Law 101.
[But] the [APA] … require[s] that an executive agency's exercise of discretion be reasonable and
reasonably explained.").

The Exemption is much narrower than Defendants contend. The Court should reject
Defendants' invitation to create a new, vague category of unreviewable agency actions.

### C.    The 2025 Policy is a Final Agency Action.

Finally, Defendants assert the 2025 Policy is unreviewable because it is not a "final
agency action," meaning "the consummation of the agency's decisionmaking process' and []
action 'by which rights or obligations have been determined, or from which legal consequences
will flow.'" *Cody Labs., Inc. v. Sebelius*, 446 F. App'x 964, 968 (10th Cir. 2011). "The finality
inquiry is a 'pragmatic' and 'flexible' one," *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289
(D.C. Cir. 2016)—and one that Defendants again construe too narrowly.

To begin, Defendants' implication that only "legislative rules" can be final (Resp. at 38–
39), is incorrect. *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 631 (D.C. Cir. 2019) ("[T]he
finality analysis is therefore distinct from the test for whether an agency action is a legislative
rule."). Indeed, "interpretive rules can be final." *Id.* at 635.

Second, Defendants do not dispute the 2025 Policy is the consummation of Defendants'
"decisionmaking process," arguing instead that no "legal consequences" flow from the 2025
Policy. But Defendants focus on only one type of final agency action: those that "modify[] the
applicable legal landscape by interpreting the scope of [the parties'] statutory rights or duties."
(Resp. at 38.) There are others. For example, actions that create, shape, or deny "safe harbors"
are binding and have legal consequences. *See, e.g.*, *United States Army Corps of Eng'rs v.*

*Hawkes Co.*, 578 U.S. 590, 599 (2016) (holding that "legal consequences [can] flow" from a "denial of [a] safe harbor"); *Texas v. EEOC*, 933 F.3d 433, 442 (5th Cir. 2019) (creation of safe harbors indicates that "an agency's action binds it and thus has legal consequences"); *Cohen v. United States*, 578 F.3d 1, 9 (D.C. Cir. 2009), *aff'd en banc* 650 F.3d 717 (D.C. Cir. 2011) (when "parties can rely on [a document] as a norm or safe harbor by which to shape their actions, it can be binding as a practical matter."). Moreover, often looking to whether the agency uses mandatory language, "[c]ourts consistently hold that an agency's guidance documents binding it and its staff to a legal position produce legal consequences or determine rights and obligations[.]" *EEOC*, 933 F.3d. at 441.

Third, Defendants' assertion that practical consequences are insufficient to satisfy the finality test fails (Resp. at 38)—under the applicable "pragmatic" final action inquiry, many courts consider practical consequences relevant to a determination of finality. *See, e.g.*, *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 412 (D.C. Cir. 2011) (agency action was final because it "imposed an immediate and significant practical burden").

Thus, legal consequences flow from the 2025 Policy. First, the Protected Areas Policy served as a "safe harbor" by exempting schools from enforcement actions except in approved or exigent circumstances. Thus, the 2025 Policy is a "denial" of this former safe harbor, from which "legal consequences" flow. *See Hawkes*, 578 U.S. at 599. Second, by providing predictable guidelines governing enforcement actions on or near schools, private parties, including DPS, "rel[ied] on [the Protected Areas Policy] as a norm or safe harbor by which to shape their actions[.]" *Cohen*, 578 F.3d at 9. Third, the 2025 Policy is binding on agency staff. *See EEOC*, 933 F.3d at 441. It speaks in mandatory terms (ECF-2-12 ("the Department will not be issuing

bright line rules regarding where immigration laws are permitted to be exercised")), and it

removes guidance for day-to-day actions of agents and officers. An unelaborated instruction to

use "common sense" is just as legally consequential as a detailed policy that provides clear

guidelines. Finally, as described in the Motion and herein, DPS has also suffered (injurious)

practical consequences due to the 2025 Policy. These factors support a holding that, under the

"pragmatic" finality inquiry, the 2025 Policy is final agency action.

## III.    DPS DEMONSTRATED IRREPARABLE HARM

Defendants do not dispute that absence from school for any period of time is irreparably

detrimental to a child's intellectual, psychological, and social development. *N.J. v. New York*,

872 F. Supp. 2d 204, 214 (E.D.N.Y. 2011) (granting preliminary injunction and noting that

"interruption of a child's schooling causing a hiatus not only in the student's education but also

in other social and psychological developmental processes that take place during the child's

schooling, raises a strong possibility of irreparable injury."); *see also C.G. v. Saucon Valley Sch.

Dist.*, 571 F. Supp. 3d 430, 445 (E.D. Pa. 2021) (finding irreparable harm where school district's

policies blocked student's attendance at school, preventing "meaningful progress" in student's

education). Instead, Defendants argue that DPS's harm is too speculative because, even under the

2021 Policy, DPS could not unconditionally assure its students that they were safe from

enforcement actions. This argument relies on a false equivalence between the 2021 Policy and

the 2025 Policy. Although the 2021 Policy did not include a categorical prohibition of

enforcement actions in schools, it designated schools as areas subject to heightened scrutiny and

procedural safeguards, and its express goal was to avoid enforcement actions in schools "to the

fullest extent possible." (ECF-1-1.) The 2025 Policy does away with these foundational

protections. This removal of protections, and the accompanying fear, has caused DPS irreparable

harm that is far from speculative.

## IV.    THE PUBLIC INTEREST AND BALANCE OF EQUITIES SUPPORT DPS

The final two factors merge and support DPS's injunction. Where a plaintiff proves both

likelihood of success on the merits and irreparable injury, as DPS has done, "it almost always

will be the case that the public interest favors preliminary relief." *Issa v. Sch. Dist. of Lancaster*,

847 F.3d 121, 143 (3d Cir. 2017). Nevertheless, Defendants argue an injunction is not in the

public interest because it would interfere with immigration officers "carrying out their arrest and

removal functions." (Resp. at 44.) Defendants, however, offer no evidence that reverting to the

guidelines established in the 2021 Policy will negatively impact them. Nor do Defendants

provide evidence that their interest outweighs the public's interest in providing safe schools.

Rather, the evidence is to the contrary. Indeed, one of the motivating factors for creating the

Protected Areas Policy 30 years ago was the public's interest in safe schools. (ECF-2, at 4-5.)

For the reasons set forth above, §1252(f)(1) does not apply (*see supra*, I.C.i) and so does not

support Defendants' argument that the public interest opposes an injunction.

Finally, Defendants' argument that a nationwide injunction is unjustified in DPS's case

ignores the context of the injunction DPS seeks. Nationwide injunctions are often appropriate

where, as here, matters of immigration law are involved. *Florida v. HHS*, 19 F.4th 1271, 1282

(11th Cir. 2021). Nationwide injunctions are appropriate where a grant of injunction would cover

not just a plaintiff, but also similarly situated parties. *Trump v. Int'l Refugee Assistance Project*,

582 U.S. 571, 582 (2017). School districts across the country are similarly situated to DPS and a

nationwide injunction is not only appropriate, but necessary to avoid inequitable treatment of similarly situated parties. *See HIAS, Inc. v. Trump*, 985 F.3d 309, 327 (4th Cir. 2021).

### CONCLUSION

Defendants attempt to discredit DPS's harm and shield the 2025 Policy from judicial review. But because DPS's harm is real, tied to the 2025 Policy, and redressable, and because Defendants misapply the requirements and exceptions of the APA—which creates a presumption of reviewability—this Court should grant DPS's motion.

Respectfully submitted on February 28, 2025.

*s/ Emily L. Wasserman*
Tess Hand-Bender, Esq.
Emily L. Wasserman, Esq.
Claire E. Mueller, Esq.
Brooke Rogers, Esq.
Stephen A. Snow, Esq.
Nicholas Moskevich, Esq.
DAVIS GRAHAM & STUBBS LLP
3400 Walnut Street, Suite 700
Denver, CO 80205
Telephone:   303.892.9400
Facsimile:    303.893.1379
tess.hand-bender@davisgraham.com
emily.wasserman@davisgraham.com
claire.mueller@davisgraham.com
brooke.rogers@davisgraham.com
stephen.snow@davisgraham.com
nick.moskevich@davisgrahm.com

*Attorneys for Plaintiff Denver Public Schools*

I hereby certify that the foregoing pleading complies with the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(2), as amended by the Court's Order.

<u>*s/ Emily L. Wasserman*</u>