## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-00474-DDD-KAS

DENVER PUBLIC SCHOOLS,

     Plaintiff,

v.

KRISTI NOEM, Secretary of the United States
Department of Homeland Security, in her
official capacity, and DEPARTMENT
OF HOMELAND SECURITY,

     Defendants.

---

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

For its Amended Complaint, Plaintiff, Denver Public Schools ("DPS" or "Plaintiff"), through its undersigned counsel, alleges as follows:

### INTRODUCTION

1.    Public education is paramount to the survival of any community; it is the bedrock upon which a community thrives. For roughly 121 years, DPS has been that bedrock for the City of Denver, Colorado. Now the largest public school district in Colorado, DPS is responsible for the education and safety of more than 90,000 students.

2.    Over those 121 years, DPS has always sought to provide a safe and enriching environment for all its students. DPS's first and foremost value is "Students

First," meaning DPS strives to put the needs of its students at the heart of every decision.

3.      DPS understands that students entering its schools are not blank slates or all the same. They come from families with diverse religious, cultural, and political beliefs, different socio-economic backgrounds, and various immigration statuses. DPS's mission and values do not depend on such metrics. Indeed, consistent with the very model of public education, providing education to local children (regardless of their personal circumstances) is integral to DPS's role in the community.

4.      For at least the last 30 years, DPS's goal of providing a safe environment for its students and their families was buttressed by the federal government's policy not to enforce immigration laws in "protected areas" such as schools, as well as houses of worship, and hospitals (generally, the "Protected Areas Policy"). Thus, parents across Denver enroll their children in public schools believing that while at school, their children will be educated and enriched without fear the government will enforce immigration laws on those premises.

5.      In one of the most recent iterations of the longstanding Protected Areas Policy, the Department of Homeland Security ("DHS") made clear that many factors should be considered in any enforcement action, "including the location in which we are conducting the action and its impact on other people and broader societal interests." (Memorandum from Alejandro N. Mayorkas, Secretary, Department of Homeland Security, *Guidelines for Enforcement Actions in or Near Protected Areas*, at 2 (Oct. 27,

2021) ( "2021 Memo"), attached as Exhibit 1.).[1] The longstanding Protected Areas
Policy specifically identified "a school, such as a pre-school, primary or secondary
school, vocational or trade school, or college or university" as a protected area because
people will feel hesitant to receive these essential educational services without
protection. (*Id.* at 2.)

6.    Even though versions of the Protected Areas Policy had been in place for
over 30 years, mere days after President Donald Trump's new administration took
office, DHS purportedly issued a directive rescinding the Protected Areas Policy.

7.    DHS did not publish this "directive" on its website or released it publicly at
the time when it was announced.

8.    Instead, DPS learned of the existence of this new policy from a January
21, 2025, Fox News article that reported that Fox News "reviewed a draft" of the new
policy. (*See* Adam Shaw & Bill Melugin, *Trump DHS repeals key Mayorkas memo
limiting ICE agents, order parole review*, Fox News (Jan. 21, 2025), attached as Exhibit
2.)[2]

9.    On January 21, 2025, DHS issued a press release confirming that Acting
DHS Secretary Benjamine Huffman had issued a directive that "rescinds the Biden
Administration's guidelines for Immigration and Customs Enforcement (ICE) and
Customs and Border Protection (CBP) enforcement actions that thwart law enforcement

---

[1] Available at https://www.dhs.gov/sites/default/files/publications/21_1027
_opa_guidelines-enforcement-actions-in-near-protected-areas.pdf.
[2] *See* https://www.foxnews.com/politics/trump-dhs-repeals-key-mayorkas-memo-
limiting-ice-agents-orders-review-parole-use.

in or near so-called 'sensitive' areas." (*See* Press Release, Department of Homeland Security, Statement from a DHS Spokesperson on Directive Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole (Jan. 21, 2025), attached as Exhibit 3.)[3]

10.     The January 21 Press Release did not attach or link any memo or other written guidance about the rescindment of the Protected Areas Policy.

11.     By all accounts, the new DHS policy gives federal agents virtually unchecked authority to enforce immigration laws in formerly protected areas, including schools. As reported to the public, the sole restraint on agents is that they use their own subjective "common sense" to determine whether to carry out enforcement activities at formally safeguarded locations such as schools. (*See id.*)

12.     DPS has devoted significant time and resources preparing for the impacts of the new administration's anticipated rescindment of this decades-long norm and reacting to the subsequent rescindment. This includes supporting its students and families in an uncertain time—tasks that distract and divert resources from DPS's core and essential educational mission.

13.     If DHS is going to entirely upend a longstanding policy—especially one that directly impacts the daily lives (not to mention potential long-term prospects) of Denver residents—it must follow specific procedures. As described herein, DHS has not followed any of those procedures. As such, the Court should grant a preliminary

---

[3] Available at: https://www.dhs.gov/news/2025/01/21/statement-dhs-spokesperson-directives-expanding-law-enforcement-and-ending-abuse.

injunction enjoining immigration enforcement actions on or near school grounds and vacate DHS's new 2025 Policy (as defined herein) as it applies to schools.

## PARTIES

14.     Plaintiff DPS is Colorado's largest public school district, with over 90,000 students currently enrolled in its 207 schools. (*See* Colorado Department of Education, *Denver County School District Profile*, (last visited Feb. 11, 2025).)[4]  DPS guarantees an education to any student located within its district boundaries and enrollment zones, regardless of that student's immigration status. DPS's mission is to prepare every one of its students for careers, college, and life by creating conditions where students and families belong and thrive.

15.     Defendant DHS is a federal cabinet agency responsible for implementing and enforcing the Immigration and Nationality Act ("INA"). DHS is an agency within the meaning of 5 U.S.C. § 551(1). DHS, as well as its component agencies, U.S. Customs and Border Protection ("CBP") and U.S. Immigration and Customs Enforcement ("ICE"), have responsibility for, among other things, administering and enforcing the nation's immigration laws.

16.     Defendant Kristi Noem is the Secretary of DHS. Defendant Noem is sued in her official capacity.

## SUBJECT MATTER JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

---

[4] Available at: https://www.cde.state.co.us/schoolview/explore/profile/0880.

18.     Declaratory and injunctive relief is sought as authorized in 28 U.S.C. §§ 2201 and 2022, and vacatur under 5 U.S.C. § 702.

19.     Venue is proper under 28 U.S.C. § 1391(b). Defendants are United States agencies or officers sued in their official capacities. Plaintiff is a public school district in the State of Colorado whose residents reside in the State of Colorado, and the events giving rise to this Complaint occurred, are occurring, and will occur in the State of Colorado, within the City of Denver.

## STATEMENT OF FACTS

### A.     History of the Protected Area Policy

20.     Prior to 1993, federal immigration enforcement officers used school grounds as a location to conduct immigration enforcement activities. *See Murillo v. Musegades*, 809 F. Supp. 487, 495 (W.D. Tex. 1992). As a federal district judge for the Western District of Texas recounted, immigration enforcement officers had a "regular, consistent, and prominent presence" on a particular high school campus. *Id.* The district judge decried the practice, finding that the high school was intended to "provide[] an oasis of safety and freedom for the students and staff who reside within the School District" but that the "continued harassment" by immigration authorities had "invad[ed] . . . the oasis." *Id.*

21.     On May 17, 1993, James Puleo, the Acting Associate Commissioner of the Immigration and Naturalization Service (the "INS"), signed a Memorandum titled "Enforcement Activities at Schools, Places of Worship, or at Funerals or other Religious

Ceremonies." (*See* Memorandum from James A. Puleo (the "1993 Memo"), attached as

Exhibit 4.)[5]

22.     The 1993 Memo established "a policy of the [INS] to attempt to avoid

apprehension of persons and to tightly control investigative operations on the premises

of schools, places of worship, funerals and other religious ceremonies." (*Id.* at 1.) Under

the 1993 Memo, apart from "exigent circumstances," any immigration enforcement

operation that was "likely to involve apprehensions on the premises of schools, places

of worship, funerals and other religious ceremonies" required "advance written approval"

from certain specified supervisory agents. (*Id.* at 1-2.) In determining the

appropriateness of such operations, these supervisory agents were required to consider

four factors:  (1) "[t]he availability of alternative measures which would achieve the

enforcement objective, such as "making the arrest off the premises;" (2) "[t]he

importance of the enforcement objective in the context of [INS] priorities;"

(3) "[m]easures which can be taken to minimize the impact on operation of the school or

place of worship;" and (4) "[w]hether the action ha[d] been requested or approved by

managers of the institution involved." (*Id.* at 2.)

23.     In continuation of this policy, on December 26, 2007, Marcy Forman, the

Director of the Office of Investigations of ICE, issued a memorandum titled

"Enforcement Action at Schools" (Memorandum from Marcy M. Forman, (Dec. 26, 2007)

---

[5] Available at: https://www.aila.org/aila-files/0630B9EA-805A-4353-92DE-
4DEBE638D0B8/08050774.pdf (pages 9-11).

(the "2007 Memo"), attached as Exhibit 5.)[6] The 2007 Memo observed *inter alia* that (1) "[t]he presence of [ICE] law enforcement agents conducting investigative activity at schools . . . has always been a point of particular sensitivity[;]" and (2) "great care and forethought [must] be applied before undertaking any investigative or enforcement type action at or near schools[.]" (*Id.* at 1.) Thus, pursuant to the 2007 Memo, prior approval was required before undertaking any enforcement action or investigative activity that included the "possibility of detention or questioning of subjects" at schools. The policy did not apply to "terrorism-related investigations, cases of public safety[,] or other cases that can be articulated." (*Id.*) The 2007 Memo did not purport to rescind or supersede the 1993 Memo.

24.    On July 3, 2008, Julie Myers, the Assistant Secretary of ICE, issued a memorandum titled "Field Guidance on Enforcement Actions or Investigative Activities At or Near Sensitive Community Locations." (Memorandum from Julie Myers, (Jul. 3, 2008) (the "2008 Memo"), attached as Exhibit 6.)[7] The 2008 Memo stated, "ICE personnel should refrain from conducting enforcement actions or investigative activities at or near sensitive community locations such as schools, places of worship, and funerals or other religious ceremonies, except in limited circumstances as set forth within [the 2008 Memo]." As articulated in the 2008 Memo, which referenced both the 1993 Memo and the 2007 Memo, "[p]recedent for this approach is clear." (*Id.* at 1.) The

---

[6] Available at:
https://www.ice.gov/doclib/foia/policy/10029_EnforcementActionsSchool_12.26.2007.pdf.
[7] Available at: https://www.aila.org/aila-files/66F1AEF1-A758-4979-9B52-40FEC0A344B0/10102632.pdf.

2008 Memo reinforced that "ICE policies are in place to ensure that our personnel conduct enforcement operations in a manner that is safe and respectful of all persons" and that "ICE views these actions with particular sensitivity." (*Id.*) The 2008 Memo did not purport to rescind or supersede the 1993 Memo or 2007 Memo.

25.    On October 24, 2011, John Morton, Director of ICE, issued a memorandum titled "Enforcement Actions at or Focused on Sensitive Locations" (the "2011 Memo"), which superseded "all prior agency policy on this subject," including the 2008 Memo, 2007 Memo, and 1997 Memo. (*See* Memorandum from John Morton, (Oct. 24, 2011), attached as Exhibit 7.)[8] The 2011 Memo set forth a policy that ICE enforcement actions would not occur at "sensitive locations such as schools and churches unless (a) exigent circumstances exist, (b) other law enforcement actions have led officers to a sensitive location as described [in the 2011 Memo], or (c) prior approval is obtained." (*Id.* at 1.)[9] The 2011 Memo covered arrests, interviews, searches, and surveillance at a non-exhaustive list of locations, including schools, hospitals, institutions of worship, sites of a funeral, wedding, or other public religious ceremony, and sites during the occurrence of a public demonstration. (*Id.* at 2.) In addition, the 2011 Memo specifically cautioned that "extra care" should be taken when "assessing

_____

[8] Available at: https://www.ice.gov/doclib/ero-outreach/pdf/10029.2-policy.pdf.
[9] Specifically, the 2011 Memo set out (1) a general rule that any planned enforcement at or focused on a sensitive location "must have prior approval" from agency leaders; and (2) limited exceptions to this general rule for certain categories of "exigent circumstances., *i.e.*, enforcement actions that involved: "a national security or terrorism matter;" "an imminent risk of death, violence or physical harm to any person or property;" "the immediate arrest or pursuit of a dangerous felon, terrorist suspect, or any other induvial(s) that present an imminent danger to public safety;" or "an imminent risk of destruction of evidence material to an ongoing criminal case." *Id.* at 2-3.

whether a planned enforcement action could reasonably be viewed as causing

significant disruption to the normal operations of a sensitive location." (*Id.*)

26.     On October 27, 2021, Alejandro Mayorkas, Secretary of DHS, issued a

memorandum entitled "Guidelines for Enforcement Actions in or Near Protected Areas"

(the "2021 Memo"), which superseded and rescinded the 2011 Memo. (*See generally*

Ex. 1.) The 2021 Memo provided "guidance for ICE and CBP enforcement action in or

near areas that require special protection." (*Id.* at 1.) The 2021 Memo set forth what it

described as a "fundamental" and "bedrock" principle: that DHS and its component

agencies "can accomplish [their] enforcement mission without denying or limiting

individuals' access to needed medical care, children access to their schools, the

displaced access to food and shelter, people of faith access to their places of worship,

and more." (Exhibit 1 at 2.) Accordingly, the 2021 Memo stated: "[t]o the fullest extent

possible, [DHS and its component agencies] should not take an enforcement action in

or near a location that would restrain people's access to essential services or

engagement in essential activities." (*Id.*) The 2021 Memo explicitly listed schools as an

example of such a location, as well as "place[s] where children gather, such as a . . .

school bus stop." (*Id.* at 2-3.)[10]

---

[10] Like the 2011 Memo, the 2021 Memo was subject to exceptions, recognizing certain "limited circumstances under which an enforcement action needs to be taken in or near a protected area." *Id.* at 3. Examples of such "limited circumstances" included enforcement actions that involved: a national security threat, an imminent risk of death, violence, or physical harm to a person, the hot pursuit of an individual who poses a public safety threat, the hot pursuit of a personally observed border-crosser, an imminent risk that evidence material to a criminal case will be destroyed, and circumstances where a safe alternative location does not exist. *Id.* at 3-4. Absent such

27.     In sum, the 2021 Memo, like those before it, placed mandatory procedural (prior approval) or situational (well-defined exigent circumstances) limitations on an agent's or officer's ability to conduct an immigration enforcement action on school properties. According to an August 8, 2023, Fact Sheet published by DHS,[11] violations of the policy set forth in the 2021 Memo could be reported through a complaint directed towards ICE, CBP, the DHS Office of the Inspector General, and/or DHS's Office for Civil Rights and Civil Liberties. (*See* U.S. Immigration and Customs Enforcement Fact Sheet, *Protected Areas Enforcement Actions* (Aug. 8, 2023), attached as Exhibit 8, at 3.)

28.     The Protected Areas Policy enshrines a "bedrock" principle that, absent prior approval or exigent circumstances, schools could proceed with their mission of educating and providing services for all students—regardless of their immigration status—without those students or their family members being arrested on school grounds for immigration violations.

29.     The Protected Areas Policy worked. Instead of the systemic practice of intimidation towards students recounted by the court in *Murillo v. Musegades*, 809 F. Supp. 487, INS and CBP conducted notably few immigration enforcement activities on school grounds. According to a 2022 report to Congress,[12] under the Protected Areas

---

"exigent circumstances," an agent or officer was required to seek prior approval from their agency's headquarters (or their delegee) prior to taking any enforcement action in or near a protected area. *Id.* at 4.

[11] Available at: https://www.ice.gov/factsheets/protected-areas-courthouse-arrests.

[12] Available at: https://www.dhs.gov/sites/default/files/2022-06/ICE%20-%20Immigration%20Enforcement%20at%20Sensitive%20Locations.pdf. From

Policy, as set forth in the 2011 Memo and 2021 Memo, ICE conducted an "extremely limited number of enforcement actions . . . at sensitive locations[.]" (U.S. Immigration and Customs Enforcement, *Immigration Enforcement at Sensitive Locations,* Fiscal Year 2020 Report to Congress (Apr. 18, 2022) at 2, excerpts attached as Exhibit 9.) Specifically, ICE data from October 1, 2018, through October 31, 2020 reflects that ICE conducted only two Enforcement and Removal Operations arrests at a school nationwide. (*Id.* at 48-49.) During that same period, ICE only conducted eighteen Enforcement and Removal Operations arrests near a school. (*Id.*)

30.    For decades, DPS, its students, and their families have relied on this Protected Areas Policy to provide education and services for their students.

31.    Against this stable backdrop of security on school grounds, DPS solidified its own protections for children attending its schools by passing policies prohibiting the collection of information relating to student immigration status and placing specific guidelines on DPS employees relating to requests for interviews from immigration officials.

### B.    The Protected Areas Policy Rescission

32.    On January 21, 2025, Fox News reported that it had reviewed a draft of a DHS memorandum rescinding the 2021 Memo. (*See* Ex. 2.)

33.    Later that same day, a press release (the "January 21 Press Release") appeared on DHS's official website stating that Acting DHS Secretary Benjamine

_____

October 1, 2017 through October 31, 2020, nationwide, there were twenty-two ICE Homeland Security Investigation Arrests at schools and universities. (*See* Table 2 at 49-51.)

Huffman had, on January 20, 2025, issued a "directive" that "rescinds the Biden

Administration's guidelines for [ICE] and [CBP] enforcement actions that thwart law

enforcement in or near so-called 'sensitive' areas." (*See* January 21 Press Release, Ex.

3.)

34.    The January 21 Press Release contained the following "statement

attributable to a DHS Spokesperson":

> This action empowers the brave men and women in CBP and ICE
> to enforce our immigration laws and catch criminal aliens—
> including murders [*sic*] and rapists—who have illegally come into
> our country. Criminals will no longer be able to hide in America's
> schools and churches to avoid arrest. The Trump Administration
> will not tie the hands of our brave law enforcement, and instead
> trusts them to use common sense.

(*See* January 21 Press Release, Ex. 3.)

35.    On or around January 21, 2025, Caleb Vitello, the Acting Director of ICE

("Vitello"), explicitly confirmed the existence of a memo relating to the Protected Areas

Policy and the 2021 Memo. (*See* Memorandum from Caleb Vitello, Acting Director of

U.S. Immigration and Customers Enforcement, *Interim Guidance: Civil Immigration

Enforcement Actions in or near Courthouses* (Jan. 21, 2025), attached as Exhibit 10.)[13]

Specifically, a memorandum issued by Vitello entitled "Interim Guidance: Civil

Immigration Enforcement Actions in or near Courthouses" referenced a "Memorandum

from the Acting Secretary of Homeland Security Benjamine Huffman, *Enforcement

Actions in or Near Protected Areas* (Jan. 20, 2025)" ("Huffman Memo") and noted that

---

[13] Available at: https://www.ice.gov/doclib/foia/policy/11072.3_CivilImmEnfActions
Courthouses_01.21.2025.pdf.

"[t]he Acting Secretary's Memorandum also supersedes and rescinds Alejandro Mayorkas's October 27, 2021 memorandum entitled, Guidelines for Enforcement Action in or Near Protected Areas." (*Id.* at 1.)

36.     DPS is aware that on February 5, 2025, in a lawsuit captioned *Philadelphia Yearly Meeting of the Religious Society of Friends et al. v. United States Department of Homeland Security et al.*, No. 8:25-cv-00243, pending in the United States District Court for the District of Maryland ("Maryland Lawsuit"), the plaintiffs attached a copy of the Huffman Memo to their amended complaint.

37.     The Huffman Memo articulates little more than the January 21 Press Release. Instead, the Huffman Memo addresses enforcement actions in or near areas that DHS "previously determined require special protection." (Huffman Memo, attached as Exhibit 11, at 1.) Rescinding the 2021 Memo "effective immediately," the Huffman Memo offers only the following as explanation and reasoning:

> Our brave men and women in uniform put their lives on the line every day to advance the rule of law and keep our people safe. As a part of that work, officers frequently apply enforcement discretion to balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive location.
>
> Going forward, law enforcement officers should continue to use that discretion along with a healthy dose of common sense. It is not necessary, however, for the head of the agency to create bright line rules regarding where our immigration laws are permitted to be enforced. The Director of ICE and the Commissioner of CBP may wish to issue further guidance to assist officers in exercising appropriate enforcement discretion.

(*Id.*)

38.     In addition, and in response to the Maryland Lawsuit's plaintiffs' motion for
a temporary restraining order and preliminary injunction, the defendants in the Maryland
Lawsuit attached a copy of another memo—a January 31, 2025, memo from Vitello
titled "Common Sense Enforcement Actions in or Near Protected Areas" ("Vitello
Memo") and together with the Huffman Memo, and the January 21 Press Release,
"2025 Policy"). (*See generally* Vitello Memo, attached as Exhibit 12, at 1.)

39.     The Vitello Memo echoes the Huffman Memo. It notes that the Huffman
Memo "acknowledges the ability of [DHS] law enforcement personnel to apply
enforcement discretion to balance a variety of interests, including the degree to which
law enforcement actions occur in protected areas," that DHS "will not be issuing bright-
line rules regarding where immigration laws are permitted to be exercised," and that
DHS has instead authorized ICE and CBP to issue further guidance. (*Id.* at 2.)

40.     As that "guidance," the Vitello Memo states that Vitello "ha[s] great faith in
the judgment of our law enforcement personnel and, accordingly, charge[s] Assistant
Field Office Directors (AFODs) and Assistant Special Agents in Charge (ASACs) with
responsibility for making case-by-case determinations regarding whether, where, and
when to conduct an immigration enforcement action in or near a protected area." (*Id.* at
3.)[14]

---

[14] The Vitello Memo does offer one additional piece of guidance for enforcement action
"at a site where a public demonstration is underway," in which case "AFODs and
ASACs must consult with local Office of the Principal Legal Advisor leadership for
guidance on constitutional considerations." (Vitello Memo, Ex. 12 at 3.)

41.     The 2025 Policy contains no further rationale for rescinding the 2021 Memo.

42.     The 2025 Policy does not discuss any facts or data relevant to the decision to maintain or remove protections for schools.

43.     The 2025 Policy does not consider schools' or students' reliance interests in school grounds remaining protected areas.

44.     The 2025 Policy makes no rational connection between established facts and the decision to rescind the Protected Areas Policy.

45.     Specifically, the only reasoning provided for rescinding the Protected Areas Policy is that "[c]riminals," specifically "murders [*sic*] and rapists," are successfully "hid[ing] in America's schools . . . to avoid arrest" and that "officers frequently apply enforcement discretion to balance a variety of interests." (*See* January 21 Press Release, Ex. 3; Huffman Memo, Ex. 11 at 1. *See also* Vitello Memo, Ex. 12 at 1.)

46.     The January 21 Press Release offers no factual support, analysis, or evidence for its assertion that there are "murders [*sic*] and rapists" "hid[ing] in America's schools."

47.     Furthermore, even if facts and data supported the purported rationale, the January 21 Press Release does not address why this assertion is grounds for rescinding the Protected Areas Policy generally, and the 2021 Memo specifically, when every iteration of the Protected Areas Policy has contained grounds for initiating enforcement actions on school grounds under such exigent circumstances as a rapist or murderer hiding on school grounds.

48.     The same can be said for the Huffman and Vitello Memos: that immigration officers "frequently apply enforcement discretion" does not provide a rationale for rescinding the Protected Areas Policy or the decades-long history of considering schools to be a "sensitive" area where—except in certain situations (where the officers could exercise some discretion)—immigration enforcement actions were to be avoided "to the fullest extent possible" because it is a "fundamental" principle that the government "can accomplish [its] enforcement mission without denying or limiting . . . children access to their schools." (2021 Memo, Ex. 1 at 2.)

49.     The 2025 Policy does not provide a policy to replace the 2021 Memo, aside from an unsupported assertion about criminals hiding in school and general statements about discretion.

50.     The 2025 Policy was a final agency action that occurred entirely behind closed doors.

51.     DHS did not initially publish or otherwise publicly released the Huffman or Vitello Memos. The undersigned counsel located the memos as attached filings in a lawsuit in another state. DHS counsel apparently provided the memos in that matter.

**C.     DPS's Services and Operations**

52.     DPS hosts a diverse student body, reflecting a cross-section of the City of Denver's community. As of the 2023-2024 school year, over 200 languages are spoken by DPS students and families, over 40% of students speak another language at home, and 51.8% of DPS students were Hispanic/Latinx. (*See* Denver Public Schools, *Annual*

*District Report Strategic Roadmap Update 2023-24* (last visited Feb. 11, 2025),

excerpts attached as Exhibit 13, pg. 2, 3.) [15]

53.    The City of Denver has seen a significant influx in migrant arrivals

recently. Since January 2023, the City of Denver estimates that it has welcomed nearly

43,000 migrants arriving from the U.S. southern border. (*See* Denver Mile High City,

*Newcomer and Migrant Support* (last visited Feb. 11, 2025).) [16]

54.    These new arrivals include many families with school-aged children.

55.    It is estimated that during the 2023-2024 school year, approximately 4,000

immigrant students attended DPS schools. (Jessica Seaman, *Colorado's public school*

*enrollment to fall, but immigrant students are helping fill classrooms*, THE DENVER POST

(Jan. 16, 2025, 12:41 PM), attached Exhibit 14.) [17] 80% of the students who finished the

school year returned in the fall for the 2024-2025 school year. (*Id.*)

56.    Other non-citizens who lack immigration documents or legal authorization

to be present in the United States have resided in Denver for longer. Many such

individuals have families and children.

---

[15] Available at: https://issuu.com/dpscommunications/docs/2024_roadmap_report_
final_web?fr=sMzQ3YTY0MDIxMjk.

[16] Available at: https://www.denvergov.org/Community/Assistance-Programs/
Newcomer-and-Migrant-Support/Media-Dashboard.

[17] Available at: https://www.denverpost.com/2025/01/15/colorado-public-school-
enrollment-2024/. *See also* Rachel Krause, *DPS reflects on welcoming thousands of*
*migrant students, begins preps for next school year*, 9NEWS (Jun. 3, 2024, 10:41 PM),
https://www.9news.com/article/news/education/school-year-denver-public-schools-
summer-4700-migrant-students/73-552597ce-b8e5-42e7-a9bb-4fe1efb3a3a2.

57.    DPS is legally obligated to enroll students regardless of their immigration status, and DPS affirmatively welcomes all students. (Denver Public Schools, *Denver Public Schools is a Safe and Welcoming School District* (last visited Feb. 11, 2025).)[18]

58.    DPS does not ask for students' immigration status when they enroll.

59.    However, on information and belief, some of these new-to-country students, as well as other students who have been enrolled in DPS schools for a longer period of time, lack legal authorization to be present in the United States, or have a family member or guardian who lacks legal authorization to be present in the United States.

60.    Under immigration enforcement guidance in place since 1993, these students would have attended DPS schools without fear or concern of immigration enforcement actions being taken against them or their family members while on DPS school grounds.

61.    During this time, DPS pursued its mission of providing quality education for all children residing within its district boundary. In pursuing its mission, DPS relied upon the Protected Areas Policy.

62.    In addition to providing education to all its students, DPS provided basic resources to all of its students. For example, during the 2023-2024 school year, DPS provided free lunches and breakfasts without regard to a student's immigration status.

---

[18] Available at: https://www.dpsk12.org/page/safe-and-welcoming-school-district/.

63.    Since the announcement of the 2025 Policy, school attendance has decreased noticeably across all DPS schools, particularly those schools in areas with new-to-country families and where ICE raids have already occurred.

64.    DPS is hindered in fulfilling its mission of providing education and life services to the students who are refraining from attending DPS schools for fear of immigration enforcement actions occurring on DPS school grounds.

65.    In addition, DPS has been forced to divert resources from its educational mission to prepare for immigration arrests on DPS school grounds.

66.    DPS has therefore spent significant time and resources implementing policies ensuring student safety and training staff and faculty to effectively respond to encounters with individuals claiming to be conducting immigration enforcement activities on school grounds.

67.    Since the enactment of the 2025 Policy, DPS has also been forced to use resources to respond to false reports of ICE activities at schools.

68.    In light of DPS's mission to provide equal education for all students within the district boundary regardless of immigration status, DPS has additionally expended resources towards community outreach programs to ensure children and family members still feel safe and welcome at DPS schools.

69.    Finally, the 2025 Policy constitutes a clear threat to DPS's stability. DPS's funding is calculated based primarily on a pupil count. The fear of immigration enforcement actions occurring at DPS Schools is leading to irregular and unpredictable attendance, which impacts DPS's available funds and ability to accurately plan.

70.     Due to the 2025 Policy, DPS has suffered and will continue to suffer irreparable harm.

### CLAIM ONE
### (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A))

71.     DPS incorporates by reference each of the paragraphs in this Complaint as if restated fully herein.

72.     The Administrative Procedure Act ("APA") provides that federal courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

73.     The 2025 Policy is governed by the APA, as it constitutes an agency action pursuant to 5 U.S.C. § 551(13) and constitutes a rule making pursuant to 5 U.S.C. § 551(5).

74.     The 2025 Policy constitutes final agency action in that it (i) "mark[s] the consummation of the agency's decisionmaking process," and (ii) is an action "by which rights or obligations have been determined", or from which "legal consequences will flow." *See United States Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (internal quotations omitted).

75.     "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). This central requirement demands that where an agency changes an existing policy, it must "display awareness that it is changing position," and demonstrate that "there are good reasons for the new policy." *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009). Agencies must "examine the relevant data and articulate a satisfactory

explanation for [their] actions." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

76.     When an agency "rescinds a prior policy its reasoned analysis must consider the alternatives that are within the ambit of the existing policy." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (internal citations and quotations omitted).

77.     The 2025 Policy is arbitrary and capricious for various reasons, including but not limited to:

(a)     Defendants failed to provide "good reasons for the new policy," let alone a "satisfactory explanation." *See Encino Motorcars*, 579 U.S. at 221; *Fox TV Stations*, 556 U.S. at 515; *State Farm*, 463 U.S. at 43.

(b)     Defendants failed to account for, much less adequately consider and address, the wide variety of costs and harms the rescission of the Protected Areas Policy will impose on DPS personnel, the DPS student population, and their families, or the likelihood that rescinding the Protected Areas Policy will negatively impact the community by chilling school attendance and the use of school resources.

(c)     Defendants failed to consider the option to retain the Protected Areas Policy, which would avoid enforcement actions in protected areas to the fullest extent possible, while nevertheless allowing for enforcement actions to combat public safety threats in exigent circumstances.

(d)     Defendants failed to address legitimate reliance on the Protected Area Policy. *See Smiley v. Citibank (s.D.), N.A*, 517 U.S. 735, 742 (1996). DHS is

obligated to consider the "existence and strength [of such reliance interests] . . . and weigh them against competing policy concerns." *Regents*, 591 U.S. at 5.

78.     The 2025 Policy and DHS's rescission of the 2021 Memo is arbitrary and capricious and otherwise not in accordance with the law and therefore should be held invalid and set aside under the APA.

## **PRAYER FOR RELIEF**

79.     Plaintiff respectfully requests that this Court:

(a)     Enjoin and vacate the 2025 Policy.

(b)     Enjoin DHS and its constituent agencies from implementing, enforcing, or acting pursuant to the 2025 Policy on both a preliminary and permanent basis;

(c)     Award Plaintiff's costs of suit, attorneys' fees, and expenses to the greatest extent authorized by all applicable laws;

(d)     Other such relief as the Court deems proper and necessary.

Dated:  April 15, 2025

*s/ Emily L. Wasserman*
Tess Hand-Bender, Esq.
Emily L. Wasserman, Esq.
Claire E. Mueller, Esq.
Brooke Rogers, Esq.
Stephen A. Snow, Esq.
Nicholas Moskevich, Esq.
Hannay McCrory, Esq.
DAVIS GRAHAM & STUBBS LLP
3400 Walnut Street, Suite 700
Denver, Colorado 80205
Telephone: 303.892.9400
Facsimile:  303.893.1379
tess.hand-bender@davisgraham.com
emily.wasserman@davisgraham.com
claire.mueller@davisgraham.com
brooke.rogers@davisgraham.com
stephen.snow@davisgraham.com
nick.moskevich@davisgraham.com
hannah.mccrory@davisgraham.com

*Attorneys for Plaintiff Denver Public
Schools*