IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-00474-DDD-KAS

DENVER PUBLIC SCHOOLS,

    Plaintiff,

v.

KRISTI NOEM, in her official capacity as Secretary of the United States Department of Homeland Security, and
DEPARTMENT OF HOMELAND SECURITY,

    Defendants.

---

**DEFENDANTS' MOTION TO DISMISS PURSUANT TO
FED. R. CIV. P. 12(b)(1) AND 12(b)(6)**

---

Defendants move to dismiss the Amended Complaint, Doc. 46, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) on the grounds that: (1) Denver Public Schools ("DPS") lacks Article III standing; (2) DPS does not plausibly allege a final agency action reviewable under the Administrative Procedure Act ("APA"); (3) internal guidance to immigration enforcement officers is committed to agency discretion by law; and (4) DPS fails to state a claim.[1]

## BACKGROUND

DPS challenges internal guidance provided by the Department of Homeland Security ("DHS") to its component agencies about immigration enforcement actions in or near "protected areas," including schools. *See generally* Doc. 46. From October 2021 to early 2025, such

---

[1] Counsel for the parties conferred about this motion via videoconference, per DDD Civ. P.S. III(D)(1). This motion is opposed.

enforcement was guided by an internal DHS memo, which stated that enforcement actions in protected areas should be avoided to "the fullest extent possible," but allowed action "to be taken in or near a protected area" in exigent circumstances or, "[a]bsent exigent circumstances," with higher-level approval.  Doc. 1-1 at 3-5 (the "2021 Guidance").[2]  The 2021 Guidance advised officers that "the exercise of judgment is required."  *Id.* at 5.  It did "not limit an agency's or employee's statutory authority" to conduct enforcement actions and was "not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter."  *Id.* at 5-6.

On January 20, 2025, then-Acting Secretary of Homeland Security Benjamine Huffman issued superseding guidance: "Going forward, law enforcement officers should continue to use … discretion along with a healthy dose of common sense" when contemplating enforcement actions in or near protected areas.  Doc. 1-11 at 2 (the "Huffman Memo").  The Huffman Memo added:  "It is not necessary" for DHS "to create bright line rules regarding where our immigration laws are permitted to be enforced," but DHS components could issue further guidance about "exercising appropriate enforcement discretion."  *Id.*  Then-Acting Director of U.S. Immigration and Customs Enforcement ("ICE") Caleb Vitello issued his own memo soon thereafter.  Doc. 1-12 at 2 (the "Vitello Memo," together with the Huffman Memo, the "2025 Guidance").  The Vitello Memo continued to recognize schools as "protected areas," *id.* at 2 n.1,

---

[2]  The Amended Complaint refers to exhibits but does not attach any.  Defendants reference the exhibits from the original complaint, as DPS appears to do.  Regardless, the Court may consider the contents of the memos because they are incorporated into the Amended Complaint and because they are referred to in and central to the Amended Complaint.  *See Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1275 (10th Cir. 2023).  The memos are also publicly available government documents subject to judicial notice.  *Id.*; Fed. R. Evid. 201(b)(2).

2

and gave regional supervisors "responsibility for making case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action in or near a protected area." *Id.* at 3. Both the Huffman and Vitello Memos disclaimed that the guidance created or intended to create any right or benefit enforceable by any person against the United States. *Id.*; Doc. 1-11 at 2.

DPS alleges that, under the 2021 Guidance, students who lacked legal authorization to be present in the United States "would have attended DPS schools without fear or concern of immigration enforcement actions." Doc. 46 ¶60. Since the issuance of the 2025 Guidance, however, attendance has decreased, hindering DPS's provision of services to absent students who "fear ... immigration enforcement actions occurring on DPS school grounds." *Id.* ¶¶63-64. Attendance has dropped "noticeably" in areas "where ICE raids have already occurred" in the community, not on school grounds. *Id.* ¶63. DPS has diverted resources to prepare for possible immigration actions, train employees, respond to "false reports" of ICE activities at schools, and conduct community outreach. *Id.* ¶¶65-68. DPS alleges that the fear of immigration enforcement is leading to unpredictable attendance, which "impacts" DPS's funding and planning. *Id.* ¶69. DPS asserts that the 2025 Guidance violates the APA. *Id.* ¶¶71-78.

## ARGUMENT

**I.     The Court lacks jurisdiction over this action.**

The burden of establishing jurisdiction rests with the party asserting jurisdiction. *Kline v. Biles*, 861 F.3d 1177, 1180 (10th Cir. 2017). Attacks on subject-matter jurisdiction may take two different forms—a facial attack or a factual attack—which implicate different analytical frameworks. *See United States v. Rodriquez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001).

3

Here, Defendants' challenge is facial, *i.e.*, it questions the sufficiency of the Amended Complaint, not the facts as alleged.

### A.  DPS lacks standing.

Article III requires a plaintiff to "show that she has suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). Article III standing is jurisdictional. *Id.* at 56-57.

DPS claims that the 2025 Guidance is arbitrary and capricious under the APA. Doc. 46 ¶77. DPS alleges that it has been injured because the 2025 Guidance has caused a decline in attendance and forced it to divert resources to prepare for potential enforcement actions. *Id.* ¶¶63-69. Those alleged injuries, however, fail to satisfy both general standing requirements and those articulated by the Supreme Court for challenges to federal immigration enforcement guidance. Because DPS does not meet the requirements for standing, this Court lacks jurisdiction over this action.

### 1.  DPS does not allege that it has suffered a cognizable injury.

**No injury in fact.**  For purposes of standing, an injury must be "'concrete, particularized, and actual or imminent.'" *Murthy*, 603 U.S. at 57. A "realistic threat" of injury is not sufficient. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499-500 (2009) (cleaned up). The plaintiff must show a "future harm" that is "certainly impending." *Clapper*, 568 U.S. at 409, 416.

To show a "certainly impending" injury, a plaintiff cannot merely allege that government enforcement has been authorized, *id.* at 412, or that the threat of enforcement has caused

4

apprehensiveness or a chill.  *See Laird v. Tatum*, 408 U.S. 1, 13-14 (1972) ("chill" based on "apprehensiveness" that the government may in the future act wrongfully "in some way that would cause direct harm" to the plaintiff is not enough to show a "threat of specific future harm").  Additionally, a plaintiff generally cannot establish standing from the threat of enforcement of a government policy directed at others.  *See Clapper*, 568 U.S. at 419 (rejecting plaintiffs' argument that they could establish standing based on the alleged chilling effect of a policy when that policy "does not regulate, constrain, or compel any action on [the plaintiffs'] part").  Finally, a party generally cannot show that a future injury is "certainly impending" by pointing to "costly and burdensome measures" it has already taken to prepare for a risk, even if those measures were reasonable.  *Id.* at 415-16.

Under these standards, DPS lacks a "'concrete, particularized, and actual or imminent'" injury.  *Murthy*, 603 U.S. at 57.  DPS cannot show a certainly impending injury by pointing to the existence of guidance about immigration enforcement, the subjective apprehension of students or families related to potential immigration enforcement at DPS schools, or measures DPS has taken to prepare for potential immigration enforcement, however reasonable.  *See Mennonite Church USA v. DHS*, --- F. Supp. 3d ----, No. 25-cv-00403, 2025 WL 1094223, at *4-5 (D.D.C. Apr. 11, 2025) (denying a motion for a preliminary injunction to enjoin the 2025 Guidance because "the plaintiffs lack standing to assert a pre-enforcement challenge").

Even under an organizational standing theory, DPS fails to allege an organizational injury.  In *FDA v. Alliance for Hippocratic Medicine*, the Supreme Court clarified that standing does not exist just because "an organization diverts its resources in response to a defendant's actions."  602 U.S. 367, 395 (2024); *see also Mennonite Church*, 2025 WL 1094223, at *8

5

("incur[ring] costs" to protect members from "'hypothetical future harm'" by immigration officers is insufficient to establish standing). Rather, an organization has standing when the defendant's wrongful conduct has "directly affected and interfered with" the organization's core functions. *Hippocratic Medicine*, 602 U.S. at 395 (discussing *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)). Here, DPS alleges no *direct* interference by DHS with its activities. For example, it has not alleged any immigration enforcement actions have occurred at DPS schools or that the 2025 Guidance directly regulates DPS. Rather, DPS relies on a theory of *indirect* interference, pointing to the impact of students' concerns about potential enforcement at schools. But such indirect effects do not establish the kind of direct effect and interference needed under *Hippocratic Medicine*.

**No legally cognizable injury.** DPS alleges that it has been injured by DHS's immigration enforcement guidance. But in *United States v. Texas*, 599 U.S. 670 (2023), the Supreme Court held that states lacked standing to challenge the Executive Branch's decision "to alter its arrest policy so as to make more arrests." *Id.* at 674. The Court explained that only certain injuries have been traditionally recognized as "'judicially cognizable'" in that they were "'traditionally thought to be capable of resolution through the judicial process.'" *Id.* at 676. Because the Executive Branch has long had discretion as to how it enforces the law, it "possesses authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'" *Id.* at 678. "That principle of enforcement discretion over arrests and prosecutions extends to the immigration context, where the Court has stressed that the Executive's enforcement discretion implicates not only 'normal domestic law enforcement priorities' but also 'foreign-policy objectives.'" *Id.* at 679. Given that enforcement discretion,

the Court held that the states could not assert a cognizable injury from federal immigration enforcement policies.

Applying the same reasoning here, DPS lacks standing to challenge DHS's 2025 Guidance, which expresses the agency's internal approach to immigration enforcement. Like the non-enforcement decisions in *Texas*, the 2025 Guidance informs how to exercise DHS's unquestioned authority and discretion in immigration enforcement, which is not traditionally thought to be capable of resolution through the judicial process. DPS, like the states in *Texas*, lacks standing to challenge that guidance.

### 2. DPS does not allege an injury traceable to the 2025 Guidance.

To establish standing, a plaintiff also must show that its injury is being caused by the specific wrongful conduct that it challenges. *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (requiring "'*de facto* causality'").

"[W]here a causal relation between injury and challenged action depends upon the decision of an independent third party, ... standing is not precluded, but it is ordinarily substantially more difficult to establish." *California v. Texas*, 593 U.S. 659, 675 (2021) (cleaned up). And where, as here, the causal link depends specifically on the subjective fears of third parties, the link may not be sufficient. For example, in *Clapper*, the plaintiffs claimed that their foreign contacts "might be disinclined to speak with them due to a fear of surveillance," but the Court held that this was not an injury "fairly traceable" to the government because it "was based on third parties' subjective fear of surveillance." 568 U.S. at 417 n.7. Even if a plaintiff can show that the injury is based on the predictable actions of third parties, the plaintiff cannot rely

on risks that are too attenuated: "[t]he causation requirement also rules out attenuated links," including "distant (even if predictable) ripple effects." *Hippocratic Medicine*, 602 U.S. at 383.

Here, DPS fails to allege an injury caused by and traceable to the 2025 Guidance. Instead, DPS's claimed injuries arise from the apprehension of students and parents confronted with the potential for future immigration enforcement. Doc. 46 ¶¶4, 63-64, 69.

First, DPS does not allege that DHS actually caused the drop in attendance. Rather, its allegations suggest that any drop is the result of fears among students and parents, not any actual enforcement actions by DHS at DPS schools. *Id.* ¶¶63, 69 (describing community reaction to enforcement actions elsewhere in the area or fear of future actions at schools). In addition, DPS's allegation that students would previously have attended DPS schools without fear of immigration enforcement actions, *id.* ¶60, reflects an inaccurate understanding of the 2021 Guidance, *i.e.*, that immigration enforcement at schools had been prohibited under the 2021 Guidance, *see* Doc. 1-1 at 4-5; Doc. 46 ¶47 ("every iteration" of protected-area guidance "has contained grounds for initiating enforcement actions on school grounds" under certain circumstances).

Second, the causal link is too attenuated to satisfy this element. Large public institutions like DPS can be affected by all manner of federal decisions or policies, including immigration. But in *Hippocratic Medicine*, the Supreme Court signaled that it would decline to rule that effects of federal immigration policy on public school attendance gives standing to educators to challenge immigration policy. 602 U.S. at 392. Because that same logic applies here, DPS's causal theory fails to establish standing. *See Mennonite Church*, 2025 WL 1094223, at *6

8

(holding that the plaintiffs failed to show substantial evidence tying the rescission of the 2021 Guidance to a drop in religious attendance).

### 3. DPS's alleged injury is not redressable.

A plaintiff also must show that its injury is "'redressable by a favorable ruling.'" *Murthy*, 603 U.S. at 57. But DPS has not plausibly alleged that the relief it seeks—vacating the 2025 Guidance and barring enforcement under it—would remedy its injury, and Congress has barred lower courts from granting at least some of DPS's requested relief.

DPS does not plausibly allege that its "injury likely would be redressed by the requested judicial relief." *Hippocratic Medicine*, 602 U.S. at 380. DPS claims that the 2025 Guidance has caused a decline in attendance and forced DPS to divert resources. But an order from this Court enjoining and vacating the 2025 Guidance would not remedy DPS's attendance concerns or avoid the diversion of DPS resources.

First, DHS's 2021 Guidance neither prohibited immigration enforcement actions in or near schools nor limited such actions to exigent circumstances. Enforcement actions were still permitted so long as higher-level approval was granted. Doc. 1-1 at 4-5 ("Absent exigent circumstances, an Agent or Officer must seek prior approval ...."). Thus, even if DPS obtained the relief it seeks and DHS followed the 2021 Guidance, that relief would not prevent immigration enforcement actions on school grounds.

Second, DPS does not plausibly plead that the relief it seeks would remedy its attendance and resource concerns. In particular, a court order would not control the actions—let alone the subjective concerns—of third parties like DPS students and parents. When the injury involves the actions of third parties, an injunction may "not give [the plaintiff] legally enforceable

9

protection" from the harm. *Haaland v. Brackeen*, 599 U.S. 255, 293 (2023). If redress of the injury would involve "'unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict,'" the plaintiff must show that those choices by third parties "will be made in such manner as to ... permit redressability of injury." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992). "[W]hen the plaintiff is not himself the object of the government action ... he challenges, standing ... is ordinarily 'substantially more difficult' to establish." *Id.*

DPS does not meet this heavier burden. It is speculative to assume that the subjective concerns of students about future immigration enforcement would be assuaged by an order enjoining actions under the 2025 Guidance and requiring DHS to operate under the 2021 Guidance, which would still permit enforcement actions at schools. Given these uncertainties, DPS fails to allege that the order it seeks would redress the injuries that it claims support standing. *See Mennonite Church*, 2025 WL 1094223, at *7 (reverting to the 2021 Guidance "would not mitigate the risks cited by congregants of leaving their homes generally, or of traveling to or from religious services").

Third, redressability of DPS's alleged injury is further hampered by 8 U.S.C. § 1252(f)(1), which "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022). Section 1252(f)(1) provides that, except in a case brought by "an individual alien" in removal proceedings, "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter." Part IV of the

10

subchapter includes 8 U.S.C. §§ 1221-1231, which "charge the Federal Government with the implementation and enforcement of the immigration laws governing the inspection, apprehension, examination, and removal of aliens." *Garland*, 596 U.S. at 549-50. Because a court could not enjoin, for example, arrests under 8 U.S.C. § 1226(a), DPS's requested relief would not guarantee that enforcement actions would not occur at schools, even if DHS otherwise returned to the 2021 Guidance. Consequently, any injunction would not redress students' alleged fears about possible future immigration enforcement. For these reasons, DPS does not plausibly allege that a court order would redress its alleged injury.

**B.     DPS's APA claim has other jurisdictional defects.**

Even if DPS had standing, the Court lacks jurisdiction under the APA because DPS does not identify a "final agency action" subject to judicial review, and DHS's internal guidance regarding its enforcement decisions is committed to agency discretion by law.

**1.     The challenged action is not final agency action subject to APA review.**

The APA defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). If the challenged action is not a final agency action, the Court lacks jurisdiction under the APA to review it. *See* 5 U.S.C. § 704; *Sinclair Wyo. Refin. Co. v. EPA*, 72 F.4th 1137, 1139 (10th Cir. 2023).

To be a final agency action, an action must satisfy two conditions: (1) "the action must mark the consummation of the agency's decisionmaking process," and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (cleaned up); *see also U.S. Army Corps of*

11

*Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (same). It is not enough to allege that "there may be practical consequences" flowing from agency action to establish that "legal consequences flow from the agency's conduct." *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 732 (D.C. Cir. 2003). To be reviewable, the agency action "must itself be the source of the parties' obligations, modifying the applicable legal landscape by interpreting the scope of their statutory rights or duties." *Sinclair*, 72 F.4th at 1143 (cleaned up). Examples of direct "legal consequences" include an order exposing a party to double penalties in enforcement proceedings and limitations on obtaining a permit, *see Sackett v. EPA*, 566 U.S. 120, 126 (2012), or an opinion prescribing conditions that must be met to comply with environmental statutes, which "alter[ed] the legal regime," *see Bennett*, 520 U.S. at 158, 178.

Neither the 2021 Guidance, its recission, nor the 2025 Guidance has any direct legal consequences. *Cf. Ass'n of Flight Attendants-CWA v. Huerta*, 785 F.3d 710, 712-13 (D.C. Cir. 2015) ("an internal guidance document issued to FAA aviation safety inspectors" "does not carry the 'force and effect of law'" and therefore "does not reflect final agency action"); *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 753 F. Supp. 3d 817, 823-24, 827 (D.N.D. 2024) (internal guidance "about how an agency 'will exercise its broad enforcement discretion' does not alter existing legal obligations"). The memos did not create any affirmative legal protections enforceable by any individuals, schools, or third parties against the government; they expressly disclaimed such legal effect. *See* Doc. 1-1 at 6; Doc. 1-11 at 2; Doc. 1-12 at 3. They created no safe harbor, no pathway for schools to ensure that enforcement actions would not happen at schools. They imposed "no obligations, prohibitions, or restrictions" on individuals or entities. *Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020).

They did not interpret the law; they do not cite Title 8 of the United States Code or implementing regulations. They did not determine any rights or obligations of any party. They neither required nor prohibited enforcement actions at schools. They did not withdraw immigration enforcement officers' discretion; rather, they *required* the exercise of "judgment" and provided only general guidance about how to exercise that "discretion" when making enforcement decisions related to protected areas. *See* Doc. 1-1 at 4-5; Doc. 1-11 at 2; Doc. 1-12 at 2-3. And the memos all anticipate future enforcement decisions by officers in specific cases, divorcing the memos themselves from direct legal consequences.

DPS alleges only indirect and practical, not legal, consequences flowing from the memos to DPS. *See* Doc. 46 ¶¶63-69. But practical consequences are insufficient to show a final agency action. *See Reliable*, 324 F.3d at 732. And the mere potential for later agency action that may affect (third parties') legal rights does not presently give rise to final agency action. *See Potash Ass'n of N.M. v. U.S. Dep't of the Interior*, 367 F. App'x 960, 966 (10th Cir. 2010) (finding no final agency action where the action affected the plaintiff's legal rights only "'on the contingency of future administrative action'").

Because DPS does not plausibly allege that legal consequences directly flow from the 2021 or 2025 Guidance, DPS does not plausibly allege a reviewable final agency action. *See Sinclair*, 72 F.4th at 1139.

### 2. Enforcement decisions are committed to agency discretion by law.

The APA claim also fails because internal approaches to immigration enforcement are committed to agency discretion by law. The APA bars judicial review of agency action that "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Agency action may be deemed

13

committed to agency discretion "even where Congress has not affirmatively precluded review." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Where "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion"—where, effectively, "'there is no law to apply'"—the APA bars judicial review. *Id.* The Tenth Circuit has described this defense as jurisdictional.[3] *See Tsegay v. Ashcroft*, 386 F.3d 1347, 1354, 1356 (10th Cir. 2004) ("committed to agency discretion" is one of two "exceptions" to the APA's "general grant of jurisdiction").

To determine if a matter is committed to agency discretion, courts analyze the statutory scheme to determine if it provides an adequate standard of review. *Heckler*, 470 U.S. at 835. "Congress may limit an agency's exercise of enforcement power if it wishes," but only when Congress "has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion," is there "'law to apply' under § 701(a)(2)." *Id.* at 833-34. Decisions are "general[ly] unsuitabl[e]" for judicial review when they require "a complicated balancing of a number of factors which are peculiarly within [agency] expertise" or involve how best to spend "agency resources," including whether the agency "is likely to succeed if it acts" and "whether the particular enforcement action requested best fits the agency's overall policies." *Id.* at 831. "The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831-32.

---

[3]   Even if this defense is not jurisdictional, *see Wilkins v. United States*, 598 U.S. 152, 157 (2023) (procedural requirements are "jurisdictional only if Congress 'clearly states'" they are), it is still a threshold legal defense to the APA claim.

Courts also may consider whether, as a matter of tradition, action is committed to agency discretion. *See id.* at 832 ("such a decision has traditionally been 'committed to agency discretion,' and we believe that the Congress enacting the APA did not intend to alter that tradition"). Enforcement decisions traditionally involve considerable agency discretion. *See, e.g.*, *Texas*, 599 U.S. at 680 ("the Executive Branch must balance many factors when devising arrest and prosecution policies"); *JGE ex rel. Tasso v. United States*, 772 F. App'x 608, 612 (10th Cir. 2019) ("law enforcement decisions surrounding the investigation and prosecution of crimes ... involve the exercise of discretion"); *Redmond v. United States*, 518 F.2d 811, 816-17 (7th Cir. 1975) ("the Government has a duty to maintain law and order, but how best to fulfill this duty is wholly within the discretion of its officers").

Under these standards, DHS's adoption of the 2025 Guidance is committed to agency discretion. DPS does not explain what statute or regulation provides a meaningful standard for judicial review or what that standard is. Congress, through the Immigration and Nationality Act ("INA") and other statutes, has expressly granted DHS discretion to set "enforcement policies and priorities." 6 U.S.C. § 202(5) (making the Secretary of Homeland Security "responsible for ... [e]stablishing national immigration enforcement policies and priorities"); *see also Arizona v. United States*, 567 U.S. 387, 396 (2012) ("A principal feature of the" congressionally established "removal system is the broad discretion exercised by immigration officials."). Congress did not "limit [the] agency's exercise of enforcement power" "either by setting substantive priorities, or by otherwise circumscribing [the] agency's power to" conduct immigration enforcement actions in schools. *Heckler*, 470 U.S. at 833. The INA imposes few location-based restrictions on DHS's broad authority to investigate and make arrests. For example, the INA limits when

15

immigration officers may enter or search a farm or dwelling near the border *without* a warrant for specified purposes.  8 U.S.C. §§ 1357(a)(3), (e).  But aside from imposing warrant requirements in some circumstances, *see, e.g.*, *id.* § 1226(a), Congress provided no "law to apply" or any "meaningful standard," *Heckler*, 470 U.S. at 830, with respect to internal procedures governing location-based decisions to conduct enforcement actions, such as under what circumstances immigration officers may enter or approach schools.  Because Congress has circumscribed the Executive Branch's discretion only in limited ways, which do not affect or apply to schools, DHS's internal guidance on enforcement actions in or near protected areas is committed to agency discretion by law.[4]  The 2025 Guidance is not reviewable under the APA.

## II.     DPS fails to state a claim.

 "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss" under Rule 12(b)(6).  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

The APA claim is subject to dismissal because DPS cannot show that it falls within the zone of interests protected or regulated by the INA.  A "statutory cause of action extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014).  The zone-of-interests test asks whether a plaintiff "falls within the class of plaintiffs whom Congress has

---

[4] In *DHS v. Regents of the University of California*, 591 U.S. 1 (2020), the Supreme Court reviewed an APA claim challenging the rescission of the Deferred Action for Childhood Arrivals ("DACA") program, because DACA had "created a program for conferring affirmative immigration relief." *Id*. at 18.  Because DACA affirmatively bestowed benefits, including eligibility to request work authorization and for Social Security and Medicare, it was "more than a non-enforcement policy," and its rescission was not committed to agency discretion. *Id.* at 18-19.  Here, in contrast, the 2021 and 2025 Guidance are merely internal memos about under what circumstances certain enforcement actions generally will be approved in certain locations.

16

authorized to sue under" the relevant statute. *Id*. at 128.  This test forecloses suit when a plaintiff's interests are "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Id*. at 130 (cleaned up).

For an APA claim, the relevant zone of interests is defined by "the statutory provision whose violation forms the legal basis for his complaint," *not* the APA itself.  *Bennett*, 520 U.S. at 176 (cleaned up).  The zone of interests does not extend to "anyone who is marginally injured by [a statutory] violation," but is "limited to those whose interests Congress intended to protect." *In re Peeples*, 880 F.3d 1207, 1216 (10th Cir. 2018).  And the plaintiff itself must be within that protected zone of interests.  *See Moya v. DHS*, 975 F.3d 120, 131 (2nd Cir. 2020) (a plaintiff "must have more than a derivative interest in someone else's rights to satisfy the zone-of-interests test").

DPS cannot identify any provision of the INA indicating that Congress even arguably intended to protect schools from immigration enforcement actions.  As explained above, the INA provides limited protections against specified activities on farms or in dwellings near the border, 8 U.S.C. § 1357(a)(3), (e), but does not provide any protection for schools.  *Cf. Fed'n for Am. Immigr. Reform, Inc. v. Reno*, 93 F.3d 897, 899, 904 (D.C. Cir. 1996) (affirming the dismissal, under the zone-of-interests test, of a claim challenging a plan for paroling Cuban nationals where the plaintiff argued that the plan affected it through the "crowding [of] public schools").

To the extent DPS would claim that its educational interest is *consistent* with the INA, that interest is not sufficient.  Any interest DPS has in the provision of education to its students is, at best, only "marginally related to" the INA's provisions on immigration enforcement.

*Lexmark*, 572 U.S. at 130. Indeed, "'it cannot reasonably be assumed that,'" through the INA, "Congress authorized" an APA claim challenging DHS's immigration enforcement guidance based on an interest in providing education to students. *Id.* DPS fails to state a claim.

## CONCLUSION

The Court should dismiss this case for lack of jurisdiction and failure to state a claim.

Dated: April 29, 2025

J. BISHOP GREWELL
Acting United States Attorney

s/Thomas A. Isler
***Nicholas A. Deuschle***
***Thomas A. Isler***
***Katherine A. Ross***
Assistant United States Attorneys
United States Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
Telephone: (303) 454-0100
E-mail: nicholas.deuschle@usdoj.gov
E-mail: thomas.isler@usdoj.gov
E-mail: katherine.ross@usdoj.gov
*Counsel for Defendants*

I hereby certify that the foregoing pleading complies with the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(2), as enlarged by the Court's order, Doc. 51 (permitting up to 5,000 words).

s/Thomas A. Isler
***Thomas A. Isler***

## CERTIFICATE OF SERVICE

I certify that on April 29, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve all counsel of record, including:

Claire Eleanor Mueller, Esq.
Tess Hand-Bender, Esq.
Emily Lauren Wasserman, Esq.
Brooke M. Rogers, Esq.
Hannah McCrory, Esq.
Nicholas Moskevich, Esq.
Stephen A. Snow, Esq.
*Counsel for Plaintiff*

                                              s/Thomas A. Isler
                                              **Thomas A. Isler**